MORGAN, LEWIS & BOCKIUS LLP
Eric Meckley, Bar No. 168181
eric.meckley@morganlewis.com
Brian D. Berry, Bar No. 229893
brian.berry@morganlewis.com
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Tel:    +1.415.442.1000
Fax:   +1.415.442.1001

MORGAN, LEWIS & BOCKIUS LLP
Ashlee N. Cherry, Bar No. 312731
ashlee.cherry@morganlewis.com
1400 Page Mill Road
Palo Alto, CA 94304
Tel:    +1.650.843.4000
Fax:   +1.650.843.4001

MORGAN, LEWIS & BOCKIUS LLP
Kassia Stephenson, Bar No. 336175
kassia.stephenson@morganlewis.com
600 Anton Blvd., Ste. 1800
Costa Mesa, CA 92626-7653
Tel:    +1.714.830.0435
Fax:   +1.714.830.0700

Attorneys for Defendant
X CORP. f/k/a TWITTER, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK SCHOBINGER, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TWITTER, INC. and X CORP.,<br><br>Defendants | Case No. 3:23-cv-03007-VC<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:      October 3, 2024<br>Time:     10:00 a.m.<br>Judge:    Hon. Vince Chhabria |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................... 1

II.  THE PUTATIVE CLASS ......................................................................................... 2

III.  FACTUAL BACKGROUND ..................................................................................... 2

    A.  Plaintiff Mark Schobinger .............................................................................. 2

    B.  The 2022 Global Discretionary Performance Bonus Plan ............................. 3

    C.  The Alleged "Promises" Regarding 2022 Performance Bonuses ................... 4

    D.  Plaintiff's Admission that X Had Discretion to Not Fund a Bonus Pool and His Recommendations that X Should Exercise Its Discretion Not To Pay Any Bonuses. .................................................................................................. 6

IV.  LEGAL STANDARD ............................................................................................... 8

V.  ARGUMENT ............................................................................................................ 8

    A.  Many Different State Law Issues Prevent Certification of a Nationwide Class. ............................................................................................................... 8

        1.  Plaintiff's Contract Claims Raise Divergent State Law Interpretation Issues. ................................................................... 10

        2.  Plaintiff's Contract and Promissory Estoppel Claims Raise Enforceability and Other Issues Governed by Many State Laws per the Government Interest Test. ............................................... 11

            a.  Step 1:  State Laws Vary Widely on Material Issues. ................... 12

                (1)  Breach of Contract Claim ................................................. 12

                (2)  Promissory Estoppel ......................................................... 14

            b.  Defendant Has Satisfied Steps 2 and 3 of the Governmental Interest Test ................................................................................... 15

        3.  Plaintiff Fails to Meet His Burden to Prove that a Nationwide Class Involving Many State Laws Satisfies Rule 23, Including the Manageability Requirement. .......................................................... 16

    B.  Plaintiff Fails to Satisfy Rule 23 for Any Class, Regardless of State Law Variations. ..................................................................................................... 17

        1.  Plaintiff Fails to Prove Commonality. .................................................... 17

        2.  Plaintiff Is Atypical and Inadequate Due to Application of Texas Law to His Claims, His Advocating Against Payment of a Bonus, and His DRA Opt-Out. ......................................................................... 18

        3.  Plaintiff Has Failed to Prove Predominance and Superiority. ................. 21

            a.  Individual Issues of Exposure to Each Promise and Reliance Predominate. ................................................................................. 21

            b.  Plaintiff Has Failed to Demonstrate that a Class Action Is Superior. ....................................................................................... 24

        4.  Numerosity Is Lacking for Any Putative California Class. ..................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Adams v. Vaughan*,

5
   1992 WL 33177 (Tex. App. Feb. 4, 1992) ................................................................. 11

6

*Adm'l Build. Sav. & Loan Ass'n v. S. River Landing, Inc.*,

7
   66 Md. App. 124 (1986) ........................................................................................... 11

8

*Amchem Prod., Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................................. 21

9

*Anaheim Extr. Co. v. Sup. Ct.*,

10
   170 Cal. App. 3d 1201 (1985) .................................................................................. 10

11

*Anzaldua v. TitanLiner, Inc.*,
   2020 WL 1236466 (N.D. Tex. Mar. 13, 2020) .................................................. 14, 19

12

13
*Arno v. Club Med*,
   22 F.3d 1464 (9th Cir. 1994) .................................................................................... 10

14

*Atl. Paper Box Co. v. Whitman's Chocolates*,

15
   844 F. Supp. 1038 (E.D. Pa. 1994) .......................................................................... 15

16

*Atlantique Prods., S.A. v. Ion Media Networks, Inc.*,
   2014 WL 11820243 (C.D. Cal. Jan. 31, 2014) ........................................................ 14

17

18
*Avilez v. Pinkerton Gov't Serv., Inc.*,
   596 F. App'x 579 (9th Cir. 2015) ............................................................................ 20

19

*Baker v. Bristol Care, Inc.*,

20
   450 S.W.3d 770 (Mo. 2014) ..................................................................................... 13

21

*Baker v. Jellibeans, Inc.*,
   252 Ga. 458 (1984) ................................................................................................... 11

22

*Berman v. Freedom Fin. Net., LLC*,

23
   400 F. Supp. 3d 964 (N.D. Cal. 2019) ..................................................................... 20

24

*Berry v. Baca*,

25
   226 F.R.D. 398 (C.D. Cal. 2005) ............................................................................. 25

26

*Bixler v. First Nat. Bank of Oregon*,
   619 P.2d 895 (1980) ................................................................... 1, 4, 14, 21

27

*Borodaenko, et al. v. Twitter, Inc.*,

28
   No. 4:22-cv-07226-HSG, N.D. Cal. ......................................................................... 20

CASE NO. 3:23-CV-03007-VC
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

*Burton v. GMC*,
    2008 WL 3853329 (S.D. Ind. Aug. 15, 2008) ........................................................................ 15

*Castillo v. Bank of Am., NA*,
    980 F.3d 723 (9th Cir. 2020) ................................................................................................. 22

*Castranova v. Teknekron Info., Inc.*,
    2003 WL 22143793 (N.D. Tex. Aug. 18, 2003) ............................................................... 12, 19

*Charles T. Driscoll Mas. Rest. Co., Inc. v. County of Ulster*,
    836 N.Y.S.2d 362 (Sup. Ct. App. Div. 2007) ........................................................................ 13

*Church v. Consol. Freight., Inc.*,
    1991 WL 284083 (N.D. Cal. June 14, 1991) ............................................................... 9, 17, 23

*CLN Prop., Inc. v. Rep. Serv., Inc.*,
    2010 WL 5146734 (D. Ariz. Dec. 13, 2010) ....................................................... 9, 14, 17, 22

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) .................................................................................................................. 8

*Conde v. Open Door Mktng.*,
    223 F. Supp. 3d 949 (N.D. Cal. Apr. 27, 2017) ............................................................... 20, 21

*Cornet, et al. v. Twitter, Inc.*,
    No. 3:22-cv-06857-JD, N.D. Cal. ........................................................................................ 20

*Dalton v. Un. Bank of Switz.*,
    134 A.D.2d 174 (N.Y. App. Ct. 1987) ................................................................................... 14

*Delgado v. Market., Inc.*,
    2018 WL 6706041 (N.D. Cal. Dec. 20, 2018) ....................................................................... 19

*Donaldson v. Microsoft Corp.*,
    205 F.R.D. 558 (W.D. Wash. 2001) ...................................................................................... 19

*Douglas E. Barnhart, Inc. v. CMC Fabr., Inc.*,
    211 Cal. App. 4th 230 (2012) ................................................................................................ 15

*Drummond v. Akselrad*,
    2023 WL 3173780 (S.D.N.Y. May 1, 2023) .......................................................................... 14

*Duchardt v. Midland Nat'l Life Ins. Co.*,
    265 F.R.D. 436 (S.D. Iowa 2009) ......................................................................................... 11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ................................................................................................................ 8

*ESC-Toy Ltd. v. Sony Inter. Enter. LLC*,
    2021 WL 4817793 (N.D. Cal. July 21, 2021) ....................................................................... 10

*Fanucchi & Limi Farms v. United Agri Prods.*,
    414 F.3d 1075 (9th Cir. 2005)................................................................. 13

*Feske v. MHC Thousand Trails Ltd. P'ship*,
    2013 WL 1120816 n.89 (N.D. Cal. Mar. 18, 2013)............................... 19

*Gaetano Assocs. Ltd. v. Artee Coll., Inc.*,
    2006 WL 330322 (S.D.N.Y. Feb. 14, 2006)......................................... 13

*Global Com. Trad. Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*,
    972 F.3d 1101 (9th Cir. 2020)............................................................. 9, 14

*Grainger v. Prec. of New Hampton, Inc.*,
    2023 WL 8411290 (N.D. Iowa Apr. 24, 2023).................................. 22, 23

*Gustafson v. BAC Home Loans Serv., LP*,
    294 F.R.D. 529 (C.D. Cal. 2013)..................................................*passim*

*Hadjavi v. CVS Pharm., Inc.*,
    2011 WL 3240763 (C.D. Cal. July 25, 2011)........................................ 19

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992)............................................................. 18, 19

*Hathaway* v. *Gen. Mills, Inc.*,
    711 S.W.2d 227 (Tex. 1986)................................................................. 13

*InCompass IT, Inc. v. XO Comm. Servs.*,
    719 F.3d 891 (8th Cir. 2013)................................................................. 15

*Ioselev v. Schilling*,
    2010 WL 1838367 (D.N.J. May 6, 2010) ............................................. 14

*Jensen v. Cablevision Systems Corp.*,
    372 F. Supp. 3d 95 (E.D.N.Y. Feb. 27, 2019) ..................................... 20

*Katterman Trucking, Inc. v. Laidlaw*,
    1998 WL 1997525 (Mich. Ct. App. Jan. 23, 1998) ............................. 15

*Kim v. Allison*,
    87 F.4th 994 (9th Cir. 2023)................................................................. 18

*Kirola v. City of San Fran.*,
    2011 WL 1330853 (N.D. Cal. Apr. 4, 2011) ....................................... 19

*Kripp v. Kripp*,
    578 Pa. 82 (2004)................................................................................. 11

*Labriola v. Pollard Grp. Inc.*,
    100 P.3d 791 (Wash. 2004)................................................................. 13

*Lara v. First Nat'l Ins. Co. of Am.*,
  25 F.4th 1134 (9th Cir. 2022) ................................................................. 21, 24

*Local Joint Executive Board of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
  244 F.3d 1152 (9th Cir. 2001) ................................................................. 23, 24

*Lotito v. Knife River Corp.-S.*,
  391 S.W.3d 226 (Tex. App. 2012) ............................................................ 14, 19

