# EXHIBIT 1

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                      SAN FRANCISCO DIVISION

4                            --oOo--

5      MARK SCHOBINGER, on behalf of
       himself and all others similarly

6      situated,

7                      Plaintiff,

8      vs.                                   Case No.
                                             3:23-cv-03007-VC

9      TWITTER, INC. and X CORP.,

10                     Defendants.
       _____/

11

12

13

14                       CONFIDENTIAL

15

16         VIDEO-RECORDED DEPOSITION OF NED SEGAL

17              SAN FRANCISCO, CALIFORNIA

18             THURSDAY, SEPTEMBER 5, 2024

19

20

21

22

23     Reported by:

24     Anrae Wimberley, CSR No. 7778

25     Job No.  6882469

                                             Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4                      --oOo--
 5   MARK SCHOBINGER, on behalf of
     himself and all others similarly
 6   situated,
 7                   Plaintiff,
 8   vs.                              Case No.
                                      3:23-cv-03007-VC
 9   TWITTER, INC. and X CORP.,
10                   Defendants.
     _____/
11
12
13                   CONFIDENTIAL
14
15
16          Transcript of video-recorded deposition
17   of NED SEGAL, taken at Sidley Austin LLP, 555
18   California Street, 19th Floor, San Francisco,
19   California 94104, beginning at 9:37 a.m. and ending
20   at 6:39 p.m. on Thursday, September 5, 2024, before
21   Anrae Wimberley, Certified Shorthand Reporter No.
22   7778.
23
24
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
1     APPEARANCES:

2     For Plaintiffs Mark Schobinger, on behalf of himself

3     and all others similarly situated:

4               LICHTEN & LISS-RIORDAN

5               BY:  SHANNON LISS-RIORDAN, ESQ.

6               729 Boylston Street, Suite 2000

7               Boston, Massachusetts 02116

8               (617) 994-5800

9               sliss@llrlaw.com

10

11    For Defendants Twitter, Inc. and X Corp.:

12              MORGAN, LEWIS & BOCKIUS LLP

13              BY:  ERIC MECKLEY, ESQ.

14              CHRIS BORAN, ESQ. (VIA ZOOM)

15              MELISSA HILL, ESQ. (VIA ZOOM)

16              One Market, Spear Street Tower, 28th Floor

17              San Francisco, California 94105-1596

18              (415) 442-1013

19              eric.meckley@morganlewis.com

20

21

22

23

24

25
```

Page  3

CONFIDENTIAL

1   For the Deponent Ned Segal, third-party witness:

2          SIDLEY AUSTIN LLP

3          BY:  JAIME BARTLETT, ESQ.

4          DAVID ANDERSON, ESQ.

5          CHADDY GEORGES, ESQ.

6          555 California Street, 20th Floor

7          San Francisco, California 94104

8          (415) 772-1200

9          jbartlett@sidley.com

10         dlanderson@sidley.com

11         cgeorges@sidley.com

12

13  Also present:

14         MARY HANSBURY, In-House Counsel for X

15         Corp.

16

17         REILLY LEET, VIDEOGRAPHER

18         VERITEXT LEGAL SOLUTIONS

19                    -oOo--

20

21

22

23

24

25

                                        Page  4

CONFIDENTIAL

```
 1                      I N D E X
 2    EXAMINATION BY:                          PAGE
 3    MR. MECKLEY                               11
 4    MS. LISS-RIORDAN                         200
 5    MR. MECKLEY                              271
 6                      --oOo--
 7
 8                   E X H I B I T S
 9    EXHIBIT            DESCRIPTION            PAGE
10    Exhibit 1     Document entitled "2022     32
                    Global Discretionary
11                  Performance Bonus, Plan
                    Effective Date:  January 1,
12                  2022"; 3 pages
13    Exhibit 2     Document entitled           53
                    "Compensation @Twitter,
14                  Total Granted
                    Compensation"; Bates
15                  stamped
                    X-SCHOBINGER_000000051
16                  through 52
17    Exhibit 3     Document entitled           55
                    "Performance Bonus Plan"; 2
18                  pages
19    Exhibit 4     Slack messages between Ned  87
                    Segal and Julianna Hayes on
20                  7/13/22; 1 page
21    Exhibit 5     E-mail chain; Bates stamped 88
                    X-SCHOBINGER_000000067
22                  through 69
23    Exhibit 6     Slack messages between Ned  90
                    Segal and Kathleen Pacini
24                  on 8/18/22; 2 pages
25
```

Page 5

CONFIDENTIAL

```
1                      E X H I B I T S  (Cont'd)
2      EXHIBIT           DESCRIPTION              PAGE
3    Exhibit 7      E-mail chain with              96
                    attachment; Bates stamped
4                   X-SCHOBINGER_000000074
                    through 77
5
     Exhibit 8      E-mail chain; 2 pages         112
6
     Exhibit 9      Slack messages between Ned    144
7                   Segal and Kathleen Pacini
                    on 4/16/22; 1 page
8
     Exhibit 10     Text messages dated           150
9                   10/21/22; Bates stamped
                    Segal_Schobinger_009
10
     Exhibit 11     Slack message from Mark       157
11                  Schobinger to Lisa Cummings
                    on 10/4/22; Bates stamped
12                  X_SCHOBINGER_000000081
13   Exhibit 12     Subpoena to Ned Segal with    170
                    Attachment A; 5 pages
14
     Exhibit 13     Document entitled "Twitter    178
15                  acquisition:  Tweep FAQ";
                    Bates stamped
16                  TWITTER_ARB_000002050
                    through 2076
17
     Exhibit 14     Document entitled "Written    181
18                  Consent" and Annex A; 2
                    pages
19
     Exhibit 15     Letter to Volodymyr Zhabiuk   187
20                  from Dalana Brand dated
                    July 26, 2022; 1 page
21
     Exhibit 16     Document entitled "Demand     190
22                  for Arbitration Form" with
                    attachments; 9 pages
23
     Exhibit 17     Letter to Arnaud Weber from   196
24                  Dalana Brand dated July 1,
                    2022; 1 page
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1                        E X H I B I T S  (Cont'd)
 2     EXHIBIT              DESCRIPTION                     PAGE
 3     Exhibit 18    Excerpted Page 65/95 from        239
                     the merger agreement; Bates
 4                   stamped
                     TWITTER_ARB_000002142
 5
       Exhibit 19    E-mail chain; Bates stamped      248
 6                   X_ARBS_000072278 through
                     72280
 7
       Exhibit 20    Google Doc comments dated        255
 8                   6/7/22; Bates stamped
                     X_ARBS_000072406
 9
       Exhibit 21    E-mail chain; Bates stamped      258
10                   X_ARBS_000072420 through
                     72421
11
       Exhibit 22    Slack messages dated             259
12                   9/12/22 and 9/13/22; Bates
                     stamped
13                   Segal_Schobinger_0007
                     through 8
14
       Exhibit 23    PowerPoint slides titled         265
15                   "Managers, Assemble" dated
                     September 2022; Bates
16                   stamped
                     X-SCHOBINGER_000000156 to
17                   191
18     Exhibit 24    Excerpted Pages 65/95 and        271
                     66/95 from the merger
19                   agreement; Bates stamped
                     TWITTER_ARB_000002142 and
20                   2143
21                         --oOo--
22
23
24
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