*Ma v. Twitter, Inc., et al.*,
  No. 3:23-cv-03301 (N.D. Cal.) ....................................................................... 20

*Madison Tool and Die, Inc. v. ZF Sachs Auto. of Am., Inc.*,
  2007 WL 2286130 (S.D. Ind. Aug. 7, 2007) ................................................... 15

*Martin v. Tango's Restaurant, Inc.*,
  253 F.3d at 1190–92 ...................................................................................... 25

*Mazza v. Am. Honda Motor Co., Inc.*,
  666 F.3d 581 (9th Cir. 2012) .................................................................... *passim*

*Moncada v. W. Coast Quartz Corp.*,
  221 Cal. App. 4th 768 (2013) ......................................................................... 12

*Nationstar Mortg. Co. v. Levine*,
  216 So. 3d 711 (Fla. Dist. Ct. App. 2017) ...................................................... 11

*Neisendorf v. Levi Strauss & Co.*,
  143 Cal. App. 4th 509 (2006) ......................................................................... 12

*Nimrod Mktg. (Overseas), Ltd., v. Tex. Energy Inv. Corp.*,
  769 F.2d 1076 (5th Cir. 1985) ........................................................................ 15

*Nitsch v. Dreamworks Animation SKG, Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016) .................................................................... 20

*O'Connor v. Uber Techs., Inc.*,
  904 F.3d 1087 (9th Cir. 2018) ........................................................................ 20

*OJ Com., LLC v. Ashley Furn. Indus., Inc.*,
  359 F. Supp. 3d 1163 (S.D. Fla. 2018) ........................................................... 13

*Oracle Corp. v. Curtis*,
  2001 WL 34047080 (D. Or. Apr. 9, 2001) ....................................................... 12

*Osborne-Davis Transp. Co. v. Mothers Work, Inc.*,
  3 Pa. D. & C. 5th 53 (Pa. C.P. 2008) .............................................................. 15

*Overka v. American Airlines, Inc.*,
    265 F.R.D. 14 (D. Mass. 2010) ................................................................................... 25

*Panorama Vill. Condo. Owners Ass'n Bd. of Dir. v. Allstate Ins. Co.*,
    144 Wash. 2d 130 (2001) ........................................................................................... 11

*Peralta v. Dillard*,
    744 F.3d 1076 (9th Cir. 2014) (en banc) ..................................................................... 9

*Perez v. Safety-Kleen Systems, Inc.*,
    253 F.R.D. 508 (N.D. Cal. 2008) ............................................................................... 25

*Pointe W. Ctr., LLC v. It's Alive, Inc.*,
    476 S.W.3d 141 (Tex. App. 2015) .............................................................................. 13

*Rice v. Vitalink Phar. Servs., Inc.*,
    124 F. Supp. 2d 343 (W.D.N.C. 2000) ....................................................................... 14

*Riley v. Hessel*,
    2015 WL 1730091 (E.D. Pa. Apr. 14, 2015) ............................................................. 14

*Rojo v. Deutsche Bank*,
    2010 WL 2560077 (S.D.N.Y. June 23, 2010) ............................................................ 14

*Sateriale v. RJ Reynolds Tobacco Co.*,
    2014 WL 7338877 (C.D. Cal. Dec. 19, 2014) ....................................................... 9, 10, 17, 24

*Senne v. K.C. Royals Baseball Corp.*,
    934 F.3d 918 (9th Cir. 2019) .............................................................................. 10, 15, 16, 17

*Shaffer v. Green Earth Tech., Inc.*,
    2019 WL 2549227 (W.D. Tex. June 19, 2019) .......................................................... 13

*Shanklin v. Colum. Mgmt. Adv., L.L.C.*,
    2008 WL 4899631 (S.D. Tex. Nov. 12, 2008) ...................................................... 12, 19

*Speedway Prom., Inc. v. Hooter's of Am., Inc.*,
    123 F. Supp. 2d 956 (W.D.N.C. 2000) ....................................................................... 14

*Stiner v. Brookdale Senior Living, Inc.*,
    665 F. Supp. 3d 1150 (N.D. Cal. 2023) ...................................................................... 17

*Sullivan v. Oracle Corp.*,
    51 Cal. 4th 1191 (2011) ........................................................................................ 15, 16

*Tan v. Grubhub, Inc.*,
    2016 WL 4721439 (N.D. Cal. July 19, 2016), *aff'd sub nom., Lawson v.
    Grubhub, Inc.*, 2021 WL 4258826 (9th Cir. Sept. 20, 2021) ...................................... 20

CASE NO. 3:23-CV-03007-VC
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

*Teig v. Suffolk Oral Surgery Assocs.*,
769 N.Y.S.2d 599 (2003) ............................................................................................... 11

*Till v. Saks Inc.*,
2013 WL 5755671 (N.D. Cal. Sept. 30, 2013) ............................................................... 25

*Trustmark Ins. Co. v. Gen. Cologne Life Re Ins. Co. of Am.*,
2004 WL 1745777 (N.D. Ill. Aug. 2, 2004), *aff'd*, 424 F.3d 542 (7th Cir. 2005) ................. 15

*Univ. Creek Assocs. II, Ltd. v. Boston Am. Fin. Grp., Inc.*,
100 F. Supp. 2d 1345 (S.D. Fla. 2000) .......................................................................... 15

*In re University of So. California Tuition & Fees COVID-19 Refund Litigation*,
695 F. Supp. 3d 1128 (C.D. Cal. 2023) .......................................................................... 23

*Valencia v. VF Outdoor, LLC*,
2021 WL 5154161 (E.D. Cal. Nov. 5, 2021) .................................................................. 20

*Valentino v. Carter–Wallace, Inc.*,
97 F.3d 1227 (9th Cir. 1996) .......................................................................................... 19

*W.J. Schafer Assocs., Inc. v. Cordant, Inc.*,
493 S.E.2d 512 (Va. 1997) ............................................................................................ 14

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........................................................................................... 1, 8, 18

*Wash. Mut. Bank, FA v. Sup. Ct.*,
24 Cal. 4th 906 (2001) .......................................................................................... 16, 17

*Watkins v. Ford*,
2010 UT App 243, *aff'd*, 2013 UT 31, *as amended* (Aug. 6, 2013) ...................................... 11

*Weisberg v. Takeda Pharms. U.S.A., Inc.*,
2018 WL 4043171 (C.D. Cal. Aug. 21, 2018) .................................................... 9, 17, 23

*Wilson v. Pactiv LLC*,
2021 WL 5818492 (C.D. Cal. Dec. 3, 2021) .................................................................. 17

*Zenor v. El Paso Health. Sys., Ltd.*,
176 F.3d 847 (5th Cir. 1999) .......................................................................................... 14

*Zinser v. Accufix Res. Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001) .............................................................................. *passim*

**Statutes**

33 Pa. Stat. Ann. § 1-6 ............................................................................................... 14

740 Ill. Comp. Stat. Ann. 80/1 .................................................................................... 13

Cal. Civ. Code § 1624 ........................................................................................... 13

Cal. Civ. Code § 1698 ........................................................................................... 13

Cal. Civ. Code § 1698(c) ....................................................................................... 13

Cal. Civil Code section 1646 ........................................................................ 8, 9, 10

Mass. Gen. Laws Ann. ch. 259, § 1 ..................................................................... 13

N.C. Gen. Stat. § 22-1-5 ........................................................................................ 14

N.Y. Gen. Oblig. Law § 5-701 .............................................................................. 13

Tex. Bus. & Com. Code Ann. § 26.01 ................................................................... 13

**Other Authorities**

Rule 23 .................................................................................................... 1, 8, 16, 25

Rule 23(a)(3) .......................................................................................................... 18

Rule 23(a)(4) .......................................................................................................... 18

Rule 23(b)(3) .......................................................................................................... 22

1    I.    **INTRODUCTION**

2    Plaintiff Mark Schobinger's claim that Defendant X Corp. ("X" or the "Company") broke

3    alleged "promises" to pay him and other employees a bonus under the 2022 Global Discretionary

4    Performance Bonus Plan ("PBP") reflects remarkable hubris given that his words and deeds at the

5    time – including in multiple emails and a "white paper" to other decisionmakers, as well as in a

6    meeting with Elon Musk himself – directly contradict his theory.  Specifically, while serving as the

7    Senior Director of Compensation with responsibility for administering the PBP, Plaintiff confirmed

8    that the Company had discretion under the PBP *not* to fund a bonus pool, and repeatedly urged the

9    Company *not* to pay any bonuses given its dire financial straits.  The Company followed his advice

10   and elected not to fund a bonus pool.  Astoundingly, his lawsuit seeks to recover the very bonuses

11   he previously advised were *not* owed.  He now asks this Court to certify common law breach of

12   contract and promissory estoppel claims on behalf of a putative class of more than 1,200 employees.

13   Compl. (ECF 43) at 2-3, 6-7.  His Motion for certification fails on several independent grounds.

14   *First*, these claims cannot be tried on a class-wide basis because putative class members are

15   subject to thirty-six (36) states' breach of contract and promissory estoppel legal standards that

16   differ in material and directly relevant ways.  For example, Texas law applies to Plaintiff (a Texan)

17   and recognizes neither promissory estoppel in the employment context nor "at will" services as

18   valid consideration for a contract. His Motion fails to address the impact of these different

19   applicable state laws. It is too late to do so on Reply, which would be futile in any event, because

20   courts routinely refuse to certify nationwide classes in cases like this, noting the near impossibility

21   of manageably trying multiple claims governed by different state laws, even with subclasses.

22   *Second*, even if the applicable law had been uniform (it is not), Plaintiff cannot satisfy Rule

23   23.  His "common questions" (*e.g.*, did the Company make a binding promise) simply restate his

24   claims in generic terms like those the Supreme Court found deficient in *Wal-Mart Stores, Inc. v.*

25   *Dukes*, 564 U.S. 338 (2011).  Also, individual issues predominate because any trial would require

26   individualized proof as to, *e.g.*, whether *each* employee (a) heard or read one or more of the alleged

27   "promises," (b) had an objectively reasonable understanding of the "promise(s)," which implicates

28   employee-specific extrinsic evidence, and (c) actually and reasonably relied on any "promise."  A

class action is not superior for adjudicating such individualized issues. Plaintiff's counsel's filing of literally *thousands* of other pending individual arbitrations against X also shows that putative class members have the motivation and means to pursue their claims individually, if they so choose.

*Third*, Plaintiff is an atypical and inadequate class representative because he was the primary advocate for X's election to not fund a bonus pool, his claims arise under Texas law, and he – unlike more than 95% of the putative class members – is not bound by an arbitration agreement.