1          QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

2                        PAGE    LINE

3                        123        4

4                        124       19

5                        210        5

6                        --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

CONFIDENTIAL

```
 1                THURSDAY, SEPTEMBER 5, 2024;

 2                SAN FRANCISCO, CALIFORNIA;

 3                    9:37 A.M.

 4                     - - -

 5         THE VIDEOGRAPHER:  Good morning.  We are going      09:36:53

 6    on the record at 9:37 a.m. on September 5th, 2024.

 7             Please note that the microphones are

 8    sensitive and may pick up whispering and private

 9    conversations.  Please mute your phones at this

10    time.  Audio and video recording will continue to     09:37:13

11    take place unless all parties agree to go off the

12    record.

13             This is Media Unit 1 of the video-recorded

14    deposition of Ned Segal taken by counsel for

15    defendant in the matter of Mark Schobinger, et al.,   09:37:30

16    vs. Twitter, Inc., et al., filed in the United

17    States District Court, Northern District of

18    California, San Francisco Division, Case

19    No. 3:23-cv-03007-VC.

20             The location of the deposition is            09:38:01

21    555 California Street, Suite 2000, San Francisco,

22    California 94104.

23             My name is Reilly Leet representing

24    Veritext Legal Solutions, and I'm the videographer.

25    The court reporter is Anrae Wimberley from the firm   09:38:20
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Veritext Legal Solutions. | 09:38:23 |

2         I am not related to any party in this

3    action nor am I financially interested in the

4    outcome.

5         Counsel and all present, including          09:38:32

6    remotely, will now state their appearances and

7    affiliations for the record beginning with the

8    noticing attorney.

9      MR. MECKLEY:  Eric Meckley, Morgan, Lewis, for

10   defendant.                                        09:38:47

11     MS. HANSBURY:  Mary Hansbury, X Corp.

12     MS. LISS-RIORDAN:  Shannon Liss-Riordan for

13   plaintiff.

14     MS. BARTLETT:  Jaime Bartlett, Sidley Austin,

15   on behalf of the witness, Mr. Segal, and with me is   09:38:57

16   Chaddy Georges and David Anderson.

17     THE VIDEOGRAPHER:  And then in the Zoom is

18   Chris Boran and Melissa Hill.  Thank you.

19         Will the court reporter please swear in

20   the witness and then counsel may proceed.         09:39:11

21     MR. ANDERSON:  Who are the people on Zoom?

22     MR. MECKLEY:  They are attorneys with my

23   office.  They're part of our team.

24     MR. ANDERSON:  Thank you.

25   //                                                09:39:20

Page 10

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | NED SEGAL, | 09:39:20 |
| 2 | sworn in personally as a witness by the Certified | |
| 3 | Shorthand Reporter, testified as follows: | |
| 4 | EXAMINATION | |
| 5 | BY MR. MECKLEY: | 09:39:20 |
| 6 | Q.   Good morning, Mr. Segal.  My name is Eric | |
| 7 | Meckley.  I introduced myself before the start of | |
| 8 | the deposition.  I represent Twitter, X Corp. in the | |
| 9 | lawsuit that has been filed by Mark Schobinger. | |
| 10 | Have you been deposed before? | 09:39:49 |
| 11 | A.   Yes, I have. | |
| 12 | Q.   Approximately how many times? | |
| 13 | A.   At least once. | |
| 14 | Q.   Okay.  So you're probably generally | |
| 15 | familiar with the process, but I'm just going to | 09:40:01 |
| 16 | give you a very truncated set of ground rules for | |
| 17 | the deposition. | |
| 18 | You understand your testimony today is | |
| 19 | under oath; correct? | |
| 20 | A.   Yes, I do. | 09:40:11 |
| 21 | Q.   So even though we're in this very nice | |
| 22 | conference room, it has the effect as if you were | |
| 23 | testifying in court. | |
| 24 | Do you understand that? | |
| 25 | A.   Yes, I do. | 09:40:20 |

Page 11

| | | |
|---|---|---|
| 1 | incentive compensation plan, such as the PBP, needed | 10:05:07 |
| 2 | to be approved by the compensation committee? | |
| 3 | MS. BARTLETT:  Objection; misstates testimony. | |
| 4 | THE WITNESS:  What's the question? | |
| 5 | BY MR. MECKLEY: | 10:05:21 |
| 6 | Q.  Was it your understanding that any type of | |
| 7 | incentive compensation program for employees needed | |
| 8 | to be approved by the compensation committee? | |
| 9 | A.  I don't remember. | |
| 10 | Q.  Was it your understanding that any changes | 10:05:32 |
| 11 | or modifications to an incentive compensation plan | |
| 12 | had to be approved by the compensation committee? | |
| 13 | A.  I don't remember. | |
| 14 | Q.  You mentioned that the compensation | |
| 15 | committee approved the 2022 performance bonus plan | 10:05:47 |
| 16 | sometime in early 2022; correct? | |
| 17 | A.  That's correct. | |
| 18 | Q.  All right.  After the plan was originally | |
| 19 | approved by the compensation committee, did the | |
| 20 | compensation committee approve any changes or | 10:06:04 |
| 21 | modifications to the 2022 PBP? | |
| 22 | A.  I don't remember. | |
| 23 | Q.  And the terms and conditions of the PBP | |
| 24 | were memorialized in a plan document; is that right? | |
| 25 | A.  I believe so. | 10:06:21 |

Page 31

CONFIDENTIAL

1    Q.   Okay.  So one of the things that we're          10:06:21

2    going to do during the deposition today is look at

3    documents, what we call "exhibits."  The court

4    reporter will mark them, you can review them and

5    then I'm going to ask you questions about them.        10:06:33

6        MR. MECKLEY:   So this is going to be Exhibit 1.

7            (Deposition Exhibit 1 was marked.)

8    BY MR. MECKLEY:

9        Q.   While you're looking at that, Mr. Segal,

10   I'll describe that for the record.                     10:07:37

11           So Exhibit 1 is a multipage document

12   entitled "2022 Global Discretionary Performance

13   Bonus Plan, Effective Date:   January 1, 2022."

14           (Witness reviews document.)

15       Q.   All right.  Are you ready to answer           10:08:39

16   questions?

17       A.   I am.

18       Q.   Did you draft this document?

19       A.   I don't think so.

20       Q.   Or any portion of it?                         10:08:45

21       A.   I don't remember.

22       Q.   Do you know who drafted it?

23       A.   I don't.

24       Q.   Okay.  If you could take a look at page 3,

25   near the top, there's a bolded heading "Entire         10:09:00

Page 32

1    Agreement" that states, "This Plan, along with each          10:09:04

2    PAF, constitutes the entire agreement and

3    understanding between the relevant Twitter Group

4    employing entity and each Eligible Employee relating

5    to the subjects covered by this Plan and supersedes        10:09:16

6    and replaces any and all other plans, agreements,

7    plans summaries, representations, discussions and/or

8    understandings (written or oral.)"

9           Do you see that?

10       A.   Yes, I do.                                          10:09:29

11       Q.   Was it your understanding that all of the

12   plan terms and rules were contained in this plan

13   document?

14       MS. BARTLETT:   Objection; foundation.

15       THE WITNESS:   Can you repeat the question,              10:09:39

16   please?

17   BY MR. MECKLEY:

18       Q.   Was it your understanding that all of the

19   plan rules and terms were contained in this

20   document?                                                    10:09:45