*Finally*, beyond the above reasons that preclude certification of any class, the Court should not certify a California-only class because numerosity cannot be satisfied. All but thirty (30) putative class members who worked in California signed a Dispute Resolution Agreement ("DRA") with a binding class waiver, or signed a general release of all claims, and thus cannot sue in court.

## II.  THE PUTATIVE CLASS

Plaintiff seeks to represent a class of "all individuals who were employed by Twitter in the first quarter of 2023 [clarified to mean at "the end of March of 2023" at his deposition] and were covered by Twitter's Bonus Plan but did not receive their annual bonus for 2022." Compl. ¶ 7; Pl. Dep. 282:24-283:12.[1] The putative class includes more than 1,200 employees who worked in thirty-six (36) different states. Mot. at 5 & Ex. 11; Decl. of Aoife Fenelon ("Fenelon Decl.") ¶¶ 3-4.[2]

## III.  FACTUAL BACKGROUND[3]

### A.  Plaintiff Mark Schobinger

Plaintiff was Twitter's Senior Director of Compensation and "led the compensation team" until he voluntarily resigned in May 2023. Compl. ¶¶ 6, 27; Pl. Dep. 20:12-21, 25:18-21, 174:2-8,

---

[1] The putative class expressly excludes employees "who were terminated or laid off before that date," because the PBP makes clear that employees "whose employment ends at any time before the Performance Bonus Payout Date will not be eligible for any Performance Bonus under the Plan." Pl. Dep. Ex. 4; *id.* 57:14-21, 58:3-59:2, 61:1-5, 99:2-6, 282:24-283:12; *see* Mot. at 4 n.1.

[2] Plaintiff incorrectly asserts that X had 2,193 active employees as of March 3, 2023. Mot. at 5. As of that date, X had about 643 employees who worked in California; 231 in New York; 84 in Washington; 41 in Georgia; 30 in Texas; and 12 to 27 each of Florida, Massachusetts, Illinois, Colorado, Washington, D.C., Michigan, and Oregon; and additional employees in Arkansas, Arizona, Connecticut, Hawaii, Idaho, Indiana, Kentucky, Louisiana, Maryland, Minnesota, Missouri, Montana, North Carolina, Nebraska, New Hampshire, New Jersey, Nevada, Ohio, Oklahoma, Pennsylvania, South Carolina, Utah, Virginia, and Wisconsin. Fenelon Decl. ¶ 4.

[3] The Declaration of Brian Berry ("Berry Decl.") attaches cited the testimony and exhibits.

258:24-259:3.  He was responsible for administering, editing, and interpreting the PBP. *Id.* 28:5-20, 50:9-51:21, 76:3-77:4. During his tenure, he worked only in Texas.  *Id.* 29:21-32:17, 34:6-13.

**B.   The 2022 Global Discretionary Performance Bonus Plan**

The PBP was intended "[t]o motivate, recognize, and reward our Tweeps for their hard work and contributions to the achievement of company and individual performance objectives." Pl. Dep. 50:9-22 & Ex. 4.  As the PBP states and Plaintiff admitted, PBP participation and payment of a bonus were entirely discretionary.  *Id.* 46:16-19, 48:18-23 (agreeing PBP was a "discretionary performance bonus plan" and "[d]iscretionary means something that is not compulsory or required").[4]  This included the Company's right under the PBP to elect not to fund a bonus pool:

> If the Twitter Group achieves its specified business performance metrics during the Plan Year, a Performance Bonus payment pool will be funded ("The Performance Bonus Pool"). ... The Performance Bonus Pool can be adjusted up or down, depending upon the achievement of the designated target metrics, with a floor of 50% and a ceiling of 200%.  Notwithstanding the foregoing and subject to applicable law, solely in the event of unforeseen and extraordinary circumstances as determined by the Compensation Committee, the Compensation Committee reserves the right in its discretion to determine a Performance Bonus Pool amount based on an alternative formula and/or elect not to fund any Performance Bonus Pool for the Plan Year.  [*Id.* Ex. 4]

Additional PBP language confirmed that bonus payments were subject to the Company's discretionary election to fund a Performance Bonus Pool, *e.g.*, "*If* a Performance Bonus Pool is established...," and "*If* the Performance Bonus Pool is funded...."  *Id.* (emphasis added).  Plaintiff admitted that "the bonus plan had to get funded before payouts would be made" and that "[a]t any point before March of the following year when bonuses get paid, this decision could be made to elect not to fund the plan."  *Id.* 78:17-22, 80:24-81:17, 99:24-100:3, 179:2-16.  He also admitted that *funding* of a bonus pool did not mean anyone would be *paid* a bonus, and that "the pool could be funded at the floor of 50 percent, but an individual employee might not get paid 50 percent of their target bonus based on the allocation".  *Id.* 110:10-18, 111:1-7.  And he conceded that Musk had the ultimate authority post-merger to decide whether to fund the bonus pool.  *Id.* 182:24-183:8.

---

[4] The PBP provided that:  "Twitter, Inc. retains full *discretion* to interpret, amend, modify, terminate or revoke the Plan…at its sole *discretion*, including the modification of any individual Performance Bonus, and its determinations are final and binding".  *Id.* at 3 (emphasis added); Pl. Dep. 47:16-18, 48:4-7, 57:1-4 (agreeing "Twitter had the right to terminate or revoke the PBP at any time"), 99:12-24.  The PBP also provided: "Subject to applicable law, Twitter reserves the right to terminate any Eligible Employee's participation in the Plan at any time." *Id.* Ex. 4.

The PBP was fully integrated and stated: "This Plan, along with each PAF, constitutes the entire agreement and understanding between the relevant Twitter Group employing entity and each Eligible Employee relating to the subjects covered by this Plan and supersedes and replaces any and all other plans, agreements, plan summaries, representations, discussions and/or understandings (written or oral)." *Id*. Ex. 4, p.3.  And, any subsequent changes to the PBP had to be reviewed and approved by the Compensation Committee. *Id*. 54:16-20; *see* Segal Dep. 31:14-37:11.

Employees had access to the PBP on the Company's intranet and were encouraged to read it.  Pl. Dep. 55:13-56:1, 76:15-77:12.

**C.   The Alleged "Promises" Regarding 2022 Performance Bonuses**

Twitter and entities owned by Elon Musk signed a Merger Agreement on April 25, 2022, by which Musk acquired Twitter.  Mot. Ex. 4 p.7.  Plaintiff claims the Company made the following oral and written "promises" to pay employees 2022 bonuses at 50% of target under the PBP:

*First*, he alleges that then-CEO Parag Agrawal described the merger terms at an "all hands" employee meeting around April 25, 2022: "The deal also had protections around benefits base salary and bonus opportunities for them to remain the same for at least one year after the deal closes."[5]  Mot. at 2 & Ex. 2, p.11.  Attendance at the all hands-meetings was voluntary, and the Company did not track attendance.  Pl. Dep. 90:22-92:11; Segal Dep. 118:25-119:11, 139:6-17.

*Second*, Plaintiff alleges that the Company reiterated the statement regarding benefits in "FAQs" made available to employees as of mid-May 2022, which stated in part:

- Specifically, the [merger] agreement specifically provides that, for one year following the closing of the transaction, the purchasing entity will: . . .
  - o   Provide continuing Tweeps with short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those than existing compensation opportunities ….

Mot. Ex. 3, p.14, 26.  The FAQs directed employees to a link where they could read the Merger

---

[5] Section 6.9(a) of the Merger Agreement provided in part:  "For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time …, Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee…short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time…."  Mot. Ex. 4, p.66.

Agreement, which was in the publicly filed Proxy Statement. *Id.* p.27-28 ("Additional Information and Where to Find It"). No records exist as to who may have read the FAQs or Merger Agreement.

Neither of the above two "promises" stated that the terms of the PBP no longer applied or changed the provision that gave the Company discretion to elect not to fund a bonus pool. Even interpreted most liberally, they simply indicated that all of the PBP terms continued to apply.

*Third*, Plaintiff alleges that CFO Ned Segal told employees in an August 19, 2022 email "that their 2022 annual bonus would be paid at fifty percent (50%) of their target". Mot. at 1 & Ex. 7. This email did not make any such promise, but only gave an update as to an accounting metric:

> Due to deal-related matters, we did not yet have a complete answer in July around *PBP accrual*, but we are now able to provide more clarity. As a reminder, the bonus pool is calculated based on our performance against annual, Board-approved revenue and profitability goals, and is intended to ensure that employees are rewarded based on Twitter's performance. **Based on our Q2 performance, the 2022 total bonus pool is now tracking to 50%.**

Mot. Ex. 7, p.1 (italics added; bold in original); *id.* p.2 (July 22, 2022 email to employees in same chain stating, "We do not have an update on *PBP accrual* right now due to the ongoing acquisition"); Pl. Dep. 93:14-23, 118:9-119:1. Segal's email linked to a FAQ on "2022 PBP *accrual*" that similarly gave a "PBP *accrual* update." *Id.* Ex. 8, p.2-4 (emphasis added).[6] Again, no records exist of who may have read Segal's email or the PBP Accrual FAQs. *Id.* 117:10-118:2; Segal Dep. 38:17-25, 109:21-110:5. However, some employees who read it were confused. For example, one manager (Anita Butler) replied almost immediately stating: "I wanted to ping you with some feedback from my team. They were quite confused by this email because it didn't clearly state that tweeps would only be receiving 50% of their bonus. Some thought it was just 50% of the company portion, some thought it was only 50% of tweeps and were then unclear on which 50% of tweeps. The FAQ doc wasn't very clear either." Segal Dep. 112:8-114:25 & Ex. 8. Plaintiff and Segal admitted that no one, including Segal, promised that bonuses would be paid separate and apart from, or independent of, the full terms and conditions of PBP. As Plaintiff testified:

---

[6] The "accrual" was simply an accounting entry that the Company adjusted based on performance over time; no bonus pool was funded during the year. Pl. Dep. 107:10-108:25 ("they're just updating the amount of money that they're holding on the books…"), 115:3-116:14; Segal Dep. 115:20-116:2 ("Twitter didn't set aside a pot of money throughout the year for bonus; correct? … A. It's an accounting accrual. Q. Like there was no separate bank account where you just put money and say, This is the PBP money; is that right? A. There was not one that I'm aware of.").

Q. Did Mr. Segal or anyone else at Twitter ever tell employees that they would get paid a bonus separate and independent from any of the terms or conditions of the PBP?

A. No. …

Q. And did Mr. Segal or anyone else at Twitter tell employees that they'd get paid a bonus separate and apart from the PBP?

A. Not that I'm aware of. […]

Q. Did Mr. Segal or anyone else at Twitter ever tell employees that the performance bonus plan was being changed in any way?

A. Not that I recollect.

Pl. Dep. 99:25-100:13, 100:9-23, 103:12-22.  The former CFO Segal testified similarly:

Q. Did you ever tell employees of Twitter during any of these video meetings that they would be paid a performance bonus completely independent of the terms and rules of the  performance bonus plan?