21       A.   I see what the paragraph says.   But I

22   don't know what else there might have been, but

23   there might have been something else.

24       Q.   Are you aware of anything else in writing

25   that contained PBP plan rules or terms?                      10:10:00

Page 33

1      A.    Two years later, sitting here today, I'm                10:10:03

2  not.

3      Q.    Okay.  And you also understood that there

4  was nothing that was said by any Twitter employee

5  could override or change the terms and rules that          10:10:16

6  were contained in the plan document; is that

7  correct?

8      MS. BARTLETT:  Objection; misstates testimony.

9      MS. LISS-RIORDAN:  And objection; calls for a

10  legal conclusion.                                          10:10:25

11      THE WITNESS:  I see what the paragraph says.

12  BY MR. MECKLEY:

13      Q.    All right.  And was it your understanding

14  that there was nothing that any Twitter employee

15  could say that would override the plan terms and           10:10:37

16  rules in the document?

17      MS. BARTLETT:  Objection; asked and answered,

18  lacks foundation, calls for a legal conclusion.

19      THE WITNESS:  I see what the paragraph says.

20  BY MR. MECKLEY:                                            10:10:51

21      Q.    Yeah, I'm just asking for your

22  understanding.  I'm not asking what the paragraph

23  says.

24          So was it your understanding that a

25  Twitter employee could not say something to override      10:10:57

Page 34

| | | |
|---|---|---|
| 1 | these plan rules and terms? | 10:11:04 |
| 2 | MS. BARTLETT:  Same objections. | |
| 3 | THE WITNESS:  I see what the paragraph says. | |
| 4 | BY MR. MECKLEY: | |
| 5 | Q.   Are you able to answer the question? | 10:11:14 |
| 6 | A.   No, I'm not. | |
| 7 | Q.   And why is that? | |
| 8 | A.   Because I don't have anything to add to | |
| 9 | what's in the paragraph. | |
| 10 | Q.   So your interpretation of this paragraph | 10:11:23 |
| 11 | is that nothing an employee could say would change | |
| 12 | or supersede or replace any of the terms and | |
| 13 | conditions in this document? | |
| 14 | MS. BARTLETT:  Objection; lacks foundation, | |
| 15 | misstates testimony, calls for a legal conclusion. | 10:11:36 |
| 16 | MS. LISS-RIORDAN:  And objection; the document | |
| 17 | speaks for itself. | |
| 18 | BY MR. MECKLEY: | |
| 19 | Q.   So you can answer. | |
| 20 | A.   Sounds like that's your interpretation. | 10:11:44 |
| 21 | Q.   I'm asking for your interpretation. | |
| 22 | A.   I'm sorry, I don't have one. | |
| 23 | Q.   Well, Mr. Segal, did you think that you | |
| 24 | could make statements that would supersede or | |
| 25 | replace or change any of the terms and conditions in | 10:11:58 |

Page 35

1    this document?                                              10:12:01

2         A.    I'm not sure.

3         Q.    And why do you say you're not sure?

4         A.    Because I'm not sure.

5         Q.    Were there things you thought that you            10:12:13

6    could say that would replace or change the PBP plan

7    for 2022?

8         A.    I'm not sure.

9         Q.    What would help you know whether or not

10   you could do that?                                          10:12:28

11        A.    I'm not sure.

12        Q.    Did you have the authority to amend the

13   PBP plan document yourself independently?

14        A.    I don't think so.

15        Q.    Did you have the authority to modify the         10:12:42

16   PBP plan document yourself independently?

17        A.    I don't think so.

18        Q.    Other than the compensation committee, was

19   there any other person that you were aware of that

20   had the authority to amend or modify the PBP plan           10:12:58

21   document?

22        A.    I don't think so.

23        Q.    And during your employment in 2022, did

24   you take any actions with the intent to amend or

25   modify the PBP plan document?                               10:13:13

Page 36

1    A.   Not that I remember.                          10:13:16

2         Q.   Did you do anything that you recall with

3    the intent to modify the terms or conditions of the

4    PBP plan?

5         A.   I don't remember.                         10:13:29

6         Q.   And during your employment in 2022, you're

7    not aware of the compensation committee ever

8    amending or modifying the PBP plan document;

9    correct?

10        MS. BARTLETT:   Objection; misstates testimony.  10:13:49

11        THE WITNESS:   I don't remember.

12   BY MR. MECKLEY:

13        Q.   Was the PBP plan document accessible to

14   all Twitter employees?

15        A.   I don't remember.                          10:14:03

16        Q.   It wasn't kept confidential from

17   employees, was it?

18        A.   I don't remember.

19        Q.   Do you recall employees could access the

20   PBP plan document through the company's Intranet?    10:14:16

21        A.   I don't remember.

22        Q.   Did the company have an Intranet?

23        A.   Yes, it did.

24        Q.   And were you aware that the company put

25   various employee policies on the Intranet for        10:14:28

Page 37

1    employees to access?        10:14:32

2        MS. BARTLETT:  Objection; vague.

3        THE WITNESS:  I don't remember what was on the

4    Intranet.

5    BY MR. MECKLEY:        10:14:38

6        Q.  I wasn't asking specifics.  I was asking,

7    you're aware that the Intranet included various

8    employee policies for employees to access; correct?

9        A.  I think so.

10       Q.  And that was at the "Go" backslash and    10:14:50

11   then whatever the document was, that's how employees

12   could get various employee policies?

13      A.  Often.

14      Q.  Do you know whether employees were

15   expected to review the PBP plan document?    10:15:07

16      A.  I don't remember.

17      Q.  Did Twitter track in any way whether an

18   employee had reviewed the PBP document?

19      A.  I don't remember.

20      Q.  Did Twitter track in any way whether an    10:15:20

21   employee had reviewed or accessed the information

22   regarding the PBP that was available on the

23   Intranet?

24      MS. BARTLETT:  Objection; foundation.

25      THE WITNESS:  I don't remember.    10:15:33

Page 38

1    context.                                              10:18:17

2        Q.   In what context would "discretionary" mean

3    noncompulsory?

4        MS. BARTLETT:  Objection; asked and answered,

5    calls for a legal conclusion.                          10:18:26

6    BY MR. MECKLEY:

7        Q.   You can answer.

8        A.   I don't have anything to add.

9        Q.   What was your understanding -- because you

10   were familiar with the performance bonus plan while    10:18:43

11   you were employed; correct?

12       A.   Yes, generally.

13       Q.   All right.  And given your familiarity

14   with the performance bonus plan, was it your

15   understanding that payment of performance bonuses       10:18:55

16   were discretionary?

17       A.   Payment was consistent with the plan.

18       Q.   Which provided what for discretionary

19   payments?

20       MS. BARTLETT:  Objection; vague.                    10:19:12

21       THE WITNESS:  The global discretionary

22   performance bonus plan.

23   BY MR. MECKLEY:

24       Q.   And would you agree that under the plan,

25   the decision to pay was discretionary?                  10:19:20

                                                      Page 42