A. I don't remember doing that.

Q. Did you ever tell Twitter employees during any of these video meetings that they would be paid a performance bonus separate and apart from the terms and conditions of the performance bonus plan?

A. I don't remember doing that.

Q. Did you ever tell Twitter employees during any of these video meetings that the performance bonus plan had been modified or changed in any of its rules or provisions?

A. I don't remember saying that.

Segal Dep. 128:3-18.  Plaintiff admitted that Segal's supposed "promises" pertained to any payment of bonuses "[u]nder the terms of the plan," and that the Company could not change the PBP terms and conditions without buyer consent.[7]  Pl. Dep. 100:13-17; 135:20-22 & Ex. 12; Segal Dep. 42:17.

*Fourth*, Plaintiff will rely on a statement during a September 2022 manager-only meeting that "Eligible Tweep's will receive 50% of their PBP targets."  Segal Dep. 265:19-271:2, 284:19-287:24 & Ex. 23 ("Managers, Assemble" slidedeck).  But that same presentation also expressly told attendees that "All PBP plan rules apply," the PBP rules were available on the intranet, and managers should review the rules.  *Id.*; *id.* at 142:13-20. No records exist as to which managers attended the meeting and/or read the slide deck, or of what – if anything – each manager may (or may not) have communicated to their reports.  *Id.* 139:6-143-14, 286:23-287:24.

### D.  Plaintiff's Admission that X Had Discretion to Not Fund a Bonus Pool and His Recommendations that X Should Exercise Its Discretion Not To Pay Any Bonuses.

As Senior Director of Compensation, Plaintiff was the main advocate against paying 2022

---

[7] Notably, Musk, as buyer, declined to consent to change any of the PBP terms and conditions. Pl. Dep. 96:4-97:10, 104:7-11; Segal Dep. 81:9-15, 89:9-11, 101:17-102:1, 234:16-22.

bonuses, and repeatedly urged that they need not and should not be paid.  On October 19, 2022, he messaged an executive: "The PBP plan does not specifically contemplate a change of control.  So it is really unclear to me if the bonus plan would permit paying out."  Pl. Dep. 133:24-135:4 & Ex. 12.  In a November 30, 2022 message to the Head of People Experience, he said the Company had discretion *not* to fund or pay bonuses, advised that it not, and said the "final decision" was Musk's:

> The logical outcome suggests we would not pay out FY22 bonuses due to the current environment and the severe underperformance to plan. So you know, that is what I recommended previously … the plan permitted the [compensation committee] to exercise that discretion. But TWTR being TWTR, we held to the 50% funding level for all the reasons you can imagine. Anyway, Elon is the sole director at this point and it really comes down to him and only him to make the final decision….

*Id.* Ex. 13; Pl. Dep. 136:5-139:5, 139:11-19, 148:13-149:9 & Ex. 15, p.1 (same).

Plaintiff told Musk directly in a January 5, 2023 meeting that the 2022 bonus was discretionary and should not be paid given the Company's underperformance.  Marcotte Dep. 90:20-91:12 ("I recall Mark Schobinger saying out loud to the group that we should not pay out – that Elon had no obligation to pay out performance bonus plans.").  He also repeatedly stated in and after January 2023 that the Company had not yet decided whether to fund a bonus pool and again recommended against it.  Pl. Dep. 143:25-144:4; 151:7-153:5 & Ex. 17 (Jan. 5, 2023: "[Musk] can approve to pay it out or exercise discretion to not pay"); *id.* Ex. 16 ("I know we were severely under-performing…. *the best decision would be to exercise discretion and not fund*.") (emphasis added); *id.* 154:1-156:5 & Ex. 18 (Jan. 19, 2023: "[Musk] can…exercise discretion and not fund or allow the plan to fund at 50%."); *id.* at 149:13-150:4, 157:9-12, 162:14-25 & Ex. 21.

On February 13, 2023, Plaintiff sent other executives a "white paper" discussing PBP options, including "Exercise discretion to NOT fund the pool," while simultaneously stating "how badly we under-performed" and advising:  "*This is why I believe exercising discretion and not paying a bonus would be prudent* despite the safe harbor nature of the plan.  The optics of paying are not good.  In any event, *we have approached the point of needing a decision*." Pl. Dep*.* 166:14-167:25, 169:6-17, 171:17-22 (emphasis added) & Ex. 22; *id.* at 175:19-182:15 & Ex. 23, p.1-3.

Ultimately, after the merger closed, the Company faced imminent and extreme financial peril and implemented cost-saving measures, including the discretionary election in March 2023 to

1   not fund a PBP bonus pool.  Pl. Dep. 183:6-20, 184:11-186:21, 189:22-25 ("Q. So was that accurate

2   what you wrote to her, that discretion, which is permitted under the plan, was applied and the plan

3   was not funded?  A. That would be accurate.") & Ex. 25 ("PBP will not be funded").

4   **IV.  LEGAL STANDARD**

5       A class action is "an exception to the usual rule that litigation is conducted by and on behalf

6   of the individual named parties only," and "to justify a departure from that rule, 'a class

7   representative must be part of the class and 'possess the same interest and suffer the same injury'

8   as the class members." *Dukes*, 564 U.S. at 348 (citation omitted).  The Court "must conduct a

9   'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of

10   Rule 23." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).  Rule 23 "does

11   not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350.  "A party seeking class certification

12   must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove

13   that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.*  The

14   "rigorous analysis" requires a plaintiff to satisfy Rule 23 with evidentiary proof, not speculation.

15   *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  The elements of the plaintiff's claims frame

16   the Rule 23 analysis for each proposed class.  *See, e.g.*, *Erica P. John Fund, Inc. v. Halliburton*

17   *Co.*, 563 U.S. 804, 809 (2011) ("[c]onsidering whether 'questions of law or fact common to class

18   members predominate' begins, of course, with the elements of the underlying cause of action.").

19   **V.  ARGUMENT**

20      **A.  Many Different State Law Issues Prevent Certification of a Nationwide Class.**

21   "'A federal court sitting in diversity must look to the forum state's choice of law rules to

22   determine the controlling substantive law.'" *Mazza*, 666 F.3d at 589 (citing *Zinser v. Accufix Res.*

23   *Inst., Inc.,* 253 F.3d 1180, 1187 (9th Cir. 2001)).[8]  California's choice-of-law analysis is controlled

24   by the governmental interest test and Civil Code section 1646. "Section 1646 governs *only* the

25

---

26   [8] "Under California's choice of law rules, the class action proponent bears the initial burden to
show that California has 'significant contact or significant aggregation of contacts' to the claims

27   of each class member ... to ensure that application of California law is constitutional." *Mazza*,
666 F.2d at 589-90 (citations omitted).  Defendant does not contest that issue for purposes of this

28   Memorandum.  At that point, "the burden shifts to the other side to demonstrate 'that foreign law,
rather than California law, should apply to class claims.'" *Id.* at 590 (citation omitted).

interpretation of contractual terms," while "all other issues in a contract dispute, including the validity of a contract, are governed by governmental interest analysis." *Global Com. Trad. Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1111 (9th Cir. 2020); ECF 37 ¶ 1.[9] The governmental interest test also applies to Plaintiff's promissory estoppel claim. *See, e.g.*, *Mazza*, 666 F.3d at 591 (unjust enrichment and consumer protection law claims). "[T]his conflicts test must be applied to *each* claim upon which certification is sought." *Zinser*, 253 F.3d at 1188.

Both tests require application of a putative class member's home state breach of contract and promissory estoppel laws, which precludes certification as detailed further below. *See infra* §§ 1-3; *see, e.g.*, *Mazza*, 666 F.3d at 596 ("Because the law of multiple jurisdictions applies here to any nationwide class of purchasers or lessees…, variances in state law overwhelm common issues and preclude predominance for a single nationwide class."); *Church v. Consol. Freight., Inc.*, 1991 WL 284083 at *12-13 (N.D. Cal. June 14, 1991) (denying nationwide certification of breach of contract claims for lack of predominance and superiority: "Given the number of causes of actions, the jurisdictions involved, and the presumed interest of each forum in regulating the employment relationships within its jurisdiction, the number of resolutions this Court must make even before approaching the merits of the action as to which law to apply is overwhelming.").[10]

---

[9] As this Court's Order on X's Motion to Dismiss noted, that motion involved only Section 1646 and did not seek dismissal based on the governmental interest test, including as to issues *other than* contract interpretation. ECF 37 ¶ 1. X now directly addresses that test here (plus contract enforceability and promissory estoppel issues) on a more fulsome record. The statement that "California law governs whether Twitter's alleged oral statements created a valid, enforceable contract" is not binding at class certification for these reasons, and because it was a non-merits ruling only as to Plaintiff's individual claims and not class-wide issues. His Motion also relies on alleged written promises not cited in his Complaint and not addressed in the Motion to Dismiss. *See Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case.").

[10] *See also Sateriale v. RJ Reynolds Tobacco Co.*, 2014 WL 7338877 at *12 (C.D. Cal. Dec. 19, 2014) ("In light of plaintiffs' failure to rebut defendants' showing of material differences among the laws of the fifty states, the Court cannot certify a nationwide class for plaintiffs' breach of contract claim."); *CLN Prop., Inc. v. Rep. Serv., Inc.*, 2010 WL 5146734 at *8 (D. Ariz. Dec. 13, 2010) (no predominance for breach of contract class "as a result of the laws of the 39 states at issue in this case"); *Gustafson v. BAC Home Loans Serv., LP*, 294 F.R.D. 529, 542-46 (C.D. Cal. 2013) (no commonality or predominance for nationwide breach of contract class; citing cases denying certification of contract claims based on extrinsic evidence issues); *Weisberg v. Takeda Pharms. U.S.A., Inc.*, 2018 WL 4043171, at *10 (C.D. Cal. Aug. 21, 2018) (no predominance for nationwide breach of contract class: "it appears that some rules of contract law that differ across

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1

### 1.   Plaintiff's Contract Claims Raise Divergent State Law Interpretation Issues.

Under Civil Code section 1646:  "A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."  The supposed "contracts" here point only to Plaintiff's and each putative class member's respective home states as the "places of performance" because that is where each of them performed their "at will" services, as well as where they received the pay for work they did.  For example, in *ESC-Toy Ltd. v. Sony Inter. Enter. LLC*, 2021 WL 4817793 at *2 (N.D. Cal. July 21, 2021), the court held that the place of performance under section 1646 was where the service provider was located, even though the oral contract did not specify the performance location:  "Given the focus of the EVA is the work to be performed by ESC (and not that performed by Sony), the place of performance under § 1646 is the site of ESC which is headquartered in Las Vegas."  *See Anaheim Extr. Co. v. Sup. Ct.*, 170 Cal. App. 3d 1201, 1203 (1985) ("the place where payment was to be made is the place 'where the contract [was] to be performed'"); *cf. Senne v. K.C. Royals Baseball Corp.*, 934 F.3d 918, 932 (9th Cir. 2019) ("If the law of the state in which work is performed is not the law that generally applies, employers and employees alike would be subjected to an unworkable scheme.").