```
1          MR. MECKLEY:  It's not misstating the          11:20:39

2    testimony.  It's asking a brand new question.

3    BY MR. MECKLEY:

4          Q.   Have you ever told other staff members

5    that you weren't sure whether the performance bonus    11:20:46

6    plan continued after the merger agreement unless you

7    spoke with counsel?

8          A.   I don't remember.

9          Q.   All right.  So did the compensation

10   committee, to your knowledge, ever exercise its        11:21:10

11   discretion to fund or not fund the performance bonus

12   pool for the 2022 plan year?

13         A.   I believe it made a decision to request

14   funding it beyond the floor in 2022 that required

15   the buyer's consent, which was not provided.           11:21:42

16         Q.   And when we get to that, I think there's a

17   document we'll look at that speaks to that.

18         So the decision that the compensation

19   committee would make regarding funding pursuant to

20   this section, whether to elect to fund or not fund,    11:22:11

21   would be made following the close of the plan year;

22   is that right?

23         A.   I don't know.

24         Q.   You don't know.

25         A.   I don't know why they would have to wait,   11:22:21
```

Page 81

1        A.   I believe they did.                          11:31:32

2        Q.   And was it your understanding that --

3    well, strike that.

4             So the compensation committee approved it.

5             Did the accrual get increased to            11:31:41

6    70 percent?

7        A.   It did not, as I remember it.

8        Q.   And why did it not?

9        A.   I believe we went to the acquirer and

10   asked for consent to increase the accrual, and        11:31:57

11   consent was not provided.

12       Q.   And why did you go to the acquirer and

13   request the consent to move up to 70 percent?

14       MS. BARTLETT:   Objection; foundation, vague.

15       THE WITNESS:   The only answer I could provide     11:32:23

16   would include conversations with counsel.

17   BY MR. MECKLEY:

18       Q.   So there was no independent knowledge or

19   understanding as to why you would have gone to the

20   buyer to request a consent other than communications   11:32:41

21   you had with counsel; is that right?

22       A.   Not that I can remember.

23       Q.   Okay.  And how did you learn that consent

24   from the buyer was not given for that?

25       A.   I don't remember.                             11:33:03

                                                   Page 89

| | | |
|---|---|---|
| 1 | A.   You tell me. | 12:04:52 |
| 2 | Q.   Is that your understanding or | |
| 3 | recollection? | |
| 4 | A.   It looks like it, but I can't be certain. | |
| 5 | Q.   Sure. | 12:04:59 |
| 6 | If you could look at page 2 of the FAQs, | |
| 7 | the first bolded heading, it says, "Would the Board | |
| 8 | and/or the buyer consider some relief on or changes | |
| 9 | to the Bonus Plan given the extraordinary | |
| 10 | circumstances we're facing?" | 12:05:16 |
| 11 | Do you see that? | |
| 12 | A.   Yes, I do. | |
| 13 | Q.   And then it says, "That is something that | |
| 14 | the Board and the management team have looked at." | |
| 15 | Is that right? | 12:05:24 |
| 16 | A.   I see what it says. | |
| 17 | Q.   And then the next bullet says, | |
| 18 | "Ultimately, any adjustments to the Bonus Plan | |
| 19 | require the consent of the buyer under the terms of | |
| 20 | the merger agreement." | 12:05:34 |
| 21 | Do you see that? | |
| 22 | A.   Yes, I do. | |
| 23 | Q.   Was that an accurate statement in this FAQ | |
| 24 | when it was communicated to employees? | |
| 25 | MS. BARTLETT:  Objection; foundation. | 12:05:42 |

Page 101

1    Thacher.                                              12:13:33

2         Q.    When you were putting together your

3    August 19, 2022 e-mail to the employees about the

4    PBP accrual, was your intent to be consistent with

5    the terms of the performance bonus plan?           12:13:52

6         A.    We worked with counsel and, also, internal

7    counsel.  So I'm not sure I can answer your question

8    without referring to those conversations.

9         Q.    Well, I don't think it goes to privilege.

10   It just was your intent to be consistent with the    12:14:10

11   terms of the PBP when you wrote your e-mail.

12        A.    My intent is always to be consistent.

13        Q.    Okay.  So if you see at the top, your

14   e-mail went to team@twitter.com.

15              Do you see that?                          12:14:41

16        A.    I do.

17        Q.    And who did that go to within the company?

18        A.    I believe it went to everybody at the

19   company.

20        Q.    And do you know -- or strike that.        12:15:02

21              Did you track whether employees read your

22   e-mail?

23        A.    I did not.

24        Q.    Well, did anyone within Twitter track

25   whether employees read the e-mail?                   12:15:15

                                               Page 109

1          A.   I don't know.                                    12:15:18

2          Q.   Do you know whether any person who read

3     your e-mail on August 19 actually understood it?

4          MS. BARTLETT:  Objection; foundation.

5          THE WITNESS:  I don't know.                           12:15:37

6     BY MR. MECKLEY:

7          Q.   And you didn't personally speak with

8     employees who read the e-mail to see whether they

9     understood it; is that true?

10         A.   I may have.  I don't remember.                   12:15:48

11         Q.   As you sit here today, you have no memory

12    of it; is that correct?

13         A.   I may have.  I don't remember.

14         Q.   And you don't know whether some employees

15    understood your August 19 e-mail or were confused by   12:16:12

16    it; is that accurate?

17         A.   I don't remember.

18         Q.   Well, weren't you informed soon after

19    sending the e-mail that some employees were confused

20    by what you meant?                                       12:16:25

21         MS. BARTLETT:  Objection; asked and answered.

22         THE WITNESS:  I can't tell by the time stamps

23    if this was before or after.

24    BY MR. MECKLEY:

25         Q.   Before or after what?                           12:16:40

                                                  Page 110

| | | |
|---|---|---|
| 1 | your August 19 e-mail that the bonus pool was now | 12:18:11 |
| 2 | tracking to 50 percent? | |
| 3 | MS. BARTLETT:  Objection; asked and answered. | |
| 4 | THE WITNESS:  I don't remember that. | |
| 5 | MR. MECKLEY:  Okay. | 12:18:19 |
| 6 | (Deposition Exhibit 8 was marked.) | |
| 7 | BY MR. MECKLEY: | |
| 8 | Q.   All right.  Exhibit 8 is a series of | |
| 9 | e-mails on August 19 that follow your e-mail to the | |
| 10 | team and are with you and Anita Butler and Dalana | 12:19:09 |
| 11 | Brand. | |
| 12 | Are you ready? | |
| 13 | A.   I'm ready. | |
| 14 | Q.   Who is Anita Butler? | |
| 15 | A.   I believe she worked on one of the product | 12:19:30 |
| 16 | teams. | |
| 17 | Q.   Do you know which one? | |
| 18 | A.   I'm sorry, I don't remember. | |
| 19 | Q.   And have you read, just as you sit here | |
| 20 | today, Ms. Butler's e-mail to you? | 12:19:46 |
| 21 | A.   Yes, I have. | |
| 22 | Q.   And it indicates that some employees on | |
| 23 | her team were confused by your August 19 e-mail; | |
| 24 | correct? | |
| 25 | A.   I see that. | 12:19:58 |

Page 112

1    Q.    And do you know how many people were on        12:20:02

2    her team?

3    A.    I'm sorry, I don't.

4    Q.    Do you have any reason to disbelieve what

5    Ms. Butler was reporting to you in this e-mail?        12:20:10

6    A.    Not that I can think of right now.

7    Q.    Is it possible that employees on teams

8    other than Ms. Butler's were also confused by your

9    e-mail?

10    MS. BARTLETT:  Objection; calls for        12:20:23

11    speculation.

12    THE WITNESS:  I would have to speculate to

13    answer your question.

14    BY MR. MECKLEY:

15    Q.    You don't know one way or another;        12:20:28

16    correct?

17    A.    What's the question?

18    Q.    Is it possible that employees on teams

19    other than Ms. Butler's were also confused by your

20    e-mail?        12:20:39

21    A.    I don't know.

22    Q.    And she tells you they were actually quite

23    confused by this e-mail "because it didn't clearly

24    state that Tweeps would only be receiving 50 percent

25    of their bonus.  Some thought it was just 50 percent        12:20:59

Page 113

1    of the company portion, some thought it was only                12:21:02

2    50 percent of Tweeps and were then unclear on which

3    50 percent of Tweeps.  The FAQ doc wasn't very clear

4    either."

5              Do you see that?                                       12:21:14

6        A.   Yes, I do.

7        Q.   And you responded [as read]:  Thanks for

8    your feedback.  Give me a call if you'd like.

9              Did you ever speak with Ms. Butler after

10   this?                                                            12:21:25

11       A.   I don't remember.

12       Q.   And then you list your phone number at the

13   end.

14             Is that your cell phone?

15       A.   Yes, it is.                                             12:21:31

16       Q.   And is that a cell phone that you texted

17   other employees at Twitter with?

18       A.   Yes, it is.

19       Q.   Okay.  Do you recall doing anything to

20   clarify the confusion that Ms. Butler was reporting             12:21:45

21   to you?

22       A.   I don't remember.

23       MS. BARTLETT:  Counsel, is this a produced

24   document in this action?

25       MR. MECKLEY:  Yes, it is.                                    12:21:58

                                                          Page 114

CONFIDENTIAL