Even if the "place of performance" was not "indicated," Plaintiff's and each putative class member's own home state law would still apply because the alleged "contracts" were "made" where they "accepted" them, which Plaintiff admits were the states where employees worked:  "Plaintiff and other employees accepted these offers by continuing to work for Twitter…."  Compl. Count I; *Arno v. Club Med*, 22 F.3d 1464, 1472 n. 6 (9th Cir. 1994) ("Because the contract here doesn't specify a place of performance, Cal. Civ. Code § 1646 requires the court to apply the law of California where the contract was made, *i.e.*, where Arno accepted"); *Sateriale*, 2014 WL 7338877 at *9 ("The offer is accepted by performing, rather than by providing a promise to perform."); *ESC*, 2021 WL 4817793 at *2 ("the Court looks to where the acceptor *manifests their assent.* ESC has alleged that, as the acceptor, they manifested their assent from Las Vegas.") (citations omitted).

---

the states, such as the extrinsic evidence rule, could impact putative members' claims."); *Zinser*, 253 F.3d at 1189-90 (no predominance or manageability, including for subclasses).

Contract interpretation rules, particularly for parol evidence, vary widely across states:

> Here, there are key differences among states laws regarding, for instance, the admissibility of extrinsic evidence. *See also Duchardt v. Midland Nat'l Life Ins. Co.*, 265 F.R.D. 436 (S.D. Iowa 2009) (noting that "the law of 47 states ... vary as to their rules governing contract interpretation, especially regarding the use of extrinsic evidence in contract interpretation....").

*Gustafson*, 294 F.R.D. at 554. "[T]he Ninth Circuit has noted, '[i]n contrast to many other states, California has a liberal parol evidence rule:  It permits consideration of extrinsic evidence to explain the meaning of the terms of a contract *even when the meaning appears unambiguous*.'  Other states…allow extrinsic evidence only where there is contractual ambiguity." *Id.* (citations omitted). Maryland and Utah permit extrinsic evidence to reveal *whether* a term is ambiguous, whereas most other states first require a term to be ambiguous based on *the document alone*.[11]  Further, many states requiring an initial finding of ambiguity, including Georgia, New York, Pennsylvania, Texas, and Washington, allow extrinsic evidence to interpret both facially evident "patent" ambiguities, and "latent" ones where an otherwise clear term could have multiple meanings given context.[12] Florida does not generally allow extrinsic evidence to resolve patent ambiguity.[13]  These differences materially impact core contract interpretation issues in this case.  Here, X will use parol evidence to show the statements at issue are not the "promises" he claims, that employees understood them differently, and that Plaintiff's interpretation conflicts with extrinsic proof, including the PBP and the Merger Agreement, that must be consulted to construe the statements in their proper context.

### 2. Plaintiff's Contract and Promissory Estoppel Claims Raise Enforceability and Other Issues Governed by Many State Laws per the Government Interest Test.

Plaintiff's claims also raise a host of contract validity, enforceability, and promissory estoppel issues to which the three-part governmental interest test applies:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.

---

[11] *See Adm'l Build. Sav. & Loan Ass'n v. S. River Landing, Inc.*, 66 Md. App. 124, 129-31 (1986); *Watkins v. Ford*, 2010 UT App 243, ¶ 13, *aff'd*, 2013 UT 31, ¶ 13, *as amended* (Aug. 6, 2013)).

[12] *See Baker v. Jellibeans, Inc.*, 252 Ga. 458, 459 (1984); *Teig v. Suffolk Oral Surgery Assocs.*, 769 N.Y.S.2d 599, 600 (2004); *Kripp v. Kripp*, 578 Pa. 82, 90-91 (2004); *Adams v. Vaughan*, 1992 WL 33177, at *7 n.2 (Tex. App. Feb. 4, 1992); *Panorama Vill. Condo. Owners Ass'n Bd. of Dir. v. Allstate Ins. Co.*, 144 Wash. 2d 130, 137 (2001).

[13] *See Nationstar Mortg. Co. v. Levine*, 216 So. 3d 711, 715 (Fla. Dist. Ct. App. 2017).

Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.

Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

*Mazza*, 666 F.3d at 590 (citation omitted).  *Thirty-six states'* varying laws apply under this test.

### a.   Step 1:  State Laws Vary Widely on Material Issues.[14]

#### (1)   Breach of Contract Claim.  State laws vary materially on key issues, *e.g.*:

• **Legal Consideration:**  Plaintiff alleges that he "and other employees accepted these offers by continuing to work for Twitter…."  Compl. Count I.  But they *already* committed to "hard work and contributions to … achievement" in the at-will employment offer letters they executed.  Mot. Ex. 1 ¶ 3 ("during your employment you must serve the Company faithfully and diligently to the best of your ability"); *id.* ¶ 14 ("Your employment with the Company will be 'at will,'"); Pl. Dep. 23:7-19 (employment was "at will"); *id.* 49:4-50:1 (admitting Company used offer letters for new hires including "discretionary" bonus provision).  Continued service by an "at will" employee may render a bonus promise enforceable under some states' laws like California and Oregon, but is not valid consideration in Texas, where Plaintiff worked, or in Washington or Missouri, for example.[15]

---

[14] X may satisfy its burden with examples of state law differences, as it does here. *See Gustafson*, 294 F.R.D. at 538 n.7 ("Plaintiffs argue that Defendants failed to meet their burden of showing there are material differences among the states' consumer protection laws because they merely "cit[ed] to other cases" and did not conduct a fifty state survey themselves.  Defendants could certainly have performed a more thorough analysis of the consumer protection laws as applied to this case. They did, however, note the various differences among the states' consumer protection laws and provide citations to cases that performed thorough analyses of these differences.  A review of these differences shows that they are, in fact, material to this case.") (citations omitted).

[15] Consideration:  ECF 37 p.2 (*citing Moncada v. W. Coast Quartz Corp.*, 221 Cal. App. 4th 768, 779 (2013); *Neisendorf v. Levi Strauss & Co.*, 143 Cal. App. 4th 509, 523 (2006)); *Oracle Corp. v. Curtis*, 2001 WL 34047080 at *1-2 (D. Or. Apr. 9, 2001) (citation omitted); No Consideration: *Shanklin v. Colum. Mgmt. Adv., L.L.C.*, 2008 WL 4899631 at *12 (S.D. Tex. Nov. 12, 2008) ("when an employment contract does not guarantee a bonus in a fixed, nondiscretionary amount, and the bonus offered is an incentive to encourage the employee to perform in accordance with the previously existing contract of employment, the promise to pay a bonus is unenforceable for want of sufficient consideration, since the employee is only giving the same service it has already contracted with the employer to render."); *Castranova v. Teknekron Info., Inc.*, 2003 WL 22143793 at *2 (N.D. Tex. Aug. 18, 2003) ("a promise to pay a bonus is unenforceable for want

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- **Modification/Novation of Contract:**  Plaintiff claims the alleged "promises" amended or novated the PBP provision granting the Company full discretion to "modify" or "amend" the PBP, and its "Entire Agreement" clause (also in the Merger Agreement) – provisions that bar those promises.  ECF 24 at 7-9 (Pl. Opp. to Mot. to Dismiss); *supra* § III.B.  But Plaintiff's theory must be tested under varying states' laws.  In contrast to California (cited by Plaintiff),[16] states like New York and Connecticut do not enforce "promises" to modify a contract outside its amendment requirements.[17]  His amendment theory fails in those states.  Even where amendments are permitted, they still must be supported by valid consideration, triggering the foregoing state law variations on that issue.  *See Hathaway* v. *Gen. Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986) ("modification must satisfy the elements of a contract: a meeting of the minds supported by consideration."); Cal. Civ. Code § 1698(c) ("Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration.").

- **Statute of Frauds:**  One of the alleged oral promises – to maintain bonus opportunities for one-year post-merger – could not be performed within a year.  The statute of frauds would bar it in several states (*e.g.*, Texas, California, New York, Illinois, Florida, and Massachusetts),[18] but not in

---

of sufficient consideration since the employee is only giving the same service he has already contracted with the employer to render"); *Labriola v. Pollard Grp. Inc.*, 100 P.3d 791, 796 (Wash. 2004) ("independent consideration is required …when employment has already commenced"); *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 775 (Mo. 2014) ("An offer of continued at-will employment is not valid consideration because the employer makes no legally enforceable promise to do or refrain from doing anything it is not already entitled to do.").

[16] ECF 24 at 7-9 (*citing* Cal. Civ. Code § 1698); *Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d 1075 (9th Cir. 2005); *id.* (*citing* "*accord Pointe W. Ctr., LLC v. It's Alive, Inc.*, 476 S.W.3d 141, 151 (Tex. App. 2015)").

[17] *See Charles T. Driscoll Mas. Rest. Co., Inc. v. County of Ulster*, 836 N.Y.S.2d 362, 365 (Sup. Ct. App. Div. 2007) ("a written agreement should be enforced according to its terms, and a contractual clause precluding oral modifications is enforceable") (internal quotation marks and citations omitted); *Shaffer v. Green Earth Tech., Inc.*, 2019 WL 2549227 at * 1, 3 (W.D. Tex. June 19, 2019) ("And an alleged verbal agreement that was never reduced to writing and signed by Shaffer and GET cannot modify the July employment contract") (applying Connecticut law).

[18] *See, e.g.*, Tex. Bus. & Com. Code Ann. § 26.01; Cal. Civ. Code § 1624; N.Y. Gen. Oblig. Law § 5-701; 740 Ill. Comp. Stat. Ann. 80/1; Mass. Gen. Laws Ann. ch. 259, § 1; *Gaetano Assocs. Ltd. v. Artee Coll., Inc.*, 2006 WL 330322, at *4 (S.D.N.Y. Feb. 14, 2006) ("New Jersey's Statute of Frauds does not bar oral service contracts the terms of which cannot be performed within one year, while New York's Statute of Frauds does…"); *OJ Com., LLC v. Ashley Furn. Indus., Inc.*, 359 F. Supp. 3d 1163, 1172 (S.D. Fla. 2018) ("The Supreme Court of Florida has further held that

CASE NO. 3:23-CV-03007-VC
DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1    others (*e.g.*, Pennsylvania, New Jersey, and North Carolina).[19]  *See Global Comm.*, 972 F.3d at

2    1111 (noting application of governmental interest test to statute of frauds); *Gustafson,* 294 F.R.D.