```
 1        MS. BARTLETT:  I don't see a Bates number on        12:21:59

 2   it.  But I would ask that to the extent it is a

 3   produced document in the action, that Mr. Segal's

 4   personal cell phone be redacted.  Doesn't seem to be

 5   any basis to have his personal information in any      12:22:10

 6   document filed in this action.

 7        MR. MECKLEY:  Well, it's not filed.

 8        MS. BARTLETT:  Or that could be filed or used

 9   in this action.  Same point.

10            Thank you.                                    12:22:24

11   BY MR. MECKLEY:

12        Q.   Your August 19 e-mail, the first sentence

13   where you talk about, you know, PBP accrual.

14            Do you see that?

15        A.   Yes, I do.                                   12:22:46

16        Q.   And I think we've covered it, but that

17   refers to an internal accounting process; correct?

18        A.   Accounting, forecasting.

19        Q.   Right.

20            Twitter didn't set aside a pot of money       12:23:03

21   throughout the year for bonus; correct?  It was an

22   accounting accrual?

23        A.   It's an accounting accrual.

24        Q.   Like there was no separate bank account

25   where you just put money and say, This is the PBP      12:23:17
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

1    money; is that right?                                    12:23:21

2         A.   There was not one that I'm aware of.

3         Q.   Okay.

4         MR. MECKLEY:  All right.  I think we can

5    probably do our lunch break now.                         12:23:35

6         MS. BARTLETT:  Let's take a break.

7         THE VIDEOGRAPHER:  This marks the end of Media

8    Unit 3.  We are going off the record.  The time is

9    12:23 p.m.

10             (Lunch recess was taken at 12:23 p.m.)

11             (Nothing omitted or deleted.  See next

12             page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page 116

```
1    AFTERNOON SESSION                    1:02 P.M.

2                        - - -

3        THE VIDEOGRAPHER:  This marks the beginning of

4    Media Unit 4.  We are going back on the record.  The

5    time is 1:02 p.m.                                    13:02:04

6                    EXAMINATION RESUMED

7    BY MR. MECKLEY:

8        Q.   Okay.  Mr. Segal, when you worked at

9    Twitter, from time to time, company management would

10   have meetings with different groups or segments of    13:02:18

11   employees.

12           Do you recall that?

13       A.   Yes.

14       Q.   And sometimes they were all hands

15   meetings; correct?                                    13:02:28

16       A.   Yes.

17       Q.   And sometimes they were just finance and

18   partnerships, your team; correct?

19       A.   Among others, yes.

20       Q.   Sometimes just developers; is that true?    13:02:38

21       A.   That's right.

22       Q.   And these were largely virtual meetings,

23   meaning remote?

24       A.   It just depended.

25       Q.   Well, if you had an all hands meeting,      13:02:56
```

Page 117

1    typically, that would be remote because people          13:02:58

2    weren't going to be there, everyone in the company,

3    in person?

4         A.   That's correct.

5         Q.   All right.  And for an all hands meeting,      13:03:08

6    would all employees be invited to attend?

7         A.   All hands were invited to all hands.

8         Q.   Right.

9              And did most of the people attend -- who

10   did attend attend remotely?                             13:03:26

11        A.   Can you be more specific, please?

12        Q.   For all hands meetings, for the folks who

13   did participate, is it true that most of them

14   participated virtually or remotely as opposed to in

15   person?                                                 13:03:44

16        A.   It just depended.

17        Q.   Depended on what?

18        A.   The year.

19        Q.   And how about 2022?

20        A.   Many -- most people would be remote in        13:03:52

21   2022.

22        Q.   Okay.  And what was the platform over

23   which the remote virtual meetings were conducted?

24        A.   We used Google Hangouts or Google Meet.

25        Q.   And did Twitter keep any records of who       13:04:11

Page 118

1    attended all hands meetings?                          13:04:14

2        A.   I'm not sure if we did.

3        Q.   And attendance at all hands meetings was

4    voluntary, or optional; is that correct?

5        A.   Unless we said otherwise.                     13:04:25

6        Q.   And if you said otherwise, would that be

7    something in writing?

8        A.   I don't know.

9        Q.   Was it your understanding that most of the

10   meetings were voluntary attendance?                   13:04:36

11       A.   Yes.

12       Q.   And even if all employees were invited to

13   the meetings, you don't know for sure how many

14   employees actually attended; is that correct?

15       MS. BARTLETT:   Objection.                         13:04:57

16       THE WITNESS:   Sorry, I'd like to go back and

17   just -- something occurred to me.

18            For the all hands, they may have been

19   optional.

20            There often were finance and partnerships     13:05:08

21   meetings that were not optional.

22   BY MR. MECKLEY:

23       Q.   Okay.   Any other clarification you want to

24   make with your testimony?

25       A.   No.                                           13:05:17

                                                  Page 119

CONFIDENTIAL

1    Q.    Okay.  So for the all hands meetings,                    13:05:17

2    you're not sure how many employees actually attended

3    those?

4        A.    I don't know -- right now, I don't know.

5            But we did know how many people joined          13:05:37

6    them at the time or how many rooms had joined.

7        Q.    And there wasn't sort of a recordation of

8    which specific employees had joined?

9        A.    I don't know of a recordation.

10       Q.    And you, meaning Twitter, didn't know, you      13:05:57

11   know, how long they attended, meaning did they

12   attend for the entire session or only a part of it?

13       A.    We would know how many lines joined and

14   how -- I suspect somebody knew how long those lines

15   stayed on.                                                 13:06:14

16           But if those -- that was 10 people in a

17   room in New York, we wouldn't know if somebody

18   walked out in the middle.

19       Q.    Okay.  And for the majority of the people

20   in 2022 who were attending remotely or virtually,        13:06:25

21   you know, it's possible they could have been doing

22   other tasks while they were listening in on the

23   meeting; is that fair?

24       MS. BARTLETT:  Objection; calls for

25   speculation.                                               13:06:39

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

CONFIDENTIAL

1      THE WITNESS:  I'd have to speculate to answer      13:06:41

2    your question.

3    BY MR. MECKLEY:

4        Q.   So you don't know; correct?

5        A.   I don't know.                               13:06:45

6        Q.   Folks could have been driving,

7    multitasking, doing other things, you're not sure?

8        A.   I don't know.

9        Q.   So the -- between that time period that I

10   had asked you about before, which was when the       13:07:12

11   merger agreement was signed in April and then when

12   the transaction closed in October of 2022, did you

13   speak at various all hands or finance and

14   partnership meetings?