3    at 546-47 (noting varying state law defenses in rejecting nationwide certification of contract claim).

4           Here, material state law differences abound as to the breach of contract claims.  *CLN*, 2010

5    WL 5146734 at *6 ("Plaintiffs have not established in the laws of the 39 states at issue" that "a

6    breach of contract claim could be based on a false statement made after the contract was formed").

7                  **(2)   Promissory Estoppel**.  State laws are starkly different for this claim too:

8    •   **Existence of Claim**:  Virginia and North Carolina do not recognize promissory estoppel, and

9    it is doubtful that such a claim in the employment context is viable in Texas and New York.[20]

10   •   **Clarity of "Promise**:  Some states require a clear, definite promise for promissory estoppel,

11   while others do not.[21]  Such variance may be dispositive here given the vague "promises" at issue.

12   •   **Jury Trial Availability**:  Some putative class members (*e.g.* in Pennsylvania, Michigan, and

13   ───────────────

the statute of frauds only applies if full performance is impossible within a year.").

14   [19] *See* 33 Pa. Stat. Ann. § 1-6; N.C. Gen. Stat. § 22-1-5; *Ioselev v. Schilling*, 2010 WL 1838367 at

15   *3 (D.N.J. May 6, 2010) ("New Jersey statute contains no provision invalidating oral contracts…
     not to be performed within one year."); *Riley v. Hessel*, 2015 WL 1730091 at *8 (E.D. Pa. Apr.

16   14, 2015) ("Under New York law, a party may not enforce an unwritten agreement if 'by its
     terms' it is not to be performed within one year …. Pennsylvania has no such prohibition.");

17   *Speedway Prom., Inc. v. Hooter's of Am., Inc.*, 123 F. Supp. 2d 956, 960 (W.D.N.C. 2000)
     ("North Carolina has no statute of frauds governing contracts…exceed[ing] one year.").

18   [20] *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 493 S.E.2d 512, 516 (Va. 1997) ("promissory
     estoppel is not a cognizable cause of action in the Commonwealth"); *Rice v. Vitalink Phar. Servs.,*

19   *Inc.*, 124 F. Supp. 2d 343, 347 (W.D.N.C. 2000) ("promissory estoppel may not be used as an
     affirmative cause of action in this state"); *Drummond v. Akselrad*, 2023 WL 3173780 at *9

20   (S.D.N.Y. May 1, 2023) ("if the promises concern the duration of [p]laintiffs' employment and
     the payment of salary and benefits earned through such employment, a plaintiff who is at-will

21   cannot state a promissory estoppel claim."); *Rojo v. Deutsche Bank*, 2010 WL 2560077 at *7
     (S.D.N.Y. June 23, 2010) ("New York law does not recognize promissory estoppel in the

22   employment context"); *Dalton v. Un. Bank of Switz.*, 134 A.D.2d 174, 176 (N.Y. App. Ct. 1987);
     *Lotito v. Knife River Corp.-S.*, 391 S.W.3d 226, 227 (Tex. App. 2012) ("promissory estoppel is

23   not an independent cause of action in Texas in an employment context."); *Anzaldua v. TitanLiner,*
     *Inc.,* 2020 WL 1236466 at *5 (N.D. Tex. Mar. 13, 2020) (noting "significant disagreement among

24   Texas courts as to whether promissory estoppel is available to plaintiffs in the employment
     context.") (citing *Zenor v. El Paso Health. Sys., Ltd.,* 176 F.3d 847, 864 (5th Cir. 1999)).

25   [21] *Compare Atlantique Prods., S.A. v. Ion Media Networks, Inc.*, 2014 WL 11820243, at *8 (C.D.
     Cal. Jan. 31, 2014) ("Under California law," one element of a promissory estoppel claim is "a

26   promise clear and unambiguous in its terms") (citations omitted) *with Bixler v. First Nat. Bank of*
     *Oregon*, 619 P.2d 895, 898 n.4 (1980) (even if a "promise were not sufficiently definite to be

27   enforceable," a "party relying reasonably on that promise" may "recover his reliance damages").

28

Indiana) could have a jury trial right, while others (e.g., in California, Texas, and Minnesota), *including Plaintiff*, would not, rendering any nationwide class trial unmanageable.[22]

- **Statute of Frauds**: The statute of frauds may bar claims for promissory estoppel – applicable to the oral "promise" Plaintiff alleges – in some states but not in others.[23] *See supra* at 13-14.

This variance is "not trivial or wholly immaterial," meeting Step 1. *Mazza*, 666 F.3d at 591.

### b. Defendant Has Satisfied Steps 2 and 3 of the Governmental Interest Test

When state laws materially differ, Step 2 of the test examines whether there is a "true conflict," *i.e.*, "each jurisdiction's interest in the application of its own law under the circumstances of the particular case," including the forum state's interest, if any, in applying its law beyond its borders. *Senne*, 934 F.3d at 929 (internal quotes omitted). There is no "true conflict" impeding application of each state's law to its own residents here because "under California's choice-of-law principles, 'a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders.'" *Id.* at 933 (quoting *Mazza*, 666 F.3d at 592); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1205 (2011) ("[T]he federal system contemplates that individual states may adopt distinct policies to protect their own residents and generally may apply those policies to businesses that choose to conduct business within that state.") (internal quotation marks omitted); *see Senne*, 934 F.3d at 933 (court "not persuaded" that a "true conflict" existed in applying each state's wage and hour laws and quantum meruit common law to their own residents); *Sullivan*, 51 Cal. 4th at 1203 (finding it "doubtful, at best" that any "true conflict" exists regarding varying state wage laws).

---

[22] Jury:  *Osborne-Davis Transp. Co. v. Mothers Work, Inc.*, 3 Pa. D. & C. 5th 53, 58 (Pa. C.P. 2008); *Katterman Trucking, Inc. v. Laidlaw*, 1998 WL 1997525, at *1-2 (Mich. Ct. App. Jan. 23, 1998); *Burton v. GMC*, 2008 WL 3853329, at *23-38 (S.D. Ind. Aug. 15, 2008) (same); No Jury: *Douglas E. Barnhart, Inc. v. CMC Fabr., Inc.*, 211 Cal. App. 4th 230, 243 (2012); *InCompass IT, Inc. v. XO Comm. Servs.*, 719 F.3d 891, 898 (8th Cir. 2013); *Nimrod Mktg. (Overseas), Ltd., v. Tex. Energy Inv. Corp.*, 769 F.2d 1076, 1079-80 (5th Cir. 1985).

[23] *Compare Univ. Creek Assocs. II, Ltd. v. Boston Am. Fin. Grp., Inc.*, 100 F. Supp. 2d 1345, 1351 (S.D. Fla. 2000) ( "promissory estoppel claim…cannot be allowed to circumvent the…Statute of Frauds"), *and Trustmark Ins. Co. v. Gen. Cologne Life Re Ins. Co. of Am.*, 2004 WL 1745777 at *2 (N.D. Ill. Aug. 2, 2004) (statute of frauds bars promissory estoppel claim), *aff'd*, 424 F.3d 542 (7th Cir. 2005), *with Madison Tool and Die, Inc. v. ZF Sachs Auto. of Am., Inc.*, 2007 WL 2286130, at *3 (S.D. Ind. Aug. 7, 2007) ("In Indiana, an oral promise which falls within the Statute of Frauds may still be enforced if the doctrine of promissory estoppel applies."), *and Atl. Paper Box Co. v. Whitman's Chocolates*, 844 F. Supp. 1038, 1044 (E.D. Pa. 1994) (in certain circumstances, "a promissory estoppel theory can be maintained despite an apparent statute of frauds bar").

While this ends the inquiry, X would satisfy Step 3 for largely the same reasons:  the court "determine[s] which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied." *Mazza*, 666 F.3d at 590.  The Ninth Circuit recognizes that each state has an overwhelming interest in applying its own law to those who perform work within its borders, and little if any interest in doing so as to non-resident workers:

> But even *if* [a party] were able to identify any states that had unambiguously expressed an interest in applying their wage laws to work performed entirely in another state, *Sullivan* strongly militates against concluding that such an expression of interest would be adequate to overcome the principle that the state in which the conduct at issue occurs has the "predominant interest" in applying their own law.

*Senne*, 934 F.3d at 937; *Sullivan*, 51 Cal. 4th at 1205-06 (same). "California's interest in applying its law to residents of foreign states is attenuated". *Mazza*, 666 F.3d at 594.  X's headquarters in California do not change that fact. *Id.* (California's "interest in regulating those who do business within its state boundaries" did not warrant consumer law extra-territorial reach to non-residents).

### 3.    Plaintiff Fails to Meet His Burden to Prove that a Nationwide Class Involving Many State Laws Satisfies Rule 23, Including the Manageability Requirement.

Because multiple varying state laws apply to Plaintiff's class claims, he bears the burden to prove that Rule 23 requirements are met despite the need to litigate myriad state law issues:

> "[W]here the applicable law derives from the law of the 50 states, as opposed to a unitary federal cause of action, differences in state law will 'compound the [ ] disparities' among class members from the different states." *Because Zinser seeks certification of a nationwide class for which the law of forty-eight states potentially applies, she bears the burden of demonstrating "a suitable and realistic plan for trial of the class claims."* [Citing cases]

*Zinser*, 253 F.3d at 1189 (emphasis added); *Wash. Mut. Bank, FA v. Sup. Ct.*, 24 Cal. 4th 906, 923 (2001) (same based on "Our survey of the relevant federal decisions").  Plaintiff's burden is heavy:

> For a significant number of federal courts, this means the proponent must creditably demonstrate, through an extensive analysis of state law variances, that class certification does not present insuperable obstacles. …. On this score, the presentation must be sufficient to permit the district court, at the time of certification, to make a detailed assessment of how the difficulties posed by the variations in state law will be managed at trial. … A number of federal courts also caution that *if more than a few of the laws of the 50 states differ*, the district court may face *an impossible task* of instructing a jury on the relevant law.… The foregoing [federal] decisions stress that … the court cannot accept 'on faith' an assertion that variations in state laws relevant to the case do not exist or are insignificant; rather, the party seeking certification must affirmatively demonstrate the accuracy of the assertion.

*Wash. Mut.*, 24 Cal. 4th at 923-24 (2001) (emphasis added) (internal quote marks and cites omitted).