15       A.   Yes, I did.                                 13:07:28

16       Q.   And were those meetings recorded?

17       A.   I believe so.

18       Q.   And recorded through the Google Meets

19   function?

20       A.   I believe so.                               13:07:40

21       Q.   At any of the meetings that you spoke at

22   during that period of time, April through October,

23   did you ever tell anyone that the performance bonus

24   would be paid to people notwithstanding any of the

25   discretionary language in the plan document?         13:08:01

Page 121

1     just -- your recollection is you never said that?          13:15:50

2          A.   I don't remember saying that.

3          Q.   Okay.  Did you ever tell employees of

4     Twitter during any of these video meetings that they

5     would be paid a performance bonus completely           13:16:06

6     independent of the terms and rules of the

7     performance bonus plan?

8          A.   I don't remember doing that.

9          Q.   Did you ever tell Twitter employees during

10    any of these video meetings that they would be paid      13:16:20

11    a performance bonus separate and apart from the

12    terms and conditions of the performance bonus plan?

13         A.   I don't remember doing that.

14         Q.   Did you ever tell Twitter employees during

15    any of these video meetings that the performance       13:16:37

16    bonus plan had been modified or changed in any of

17    its rules or provisions?

18         A.   I don't remember saying that.

19         Q.   All right.  And the videos that you

20    reviewed that refreshed your memory, do you recall       13:17:08

21    what was refreshed, what in the videos you saw

22    refreshed your memory as to what you said about

23    performance bonuses?

24         A.   I don't understand the question.

25         Q.   Okay.  You reviewed some videos that         13:17:22

Page 128

1                    And of that 3,000 to 6,000 U.S. employees,        13:29:01

2      how many were managers?

3          A.    I don't know the answer.

4          Q.    Are you able to estimate?

5          A.    At least hundreds.                                    13:29:14

6          Q.    And at the manager meeting you were

7      referring to, you don't know which of the managers

8      attended and which didn't; is that correct?

9          A.    I don't remember if I knew.

10         Q.    And you don't know if attendance was             13:29:36

11     tracked?

12         A.    I don't remember if attendance was

13     tracked.

14         Q.    And you don't know whether folks who might

15     have attended were doing other things while they        13:29:49

16     were attending remotely?

17         A.    I don't know.

18         Q.    And at that meeting, the managers meeting,

19     did you -- well, was that recorded as well?

20         A.    Could you ask the question again, please?        13:30:07

21         Q.    Was the managers meeting recorded?

22         A.    Which one?

23         Q.    I think there's only one you referred to.

24     Were there more manager meetings that you spoke

25     about?                                                   13:30:21

                                                    Page 139

1          I thought there was one.                          13:30:22

2      A.   The recording that I watched was recorded.

3      Q.   Okay.  So at that meeting that you watched

4   in preparation for your deposition that was a

5   managers meeting, you spoke.                             13:30:33

6           Did anyone else speak about the

7   performance bonus?

8      A.   I believe so.

9      Q.   Who was that?

10     A.   I believe that Courtney McMillian also         13:30:42

11  spoke about the PBP.

12     Q.   And what was Ms. McMillian's position

13  then?

14     A.   I believe her title was employee

15  experience.                                              13:30:53

16     Q.   Employee experience.

17          Was there something else with the title or

18  was that the whole title?

19     A.   I don't remember, no.

20     Q.   And who did she report to?                      13:31:02

21     A.   I believe she reported to Dalana Brand.

22     Q.   And do you remember what Ms. McMillian

23  said during that managers meeting about the

24  performance bonus?

25     A.   I believe she talked about how it worked.      13:31:14

Page 140

CONFIDENTIAL

1        Q.    And do you remember anything specifically          13:31:18

2    she said?

3        A.    I'd have to look at the transcript.

4        Q.    Without looking at the transcript, you

5    can't remember any other specifics about what              13:31:26

6    Ms. McMillian said about the performance bonus?

7        A.    I believe she talked about how it worked.

8        Q.    Other than that, do you recall any other

9    specifics?

10        A.    I'm sorry, I don't.                              13:31:39

11        Q.    Do you recall that during the managers

12    meeting, Ms. McMillian said that the plan rules of

13    the PBP plan would apply to any performance bonuses

14    that might be paid?

15        A.    I don't remember if she used those words.       13:31:58

16        Q.    Okay.  Again, the transcript would tell us

17    hopefully if the quality is good; right?

18        A.    I hope so.

19        Q.    Okay.  Did you review what Ms. McMillian

20    said in the video when you were, you know, watching      13:32:11

21    the video to refresh your memory?

22        A.    I believe it's McMillian.

23        Q.    Or McMillian.

24        A.    What's the question, I'm sorry?

25        Q.    Did you review what she said in the video       13:32:20

Page 141

CONFIDENTIAL

1    when you were reviewing the video to refresh your      13:32:23

2    memory?

3        A.   I did.

4        Q.   Okay.  And other than recalling that she

5    talked about how, you know, the funding worked,        13:32:32

6    nothing else was refreshed in your memory about what

7    she said?

8        A.   I don't remember the specifics.

9        Q.   Okay.  Did Ms. McMillian tell participants

10    in that meeting that a pool had to be funded first      13:33:00

11    before there would be any payouts of bonuses?

12        A.   I don't remember.

13        Q.   Did Ms. McMillian -- did Ms. McMillian

14    tell participants in that managers meeting that the

15    information regarding the PBP could be found at the     13:33:25

16    Go Performance Bonus Intranet link?

17        A.   She may have.

18        Q.   And that they should review the plan

19    rules?

20        A.   She may have.                                13:33:44

21        Q.   You don't know whether any of the

22    participants who attended the managers meeting

23    communicated with any of their reports about what

24    was said at the meeting?

25        A.   I don't remember.                            13:34:07

Page 142

| | | |
|---|---|---|
| 1 | Q.   You didn't track or Twitter didn't track | 13:34:10 |
| 2 | whether managers who attended the managers meeting | |
| 3 | then subsequently spoke with their direct reports | |
| 4 | about it? | |
| 5 | A.   I did not.  I'm not sure if somebody else | 13:34:20 |
| 6 | did. | |
| 7 | Q.   Did you or Ms. McMillian -- | |
| 8 | A.   Sorry. | |
| 9 | For my direct reports, although I don't | |
| 10 | remember, I likely knew if they had those | 13:34:40 |
| 11 | conversations with their teams. | |
| 12 | I don't know if we tracked it broadly.  I | |
| 13 | don't know if somebody else did.  And I don't | |
| 14 | remember. | |
| 15 | Q.   Okay.  Now, did you or Ms. McMillian in | 13:34:57 |
| 16 | the managers video meeting tell employees that there | |
| 17 | had been changes made to the performance bonus plan | |
| 18 | document? | |
| 19 | A.   I don't remember. | |
| 20 | Q.   Did any employee of Twitter ever tell you | 13:35:44 |
| 21 | that they -- well, strike that. | |
| 22 | After your termination in October, did you | |
| 23 | keep in touch with other Twitter employees? | |
| 24 | A.   Some. | |
| 25 | Q.   Did you keep in touch with any other | 13:36:04 |

Page 143

1        Q.    Do you recognize Exhibit 15 [sic],        14:43:30

2   Mr. Segal?

3        A.    Yes, I do.

4        Q.    And what is it?

5        A.    It's the Twitter acquisition Tweep FAQ.        14:43:35

6        Q.    Did Twitter keep records of who received

7   the Tweep FAQ?