Plaintiff bore the burden of making this showing in his Motion, *not* on Reply, particularly since he knew that X raised choice of law issues previously.  ECF 16 at 7-10.  His failure to do so alone justifies denying his Motion.[24]  But he could not meet this burden even if he had tried.  Subclasses and/or jury instructions cannot rescue his proposed nationwide class given the number of states and varying laws at issue.  As noted, courts routinely and appropriately deny certification of nationwide classes, including for breach of contract claims, due to lack of predominance, manageability, superiority, and/or commonality.  *See supra* at 8-9 & n.10 (citing *Sateriale*, 2014 WL 7338877 at *12 (no nationwide breach of contract class due to "material differences among the laws of the fifty states");[25] *CLN*, 2010 WL 5146734 at *8 (no predominance for contract breach class "as a result of the laws of the 39 states at issue"); *Church*, 1991 WL 284083 at *12-13 (no predominance or superiority for nationwide contract breach claims where claims and varying state law issues rendered resolution "overwhelming"); *Gustafson*, 294 F.R.D. at 542-46 (no commonality or predominance for nationwide contract breach class, including given varying extrinsic evidence laws); *Weisberg*, 2018 WL 4043171, at *10 (same; no predominance); *Zinser*, 253 F.3d at 1189-90 (no predominance or manageability, including for subclasses); *Mazza*, 666 F.3d at 594 (no certification of nationwide class involving multiple state laws for lack of predominance)).

## B.  **Plaintiff Fails to Satisfy Rule 23 for Any Class, Regardless of State Law Variations.**

### 1.  **Plaintiff Fails to Prove Commonality.**

Plaintiff asserts four supposed "common questions": (1) did the Company make the "promises" alleged; (2) were they enforceable as contracts; (3) were they "definitive for purposes of establishing promissory estoppel"; and (4) did the Company have discretion not to pay bonuses.  Mot. at 1-2, 6-7.  These conclusory questions fail to "prove that there [is] in fact" a "common contention…capable of class-wide resolution—which means that determination of its truth or

---

[24] *See Wilson v. Pactiv LLC*, 2021 WL 5818492, at *7 (C.D. Cal. Dec. 3, 2021) (finding no predominance and explaining that "the Court will not consider [plaintiff's] new argument" raised "[f]or the first time in reply"); *Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150, 1179 (N.D. Cal. 2023) ("New evidence submitted as part of a reply is improper[.]").

[25] While *Sateriale* certified a California-only breach of contract class, this Court should not do so as discussed *infra*.  *Senne* approved state subclasses but there were only *three*.  934 F.3d at 928.

falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.  Question (1) is not even a "question," as it is not disputed that the four statements were made.  The rest simply restate Plaintiff's claims, each with a host of non-common subsidiary issues, like other "bottom line" questions the Supreme Court found inadequate.  *Id.* ("Do our managers have discretion over pay?  Is that an unlawful employment practice? …Reciting these questions is not sufficient to obtain class certification.").  None "generate common *answers* apt to drive the resolution of the litigation" with common proof.  *Id.* (internal quotation marks omitted).

Plaintiff's questions raise only individualized issues, including whether each employee heard or read a given statement and, if so, how they understood it.  Such context-specific inquiries are needed to assess contract formation, interpretation and breach, particularly since no statement actually said that bonuses would be paid at 50% of target, unmoored from the PBP's terms, and the Company admonition in September 2022 that "All PBP plan rules apply".  *Gustafson*, 294 F.R.D. at 542 ("while Plaintiffs may abstractly list a number of questions and facts that are 'common' to putative class members, they fail to show how these facts and questions meet the commonality or predominance requirements *in the context of their claims*.") (emphasis added); *id.* 541-47 (no commonality for analogous contract claim questions).  Plaintiff's statements at the time make clear that *he* did not believe any "promises" were made, and he never spoke with *any* of the putative class members about whether they believed they would receive a PBP bonus.  Pl. Dep. 129:5-10.

### 2. Plaintiff Is Atypical and Inadequate Due to Application of Texas Law to His Claims, His Advocating Against Payment of a Bonus, and His DRA Opt-Out.

Rule 23(a)(3) requires Plaintiff to prove that his claims or defenses "are typical of the claims or defenses of the class," *i.e.*, "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  Rule 23(a)(4) requires that he establish he "will fairly and adequately protect the interests of the class," which examines "whether the named plaintiffs and their counsel have any conflicts of interest with other class members."  *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023) (internal quotes omitted).  Typicality and adequacy "often merge in a class certification

analysis because an atypical representative may create conflicts between that representative and the class." *Feske v. MHC Thousand Trails Ltd. P'ship*, 2013 WL 1120816 at *12 & 12 n.89 (N.D. Cal. Mar. 18, 2013) (citing *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)).

Plaintiff is atypical of the class because X has unique defenses to his claims.  He was the Senior Director of Compensation who administered the PBP plan and repeatedly advised – including in a meeting with Musk – that funding a PBP bonus pool was discretionary and the Company should *not* pay bonuses due to its horrible financial performance.  The trial will focus on these admissions, including that he did not believe "promises" were made to pay a 2022 bonus and that he did not rely on these statements.  X's estoppel and unclean hands defenses make Plaintiff atypical.  *Hanon*, 976 F.2d 497 at 508 (no certification "if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."); *Feske*, 2013 WL 1120816 at *14 (same: "plaintiff may be atypical and thereby an inadequate representative.")

The applicability of Texas law to Plaintiff's claims also renders him atypical.  As noted, Texas does not recognize his continued employment as valid consideration for an enforceable contract, and appears not to recognize promissory estoppel as a viable claim in the employment context.  *See supra* at 12 n.15 & 14 n.20 (citing *Castranova*, 2003 WL 22143793 at *2; *Shanklin*, 2008 WL 4899631 at *12; *Lotito*, 391 S.W.3d 226, 227; *Anzaldua*, 2020 WL 1236466, at *5).

Plaintiff also fails the adequacy test.  He played a primary role in the decision not to fund a bonus pool and pay bonuses, placing him in direct conflict with the class.  *See Delgado v. Market., Inc.*, 2018 WL 6706041 at *8 (N.D. Cal. Dec. 20, 2018) (manager inadequate where "[his] own actions—such as failing to complete a timecard before terminating an employee—may have contributed" to class not receiving timely final pay); *Hadjavi v. CVS Pharm., Inc*., 2011 WL 3240763 at *6 (C.D. Cal. July 25, 2011) (plaintiff manager an inadequate representative because he "may have contributed to [another plaintiff's] inability to take his meal break); *Donaldson v. Microsoft Corp*., 205 F.R.D. 558, 568 (W.D. Wash. 2001) ("the Court is unable to envision a class which would include both those who implemented the ratings system and those who allegedly suffered under it."); *cf. Kirola v. City of San Fran.*, 2011 WL 1330853 at *5 (N.D. Cal. Apr. 4, 2011) (excluding class member "responsible, at least in part, for developing and implementing the

1   very City programs and policies challenged by Plaintiffs" due to intra-class conflict).

2        Plaintiff also opted out of the DRA, in contrast to the 95% of the putative class members

3   who *are* subject to a DRA and must individually arbitrate any disputes.  Fenelon Decl. ¶ 6; Mot. at

4   14 n.7 & Ex. 22 ¶ 1; Pl. Dep. 21:23-22:21.[26]  The Ninth Circuit held:  "[t]he district court abused

5   its discretion to the extent it certified classes ... that include [members] who signed class action

6   waivers" when the class representative did not, including because members who signed arbitration

7   agreements with waivers "have potential defenses that [the class representative] would be unable

8   to argue on their behalf."  *Avilez v. Pinkerton Gov't Serv., Inc.*, 596 F. App'x 579, 579 (9th Cir.

9   2015).  "District courts within this Circuit have consistently relied on *Avilez* to reach a similar

10  result."  *Valencia v. VF Outdoor, LLC*, 2021 WL 5154161 at *3-4 (E.D. Cal. Nov. 5, 2021) (citing

11  cases; no certification where "a majority" of class signed arbitration agreement but not plaintiff).[27]

12       *Nitsch v. Dreamworks Animation SKG, Inc.*, 315 F.R.D. 270, 284-85, 314 (N.D. Cal. 2016)

13  (Mot. at 14) is inapposite, as it failed to address *Avilez*; involved parties without arbitration

14  agreements; and the defendant with an agreement did not pursue arbitration. Many courts in this

15  Circuit declined to follow *Nitsch*.  *See Conde v. Open Door Mktng.*, 223 F. Supp. 3d 949, 958-62

16  (N.D. Cal. Apr. 27, 2017); *Valencia*, 2021 WL 5154161, at *5; *Berman*, 400 F. Supp. 3d at 985-

17  87.  Plaintiff's other citations are unhelpful.[28]  His speculation "whether [Twitter] has waived its

---

[26] The class waiver provision states in relevant part:  "You and the Company agree to bring any dispute in arbitration on an individual basis only, and not on a class…basis."  *See* Par. 5 of sample Arbitration Agreement available at ECF 1-1 in *Ma v. Twitter, Inc., et al.,* No. 3:23-cv-03301 (N.D. Cal.) (cited at Mot. at 13 n.6).  Other judges in the Northern District have already found this DRA, and its class waiver, enforceable and binding on employees who did not opt out.  *See* Request for Judicial Notice ("RJN") ¶ 1 & Ex. 1 (Order re Arbitration, ECF 52 (filed Jan. 13, 2023), *Cornet, et al. v. Twitter, Inc.*, No. 3:22-cv-06857-JD, N.D. Cal.); *id.* ¶ 2 & Ex. 2 (Order Granting Motion to Compel Arbitration and Granting Motion to Dismiss, ECF 35 (filed May 5, 2023), *Borodaenko, et al. v. Twitter, Inc.*, No. 4:22-cv-07226-HSG, N.D. Cal.).

[27] *See Berman v. Freedom Fin. Net., LLC*, 400 F. Supp. 3d 964, 986-87 (N.D. Cal. 2019) (citing *Avilez*; "the Ninth Circuit has suggested, without expressly holding, that a class encompassing members with valid arbitration agreements and others not subject to the arbitration agreements cannot be certified" (citing *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094 (9th Cir. 2018))); *Tan v. Grubhub, Inc.*, 2016 WL 4721439 at *3 (N.D. Cal. July 19, 2016) (finding *Avilez* "instructive"; denying certification where plaintiff opted out of arbitration agreement, in contrast to class), *aff'd sub nom., Lawson v. Grubhub, Inc.*, 2021 WL 4258826 (9th Cir. Sept. 20, 2021).
[28] *Jensen v. Cablevision Systems Corp.*, 372 F. Supp. 3d 95, 121-25 (E.D.N.Y. Feb. 27, 2019), found typicality and adequacy lacking because plaintiff opted out of arbitration, unlike class members. *Chen-Oster*, *Rushing*, *Gutierrez*, *Jackson*, *Ductile*, and *TFT-LCD* did not decide class

right to compel arbitration" is wrong and irrelevant here.  *Conde*, 223 F. Supp. 3d at 961 (no

certification: "enforceability of the arbitration agreement…[is] not yet properly before the Court.").