8        A.    I'm not sure.

9        Q.    Did Twitter keep any records of whether or

10  not people read the Tweep FAQs?        14:43:53

11       A.    I don't know that we did.

12       Q.    Did Twitter keep records of who accessed

13  Slack posts?

14       A.    I'm not sure.

15       Q.    Take a look at page -- it's stamped at the        14:44:15

16  bottom -- 2061.

17             Down at the bottom, there's a heading,

18  "Why haven't we implemented retention packages or

19  similar for Tweeps?"

20             Do you see that?        14:44:43

21       A.    Yes, I do.

22       Q.    And part of the paragraph below says, "On

23  June 20, 2022, we sent Mr. Musk a formal request for

24  consent to two tailored employee retention programs

25  that had been vetted by the board and the        14:44:58

Page 179

| | | |
|---|---|---|
| 1 | August 2022, you were trying to give some answers to | 16:25:58 |
| 2 | employees in response to their questions? | |
| 3 | A.   Yes. | |
| 4 | Q.   And was that a topic that you spoke to | |
| 5 | employees about also in various size meetings? | 16:26:06 |
| 6 | A.   Yes. | |
| 7 | Q.   And when you spoke to employees in various | |
| 8 | size meetings about bonus for 2022, is what you said | |
| 9 | consistent with what you indicated in your e-mail | |
| 10 | from August? | 16:26:23 |
| 11 | MR. MECKLEY:  Objection; vague and ambiguous, | |
| 12 | compound. | |
| 13 | THE WITNESS:  It was always my intent to be | |
| 14 | consistent. | |
| 15 | BY MS. LISS-RIORDAN: | 16:26:46 |
| 16 | Q.   Now, you said that Twitter needed | |
| 17 | Mr. Musk's consent to fund the bonus plan above the | |
| 18 | floor; right? | |
| 19 | A.   I did. | |
| 20 | Q.   And Mr. Musk did not provide consent to | 16:26:59 |
| 21 | funding the bonus plan above the floor; right? | |
| 22 | A.   Correct. | |
| 23 | Q.   Did Twitter need Mr. Musk's consent to | |
| 24 | fund the bonus plan at the floor? | |
| 25 | A.   No. | 16:27:14 |

Page 234

1    about continuing their partnerships with Twitter in        18:01:30

2    light of Mr. Musk's public statements about content

3    that he was going to allow back on the platform

4    after he acquired the company?

5        A.    I believe I addressed that already.            18:01:42

6        Q.    Okay.  And the answer is yes?

7        A.    I would just refer you back to my previous

8    answer.

9        Q.    Okay.  Well, I'm not talking now about

10    advertisers.  I'm talking about companies that        18:01:51

11    Twitter partnered with, not advertisers.

12        A.    I did refer to them.

13        Q.    What's that?

14        A.    I had already referred to them.

15        Q.    Okay.  You mean previously, earlier in        18:02:00

16    your testimony?

17        A.    That's correct.

18        Q.    Okay.  All right.

19        MS. LISS-RIORDAN:  All right.  Let's take a

20    look at the next, and I believe, last exhibit.  So        18:02:08

21    we're at 23.

22                (Deposition Exhibit 23 was marked.)

23                (Witness reviews document.)

24    BY MS. LISS-RIORDAN:

25        Q.    All right.  Mr. Segal, do you recognize        18:03:19

Page 265

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | Exhibit 23? | 18:03:21 |
| 2 | A.    I believe I do. | |
| 3 | Q.    What is it? | |
| 4 | A.    Looks like these are slides for manager | |
| 5 | meetings in September of 2022. | 18:03:31 |
| 6 | Q.    And can you describe what manager meetings | |
| 7 | were? | |
| 8 | A.    Well, they could be lots of things.  I | |
| 9 | think it was meant to cover the contents inside this | |
| 10 | presentation. | 18:03:48 |
| 11 | Q.    All right.  Do you know who attended this | |
| 12 | meeting or meetings such as this one? | |
| 13 | A.    Managers. | |
| 14 | Q.    Managers throughout the company? | |
| 15 | A.    Correct. | 18:03:59 |
| 16 | Q.    Managers at all levels of the company? | |
| 17 | A.    I'm not sure. | |
| 18 | Q.    All right.  Do you know approximately how | |
| 19 | many managers might attend a meeting like this? | |
| 20 | A.    I don't remember. | 18:04:08 |
| 21 | Q.    All right.  But was it open to all | |
| 22 | managers across the company? | |
| 23 | A.    I believe so. | |
| 24 | Q.    Did you participate in this presentation? | |
| 25 | A.    I believe I did. | 18:04:18 |

Page 266

1    Q.   If you take a look at what is Bates          18:04:21

2    stamped as 185 on the bottom near the end.

3           And that looks like your name and picture

4    there?

5    A.   I think so.                                   18:04:35

6    Q.   Does that show that you participated in

7    this presentation?

8    A.   I suspect it does, but it's hard to tell

9    from the slides.

10   Q.   Okay.  Well, it has next to you              18:04:42

11   compensation and PBP.

12          Do you recall speaking to the managers

13   meetings about compensation and PBP?

14   A.   That sounds like something that I would

15   do.                                                18:04:52

16   Q.   Okay.  And so can you just tell me what

17   the purpose was of Twitter having a meeting such as

18   this for managers through the company?

19   A.   We often wanted to prepare managers to

20   manage, help them digest and communicate the       18:05:07

21   information for which they were responsible

22   communicating to the people who reported to them.

23   Q.   Okay.  So was the purpose of this meeting

24   to provide information to managers that they would

25   share with the employees who they managed?          18:05:23

Page 267

1    A.    I would just refer you back to my answer.    18:05:26

2    Q.    Okay.  All right.

3          Well, the purpose of this was to both give

4    direction to managers about their roles and, also,

5    to communicate to them things that the company    18:05:39

6    wanted to have disseminated across the company to

7    non-managers as well as managers?

8    A.    I would just refer you back to my last

9    answer.

10    Q.    Okay.  If you turn to Bates stamp 180,    18:05:52

11    part of this presentation was given by Courtney

12    McMillian?

13    A.    Looks like it.

14    Q.    Okay.  All right.

15          And tell us again who she was.    18:06:22

16    A.    It looks like she was the head of people

17    experience.

18    Q.    Okay.  And do you know how this

19    presentation happened?  Was it a -- was it a remote

20    meeting?    18:06:34

21    A.    I believe this was a Google Hangout.

22    Q.    Okay.  All right.

23          And if you go to the next page, the slide

24    discusses comp at Twitter.  And then the next page

25    after that, 182, PBP at Twitter.  And then 183, 2022    18:06:54

Page 268

1    PBP payout example.                                              18:07:03

2        And this example shows an illustrative

3    example of an employee who has a PBP target of

4    $5,000, and it says that PBP funded target based on

5    company performance of 50 percent is $2,500.        18:07:23

6        Do you see that?

7    A.    Yes, I do.

8    Q.    Okay.  And then on the next page, 184, it

9    says, "Key Takeaways:    PBP, Eligible Tweep's will

10   receive 50 percent of their PBP targets."          18:07:39

11       Do you see that?

12   A.    Yes, I do.

13   Q.    Okay.  So is this what you may have been

14   referring to before the break when you said that it

15   was communicated to all employees across the company  18:07:50

16   that their bonus for 2022 would be paid out at

17   50 percent of their targets?