### 3. Plaintiff Has Failed to Prove Predominance and Superiority.

Predominance is a "far more demanding" burden than commonality, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997), and "'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1138 (9th Cir. 2022) (citation omitted). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *Id.* (internal quotation marks and citation omitted).

#### a. Individual Issues of Exposure to Each Promise and Reliance Predominate.

Plaintiff's entire predominance argument amounts to just *nine lines* of text in his brief:

> Here, common questions common of law and fact will predominate. Specifically, the case will focus on: (1) whether the oral and written statements by Twitter's management constitute a binding contract (or alternatively a definitive promise for promissory estoppel) is a common question central to every class member's claim; and (2) whether Twitter's decision not to pay 2022 annual bonuses may be justified based on the discretion under the 2022 Performance Bonus Plan.  [Mot. at 11-12.]

This *ipse dixit* merely repackages his deficient "common questions" and cannot meet his burden.

*First*, material individual questions exist whether each putative class member even heard or read any of the statements at issue, and if so, which ones, given that the Company does not track meeting attendance, email review, or intranet access. *See supra* at 4-6. Nor would any such evidence show whether an employee read, heard, or paid attention to any such statement.  The September 2022 meeting, available to only managers, adds uncertainty as to whether and what any manager may have communicated to their reports, and to which ones.  *Id.*  Furthermore, more than 100 putative class members were hired *after* one or more of the statements at issue were made (Fenelon Decl. ¶ 5), requiring individualized proof of whether and how they heard or read them later.

The only way to know these critical facts is to ask each putative class member, which is

---

certification and simply hold that a defendant does not waive the right to compel arbitration by waiting until after class certification.  *Barnes*, *Saleh* did not involve arbitration agreements at all.

fatal to predominance.  *See, e.g.*, *Mazza*, 666 F.3d at 595 (denying nationwide and California class fraud claims:  "common issues of fact would not predominate in the class as currently defined because it almost certainly includes members who were not exposed to, and therefore could not have relied on, Honda's allegedly misleading advertising material"); *cf. Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020) ("If many class members…'were never exposed to the challenged conduct to begin with,' the class does not satisfy Rule 23(b)(3).").  In *CLN*, the court held that a uniform notice "enclosed with invoices sent to customers" was not common proof that met predominance.  2010 WL 5146734 at *6.  The court found that "it is not at all clear that most 2005 customers received the notice," just as it is "not at all clear" here that most or all employees received the communications at issue, including statements made only to managers in September 2022.  *Id.*  It also found that myriad inquiries were needed into customers' communications with individual sales representatives – just like the managers here – *even if they used uniform talking points*:  "a breach of contract claim premised on false statements made to customers would require a customer-by-customer inquiry into what statements actually were made by sales representatives, whether the statements were misleading, and what else the customer knew about the fuel fees."  *Id.*

*Second*, *if* any class claims were tried, even under the "objective" theory of contract, "individualized issues would predominate over common ones because [defendant] would be entitled to present *the relevant setting or context in which the purported offer was made as to each employee, and informed his or her objectively reasonable belief, which cannot be done through evidence common to the class*."  *Grainger v. Prec. of New Hampton, Inc.*, 2023 WL 8411290 at *4 (N.D. Iowa Apr. 24, 2023) (emphasis added); *Gustafson*, 294 F.R.D. at 544 n.15 (rejecting "argument that extrinsic evidence is unnecessary to interpret standardized consumer contracts.  This position has been rejected by several courts, and thus, at least in interpreting some of the putative class members' contracts, the Court would likely need to look to extrinsic evidence.") (citing cases).  None of the statements here unambiguously says that every employee who stayed employed unconditionally would receive a 2022 bonus at 50% of target – full stop.  They said only that bonus "opportunities" would stay the same for one year post-closing; that "Based on our Q2 performance, the 2022 total bonus pool is now tracking to 50%"; and that "Eligible Tweep's will receive 50% of

their PBP targets," but also that "All PBP plan rules apply" – one or more of which statements created documented "confusion" among employees.  *See supra* at 4-6; Segal. Dep. Ex. 8.

While the Company contends that the plain language of these statements *refutes* Plaintiff's claims and ultimately would justify summary judgment against him, extrinsic evidence would be needed to determine what each putative class member *reasonably* understood regarding, *e.g.*, whether bonus "opportunities" included PBP and Merger Agreement terms; whether Company "discretion" and eligibility criteria requiring satisfactory performance still applied (Pl. Dep. Ex. 4, p.1); whether and to what extent "bonus *pool* tracking" of accrual as of "*now*" speaks to future payment; and whether the "PBP plan rules" that "apply" qualified the statement that employees "will receive 50% of their PBP targets". The objectively reasonable interpretation of each statement can vary by employee depending on what information they had available or reviewed (including the PBP and/or Merger Agreement), and what they may have been told by managers or others:  "the setting or context of the purported offer looks different for different employees (depending on whether they knew the bonuses were discretionary based on communications from supervisors or otherwise)."  *Grainger*, 2023 WL 8411290 at *4.

These individualized inquiries defeat predominance.  *Id.*; *Church*, 1991 WL 284083 at *13 (no predominance:  "the circumstances surrounding the creation and termination of each of these contracts, or whether there were any modifications to such contracts (or whether such modifications were enforceable), would undeniably vary."); *Gustafson*, 294 F.R.D. at 544; *Weisberg*, 2018 WL 4043171, at *10 (no predominance, despite claim of the same "core messaging" across contracts, in part because "Plaintiff fails to point to the terms that are identical and were 'executed under like conditions' across the putative class").  Plaintiff's cited cases are inapposite.  In *In re University of So. California Tuition & Fees COVID-19 Refund Litigation*, 695 F. Supp. 3d 1128, 1159 (C.D. Cal. 2023), the promise was straightforward with no ambiguity or possible varying understandings, nor were there choice of law issues – the court "already concluded that [a student handbook and other] statements … plausibly constituted a promise to provide access to campus facilities and in-person, on-campus courses."  *Id.* at 1157.  And in *Local Joint Executive Board of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152 (9th Cir. 2001), the only "timely payment" issue as

to the laid-off employee class was "the date of 'discharge' from which the [statutory] three-day period runs," which was the same for all employees. *Id.* at 1155, 1163 & n.4 (referencing "separate unpublished memorandum disposition" of timely pay issue in the same case, from which the above quote is taken, *see id.*, 7 Fed. Appx. 753 (9th Cir. 2001)).

*Third*, it is well-settled that individualized inquiries into reliance – essential to any promissory estoppel claim – predominate over any common questions and cannot be resolved with common proof. Some employees may have elected to keep working, *e.g.*, because they liked their jobs, were risk-averse, or did not wish to look for another job. Plaintiff himself clearly did not rely on these supposed "promises," because he urged the Company *not* to pay bonuses. The Court also would need to determine whether and why each employee sought, received, and turned down any job opportunities, which Plaintiff alleges as further reliance. These individualized reliance inquiries defeat predominance. *See Mazza* 666 F.3d at 596 (stating in analogous fraud context: "common questions of fact do not predominate where an individualized case must be made for each member showing reliance"); *Sateriale*, 2014 WL 7338877 at *12 (no certification of promissory estoppel class even as to California members: "determining whether any given member relied on RJR's alleged promise to make non-tobacco merchandise available would require an inquiry into each class member's state of mind. Such individualized inquiries would undermine any efficiencies that might be achieved by adjudicating this claim on a class-wide basis.").

This alone defeats Plaintiff's Motion, a result the many state law complexities reinforce.

## b. **Plaintiff Has Failed to Demonstrate that a Class Action Is Superior.**

The court in *Lara* stated that "Whether a class action will be manageable is, by ... far, the most critical concern in determining whether a class action is a superior means of adjudication," and quickly deemed superiority lacking after finding predominance was not met:

> [T]he district court's finding of no superiority was not an abuse of discretion *for the same reason* [as the lack of predominance]. A class action here would involve adjudicating issues specific to each class member's claim, and *that would be unmanageable. Individual trials would be a better way to adjudicate those issues*.

25 F.4th at 1138, 1140 (emphasis added). These principles dispose of Plaintiff's conclusory claim that it would be "grossly inefficient to require each employee to bring a case," as does the fact that

1  Plaintiff's counsel already represents *thousands* of highly paid employees in individual arbitrations.

2  Mot. at 13 n.6.  Here, they are even more compelling given the many state law issues at play.

3  Plaintiff's reference to "vindicat[ing] statutory rights" are irrelevant.  The claims here are

4  common law not statutory, and *Martin v. Tango's Restaurant, Inc.* did not involve Rule 23.  Mot.

5  at 12-13.  His "retaliation" argument is equally specious.  He makes no showing of any social media

6  "attack" on Plaintiff or other class members.  His cited cases involved lower-wage workers and

7  truly uniform policies, and neither suggested that "retaliation" concerns can surmount a lack of

8  commonality or predominance.  *Overka v. American Airlines, Inc.*, 265 F.R.D. 14, 18-24 (D. Mass.

9  2010); *Perez v. Safety-Kleen Systems, Inc.*, 253 F.R.D. 508, 518-21 (N.D. Cal. 2008); *see Till v.*

10  *Saks Inc.*, 2013 WL 5755671 at *8 n.3 (N.D. Cal. Sept. 30, 2013) ("It is unclear whether fear of

11  reprisal is germane to demonstrating superiority, as *Zinser* makes no mention of it. 253 F.3d at

12  1190–92.").  Plaintiff thus fails to prove superiority even if the applicable state law were uniform.

13  **4.  Numerosity Is Lacking for Any Putative California Class.**

14  Plaintiff cannot certify *any* class for the reasons discussed *supra*.  Nor can he certify a

15  California-only class because all but thirty (30) putative class members in California signed DRAs

16  with class waivers, or signed general releases of all claims, and cannot participate in this case.

17  Fenelon Decl. ¶¶ 8-9. This low number precludes a finding of sufficient numerosity. *Berry v. Baca*,

18  226 F.R.D. 398, 403 (C.D. Cal. 2005) ("plaintiffs have only presented evidence of thirty-three

19  possible class members" and failed to show joinder was impracticable).  Joining this handful of

20  California employees is clearly practicable as evidenced by Plaintiff's counsel's individual

21  representations of thousands of other Company employees.  Mot. at 14 n.7.

22  For the foregoing reasons, Plaintiff's Motion should be denied in its entirety.

23  Dated: September 16, 2024                MORGAN, LEWIS & BOCKIUS LLP

24                                                         By:   */s/ Brian D. Berry*
                                                                      Eric Meckley
25                                                                  Brian D. Berry
                                                                      Ashlee Cherry
26                                                                  Kassia Stephenson
                                                                      Attorneys for Defendant
27                                                                  X CORP. f/k/a TWITTER, INC.

28