18       A.    This is an example.  I don't believe it's

19   the only example.

20       Q.    Okay.  So there were other types of        18:08:03

21   communications that informed employees across the

22   company that their bonus for 2022 would be paid out

23   at 50 percent of target?

24       MR. MECKLEY:  Objection; lacks foundation.

25       THE WITNESS:  I believe there were.           18:08:20

Page 269

1    BY MS. LISS-RIORDAN:                                    18:08:21

2        Q.   Okay.   Do you remember any context of what

3    manner that was communicated to employees besides

4    for this presentation?

5        A.   Sitting here today, I don't remember.         18:08:31

6        Q.   Okay.   Do you remember whether your

7    discussion in the presentation that this slide show

8    was taken from and touched on PBP payout for 2022?

9        A.   I do not specifically remember.

10       Q.   Okay.   But would you have made statements     18:08:56

11   consistent with what Ms. McMillian communicated

12   during her part of the presentation?

13       A.   Sounds like something I might have done,

14   but I don't have the transcript or the video in

15   front of me.                                            18:09:12

16       Q.   Okay.   Is it possible that during this

17   presentation you communicated to managers across the

18   company that Twitter employees for 2022 would

19   receive 50 percent of their target bonus for the

20   year?                                                   18:09:24

21       A.   It looks like that was done on an earlier

22   slide.   I don't know exactly what I said.   But it

23   looks like that was covered in this presentation,

24   whether I said it or somebody else did.

25       Q.   Okay.   You may have said it yourself as       18:09:34

                                                          Page 270

1    well as Ms. McMillian?                                    18:09:36

2         A.   I may have.

3         MS. LISS-RIORDAN:  Okay.  All right.  Thank

4    you, Mr. Segal.  Those are all my questions for you.

5         MR. MECKLEY:  Okay.  I have a couple more,         18:09:43

6    follow-up.  So let's have this marked and pass that

7    down.

8              (Deposition Exhibit 24 was marked.)

9                      EXAMINATION

10   BY MR. MECKLEY:                                          18:10:14

11        Q.   So, Mr. Segal, for the record, Exhibit 24

12   is actually the full version of Exhibit 18 that

13   Ms. Liss-Riordan had previously marked and given to

14   you, which is Section 6.9 of the merger agreement.

15             You'll notice that Exhibit 18, if you want    18:10:36

16   to pull it up, had only one part of it, but

17   Exhibit 24 that I've now marked and given to you,

18   that has the full portion of Section 6.9.

19        A.   I remember.

20        Q.   Does that sound right?                         18:10:51

21        A.   Yes, it does.

22        Q.   Okay.  And if you look at 6.9(a),

23   Continuing Employee Benefits, it says, "Employees of

24   the Company . . ."

25             Is "Company" in the merger agreement          18:11:06

                                                      Page 271

```
1    respect to that; correct?                              18:23:20

2         A.   The document stands on its own.

3         Q.   With respect to Section 6.9(a)?

4         A.   I don't have anything to add.

5         Q.   No, I'm not asking you that.                  18:23:27

6              I'm asking you, the document stands on its

7    own with respect to both Section 6.9(a) and (e); is

8    that true?

9         A.   I think the document stands on its own.

10        Q.   And you don't parse any sections out in       18:23:38

11   how you would interpret those?

12        MS. LISS-RIORDAN:  This is getting asked and

13   answered and repetitive.

14        MR. MECKLEY:  Well, it's asked and answered

15   when you asked it.  It's not asked and answered when    18:23:49

16   I ask it.

17             But that's fine.  We'll move on.

18   BY MR. MECKLEY:

19        Q.   Let's take a look now at Exhibit 23.

20             This is a series of slides; correct?          18:24:09

21        A.   I think so.

22        Q.   Did you draft any of these?

23        A.   I don't remember.

24        Q.   Okay.  Any portions that you recall being

25   involved in drafting?                                   18:24:19
```

Page 284

1      A.   I don't remember.                                18:24:21

2      Q.   Okay.  Take a look at the page that's

3  stamped 184.

4      A.   Got it.

5      Q.   You see next to PBP where it says,             18:24:36

6  "Eligible Tweep's will receive 50 percent of their

7  PBP targets.  All PBP plan rules apply."

8           Do you see that?

9      A.   Yes, I do.

10     Q.   Okay.  One of the planned rules was that        18:24:49

11  the plan needed to be funded before any payments

12  were made; is that right?

13     A.   I would have to refer back to the plan

14  document in its entirety.

15     Q.   Okay.  Why don't you pull that out.             18:25:00

16  That's Exhibit 1.

17          Do you have Exhibit 1?

18     A.   I do.

19     Q.   Okay.  So where it says in --

20     MS. LISS-RIORDAN:  Hold on.  Hold on.  My            18:25:18

21  exhibits are all out of order.  Give me a minute.

22          Okay.

23  BY MR. MECKLEY:

24     Q.   All right.  So in Exhibit 23, page 184, it

25  says, "All PBP plan rules apply."                      18:25:53

Page 285

1          Correct?                                        18:25:55

2     A.    I see what it says.

3     Q.    And the PBP plan rules are in Exhibit 1,

4 the 2022 Global Discretionary Performance Bonus

5 plan; is that right?                                     18:26:11

6     A.    They may be.

7     Q.    When you say, "They may be," what do you

8 mean?

9     A.    I don't know if there's another document

10 that has -- other PBP plan was in it.                    18:26:24

11     Q.    The document that you are aware of that

12 contains PBP plan rules though is Exhibit 1;

13 correct?

14     A.    Yes.

15     Q.    Okay.  And the intent of this slide         18:26:34

16 telling managers that all PBP plan rules apply was

17 what?  What was the intent of telling them all PBP

18 plan rules apply?

19     A.    I don't remember.

20     Q.    You don't know whether managers gave the    18:26:55

21 slide deck to any of their direct reports, do you?

22     A.    I do not.

23     Q.    And you don't know whether managers

24 communicated the substance of any of the slides to

25 their direct reports, do you?                            18:27:06

Page 286

CONFIDENTIAL

1    A.   In some cases, I do know and -- or did          18:27:08

2    know, and other cases, I would not, no.

3    Q.   All right.  And you don't know whether any

4    specific parts of this presentation were actually

5    communicated to managers' direct reports, do you?       18:27:18

6    A.   I do believe that we communicated more

7    broadly that PBP would be paid out at 50 percent to

8    all employees.

9    Q.   And in what context?

10   A.   I don't remember.                                 18:27:33

11   Q.   Okay.  And you don't know whether that was

12   verbally or in writing?

13   A.   I do not.

14   Q.   And you don't know when that occurred

15   exactly?                                                18:27:41

16   A.   I do not.

17   Q.   But if it was at one of the Google Meets

18   video meetings, it would have been recorded;

19   correct?

20   A.   If the meeting had been recorded.                 18:27:53

21   Q.   Well, were there any meetings regarding

22   PBP that were done via Google Meets that weren't

23   recorded, to your knowledge?

24   A.   I have no idea.

25   Q.   Okay.  Previously, you were asked by            18:28:09

Page 287

CONFIDENTIAL

1              I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4              That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12             Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript ( ) was (X) was not requested.

16             I further certify that I am neither

17    financially interested in the action nor a relative

18    or employee of any attorney of any party to this

19    action.

20             IN WITNESS WHEREOF, I have this date

21    subscribed my name.

22    Dated: 9/9/24

23

24

25             ANRAE WIMBERLEY, CSR No. 7778

                                        Page 299