# EXHIBIT 5

CERTIFIED COPY

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4

5    MARK SCHOBINGER, on behalf
     of himself and all others
6    similarly situated,

7              Plaintiff,      Case No. 3:23-cv-03007-VC

8              v.

9    TWITTER, INC. and X CORP.,

10             Defendants.

11   _____

12

13

14

15             DEPOSITION OF MARK SCHOBINGER

16                  July 15, 2024

17

18

19

20

21

22

23

24   Siew G. Ung, CSR No. 13994, RPR, CSR
     1167678

25

BARKLEY
Court Reporters
barkley.com

SINCE
1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(310) 207-8000 Century City    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento    (800) 222-1231 Martinez    (702) 366-0500 Las Vegas    (800) 222-1231 Monterey
(951) 686-0606 Riverside    (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson    (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn    (518) 490-1910 Albany    (914) 510-9110 White Plains
(312) 379-5566 Chicago    00+1+800 222 1231 Paris    00+1+800 222 1231 Dubai    001+1+800 222 1231 Hong Kong

1               UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5   MARK SCHOBINGER, on behalf
    of himself and all others
6   similarly situated,

7                 Plaintiff,     Case No. 3:23-cv-03007-VC

8              v.

9   TWITTER, INC. and X CORP.,

10                Defendants.

11  _____

12

13

14

15      REMOTE VIDEOTAPED DEPOSITION OF MARK SCHOBINGER

16

17                     July 15, 2024

18                      10:39 a.m.

19

20

21

22

23  REPORTED BY:

24  Siew G. Ung

25  CSR No. 13994, RPR, CSR

                            1

```
1   APPEARANCES:

2

3       For MARK SCHOBINGER, ON BEHALF OF
        HIMSELF AND ALL OTHERS SIMILARLY SITUATED
4
            LICHTEN & LISS-RIORDAN, P.C.
5           SHANNON LISS-RIORDAN, ESQ,
            MATTHEW CARRIERE, ESQ.
6           729 Boylston Street, Suite 2000
            Boston, Massachusetts 02116
7           sliss@llrlaw.com
            mcarrieri@llrlaw.com
8           415.260.2261

9

10      For TWITTER, INC. And X CORP.        :

11          MORGAN, LEWIS & BOCKIUS LLP
            ERIC MECKLEY, ESQ.
12          ASHLEE N. CHERRY, ESQ.
            One Market, Spear Street Tower, 28th Floor
13          San Francisco, California 94105
            Eric.meckley@morganlewis.com
14          Ashlee.cherry@morganlewis.com
            415.442.1000
15
            QUINN EMANUEL
16          VICTORIA PARKER, ESQ.
            MICHAEL LIFRAK, ESQ.
17          2921 California Street
            San Francisco, California 94115
18          vikiparker@quinnemanuel.com
            mlifrak@yahoo.com
19          415.875.6503

20          X CORP.
            MARY HANSBURY, ESQ. (in-house)
21          GEMMA CHUBB, ESQ. (in-house)

22       Also Present:

23          THERESA MAJERS, Videographer
            MEGAN GROSSMAN, CSR, Substitute Reporter
24

25
```

2

1                    INDEX TO EXAMINATIONS

2

3                  WITNESS: MARK SCHOBINGER

4    EXAMINATION                                    PAGE

5    BY MR. MECKLEY                                    6

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

MARK SCHOBINGER

1                    EXHIBITS MARKED

2    MARKED              DESCRIPTION                PAGE

3    Exhibit 1           December 26, 2018, Letter from    17

4                        Leslie Berland to Mark Schobinger

5                        (X-SCHOBINGER_000000001 to

6                        X-SCHOBINGER_000000016)

7

8    Exhibit 2           Packet of Documents              36

9                        (TWITTER_ARB_00002184 to

10                       TWITTER_ARB_00002243)

11

12   Exhibit 3           Code of Business Conduct and     39

13                       Ethics (TWITTER_ARB_000002173 to

14                       TWITTER_ARB_000002181)

15

16   Exhibit 4           January 1, 2022, 2022 Global     50

17                       Discretionary Performance Bonus

18                       (X-SCHOBINGER_000000047,

19                       X-SCHOBINGER_000000048, and one

20                       unnumbered page)

21

22

23

24

25

MARK SCHOBINGER

1                    MONDAY, JULY 15, 2024, 10:39 A.M.

2                                ***

3          THE VIDEOGRAPHER:  We are now on the

4    record.  This begins media file number one in the

5    deposition of Mark Schobinger.  We're taping this

6    deposition remotely via Zoom in the matter of Mark

7    Schobinger, et al. versus Twitter, Inc. and X -- X

8    Corp., filed in the United States District Court,

9    Northern District of California, San Francisco

10   Division.  Case number 3:23-CV-03007-VC.

11          Today is July 15th, 2024, and the time is

12   10:39 a.m.  I am Teresa Majers, the videographer

13   from Magna Legal Services, and the court reporter is

14   Siew Ung, also with Magna Legal Services.

15          Counsel, would you please introduce

16   yourself and who you represent starting with the

17   questioning attorney.

18          MR. MECKLEY:  This is Eric Meckley of

19   Morgan Lewis, and I represent the defendants.

20          MS. LISS-RIORDAN:  This is Shannon

21   Liss-Riordan.  I represent the plaintiff.

22          THE VIDEOGRAPHER:  And will the court

23   reporter plies swear in the witness.

24                    MARK SCHOBINGER,

25      having been first duly sworn, was examined and

                                5

```
 1                       testified as follows:

 2                   EXAMINATION BY MR. MECKLEY

 3        Q.  All right.  Mr. Schobinger, I introduced

 4   myself just now.  My name is Eric Meckley, and I

 5   represent Twitter, now, X Corp. in the lawsuit that

 6   you filed in federal court here in San Francisco.

 7            Today's your deposition.

 8            Have you ever been deposed before?

 9        A.  No.

10        Q.  Okay.  Have you ever given testimony under

11   oath before -- under penalty of personally?

12        A.  No.

13        Q.  All right.  So I'll give you a couple

14   instructions about the deposition today.

15            First, you understand that your testimony

16   today is under penalty of perjury, which means that

17   you are required to tell the truth.

18            Do you understand that?

19        A.  Yes.

20        Q.  And because this is being transcribed by

21   the court reporter, it's important that we use words

22   to answer questions, so no gestures or nonverbal

23   statements.  It's important to use words to answer.

24            Do you understand that?

25        A.  Yes.
```

```
 1    BY MR. MECKLEY:

 2         Q.  All right.  Have you had the document

 3    open, Mr. Schobinger, and are you able to review it?

 4         A.  Yes.

 5         Q.  Okay.  So can you take a look at page 2?

 6         A.  Okay.

 7         Q.  And this is a letter dated December 26th,

 8    2018, to you.  It's earmarked.

 9              Do you recognize this as your offer letter

10    at Twitter?

11         A.  Yes.

12         Q.  And did you start your employment with

13    Twitter in February 2019?

14         A.  Yes.

15         Q.  And your job title was director, total

16    rewards?

17         A.  Yes.

18         Q.  And your business title was executive and

19    incentive compensation director.

20              Is that right?

21         A.  Yes.

22         Q.  And when you began, did you report to

23    Dalana Brand?

24         A.  Yes.

25         Q.  What was her position?
```

20

1        A.   VP of total rewards.

2        Q.   And if you look at page 4 of your offer

3   letter, you'll see at the bottom there's a

4   signature.  And it looks like you signed

5   electronically.

6             Is that correct?

7        A.   Yes.

8        Q.   And immediately above your signature you

9   represented:  I have read, understood, and accept

10  all the provisions of this offer put before me.

11            Do you see that?

12       A.   I'm sorry, what -- what are you referring

13  to that you wanted me to review?

14       Q.   Immediately above your signature, the

15  statement where it says:  By signing below, I

16  acknowledge and agree that I have read, understood,

17  and accept all of the provisions of this offer of

18  employment.

19            Do you see that?

20       A.   Yes.

21       Q.   And that was true, correct?

22       A.   Yes.

23       Q.   And you noted next to your signature that

24  you will opt out of arbitration per process.  Do you

25  see that?

1          A.   Yes.

2          Q.   And why did you do that?

3               THE REPORTER:   Wait.   Opt out of what

4    process?

5               MR. MECKLEY:   Arbitration.

6    BY MR. MECKLEY:

7          Q.   Do you have my question or are you still

8    thinking?

9          A.   Oh, no.   I -- I thought we were pausing

10   for -- somebody else was saying something.

11              Can you repeat your question?

12         Q.   Yeah.   The question is:   Why did you opt

13   out of arbitration?

14         A.   That was a choice that was given to new

15   employees.

16         Q.   Yes.   And -- and why, in your choice, did

17   you elect to opt out of the arbitration?

18         A.   That's the choice I made.

19         Q.   Was there any reason behind it?

20         A.   Nothing other than that's the choice that

21   I made.

22         Q.   Had you ever been asked to participate in

23   arbitration with some prior employer?

24         A.   I'm not sure I understand the question.

25         Q.   Sure.   So with respect to Twitter, when

22

1      Q.   Yes.  Did you have other direct reports?

2      A.   At -- yes.

3      Q.   Who were they?

4      A.   I have forgot -- I have actually forgotten

5    their names.  The -- the reason I wanted to go back

6    is when Twitter did the mass layoff, there were a

7    couple of comp team -- compensation team members

8    from other teams that I inherited, so they would

9    have been direct reports.  So I wanted to go back

10   and clarify that answer since precision seems to

11   matter.

12     Q.   Who were the other people that you

13   inherited?

14     A.   I -- I -- yeah, I forgot -- Cheryl -- and

15   I don't remember Cheryl's last name.  And then there

16   was one other individual.  I -- I don't remember the

17   name.

18     Q.   And were you promoted to senior director

19   of compensation in January of 2022?

20     A.   I was promoted, but I don't remember the

21   time frame.

22     Q.   Does that date sound about right as to

23   when you were promoted?

24     A.   If that is what you are saying -- if that

25   is what Twitter provided to you, then I would assume

25

1        Q.   In 2022.

2        A.   To Parag Agrawal.

3        Q.   And he was the CEO, correct?

4        A.   Yes.

5        Q.   And what were your duties after you were

6    promoted to senior director of compensation?

7        A.   They were the same.

8        Q.   And what were those duties?

9        A.   To deal with all matters pertaining to

10   executive compensation, supporting the compensation

11   committee of the board of directors, and then to

12   work on special projects as directed by management

13   or at the request of the comp committee.

14       Q.   And in addition to dealing with matters of

15   executive comp, were you responsible for dealing

16   with matters as to nonexecutive comp?

17       A.   Yes.   For specific -- for specific things.

18       Q.   And what were the specific things?

19       A.   The broad-based cash bonus plan and the --

20   the equity incentive plan.

21       Q.   Any other rank-and-file employee

22   compensation matters that you were responsible for?

23       A.   Are you asking for -- in a specific time

24   frame?

25       Q.   Yes.   After you were promoted to senior

28

1   director of compensation in 2022.

2        A.   Yeah.   Then, no.   Just to what I already

3   answered.

4        Q.   And what's your current address?

5             MS. LISS-RIORDAN:   Wait.   I'm really

6   sorry.   My audio just went out for a second.   I

7   didn't hear the last answer.

8   BY MR. MECKLEY:

9        Q.   Can you repeat your answer,

10  Mr. Schobinger?

11       A.   You asked me if my -- if I was responsible

12  for anything else in 2022, and I told you no, that

13  the -- it was the same responsibilities.

14       Q.   What is your current address?

15       A.   I'm sorry.   You -- I -- my current what?

16       Q.   Address.

17       A.   3337 Catalina Cove, Round Rock, Texas.

18       Q.   And during your employment with Twitter,

19  was that your same address?

20       A.   Yes.

21       Q.   And during your entire employment with

22  Twitter, you resided in Texas, correct?

23       A.   Yes.

24       Q.   And during that same period, you were

25  never a resident -- a resident of California,

29

1    correct?

2            A.   Correct.

3            Q.   You had a work from home remote working

4    agreement with Twitter.

5                 Isn't that true?

6            A.   Yes.

7            Q.   Could you refer back to the document we've

8    marked as Exhibit 1 and look at the fifth page of

9    the PDF.

10           A.   When you are referring to the page numbers

11   in the PDF, do you mean the -- the page number that

12   appears on the page or the -- the physical page

13   number volume?

14           Q.   Yeah.   That's a good question.

15                In this context, I'm referring to the

16   physical number of the PDF.

17           A.   Okay.   All right.

18           Q.   And do you see there that that's a

19   document entitled "Addendum to Offer Letter.   Home

20   Office Work Arrangement."   Do you see that?

21           A.   Yes.

22           Q.   And this particular agreement allowed you

23   to work from your home in Round Rock, Texas,

24   correct?

25           A.   Yes.

1    Q.  And the agreement also provided that if

2    this arrangement ever ended, you had the option of

3    performing your work at Twitter's office in Austin,

4    Texas, isn't that right?

5    A.  I don't think that would be right.

6    Twitter did not have an office in Austin, Texas.  It

7    wouldn't have been possible.

8    Q.  So if you look at the first paragraph of

9    the document that is the one entitled "number one"

10   in the last sentence.

11   A.  Yes.

12   Q.  It states -- it states:  If, at that time

13   or any time during this trial period in the

14   company's sole discretion, the company determines

15   that this arrangement to be ended, you acknowledge

16   and agree that you will have the option to perform

17   your role at Twitter's office at Austin, Texas.

18       Do you see that?

19   A.  Yes.

20   Q.  And during your employment with Twitter,

21   did Twitter have an office in Austin, Texas?

22   A.  Not that I'm aware of.

23   Q.  Did you ever ask anyone, when you signed

24   this home office work arrangement, you know, why it

25   referred to an office in Texas if there wasn't one?

31

1          A.  I didn't.  That would be a question that

2     you would have to ask Twitter.

3          Q.  No, I'm not asking you if -- anything from

4     Twitter.  I'm just asking:  Did you inquire as to

5     anyone why it said this if there was no office?

6          A.  No.

7          Q.  Did your home office work arrangement ever

8     end before you left Twitter?

9          A.  No.

10         Q.  So you were allowed to work remotely

11    throughout the entirety of your employment with

12    Twitter.  Isn't that right?

13         A.  Yes.

14         Q.  After Elon Musk acquired the company in

15    late October 2022, you continued to work remotely.

16    Is that right?

17         A.  Yes.

18         Q.  And were you ever directed to report to a

19    physical office to work?

20         A.  I'm not sure how the -- can you elaborate

21    on what you mean by "directed"?

22         Q.  Sure.  So after Mr. Musk acquired Twitter,

23    were you ever instructed that you could no longer

24    work remotely, you had to report to a physical

25    office?

1    Q.  So even though as you described, Mr. Musk

2  made, you know, threats, that in effect you didn't

3  have to comply with any of the threats.  Is that

4  right?

5    A.  That's what I was led to believe, yes.

6    Q.  And between the period of April and

7  October 27 of 2022, did you ever physically come

8  into Twitter's San Francisco offices?

9    A.  Can you repeat the time frame?

10    Q.  April of 2022 through October 27th, 2022,

11  did you ever physically come into San Francisco to

12  Twitter's offices in the city?

13    A.  Not that I recall.

14    Q.  If you could, again, look at this home

15  office work arrangement we have.  Paragraph Number

16  5.

17        The second sentence, it states: "You are

18  required to comply with all Twitter employment

19  policies, practices and procedures including but not

20  limited to anti-harassment and discrimination

21  policies, the Code of Conduct, any applicable

22  Playbook or Work Rules, and the Employee Security

23  Handbook."

24        Do you see that?

25    A.  Yes.

34

1       Q.  I don't know, since you are on an iPad,

2   you said, whether you get like notifications or

3   things like that that pop up.  But if -- if you do,

4   it would be good to turn them off.

5           So can you do that?

6       A.  I'm not getting popups.

7       Q.  Oh, good.  All right.

8           So can you go back, please, and look at

9   Exhibit 1 and specifically page -- the third page of

10  the PDF in your offer letter.

11      A.  Okay.

12      Q.  And you'll see that there's a heading

13  there, Number 7.  Performance Bonus Plan.

14          Do you see that?

15      A.  Yes.

16      Q.  And when you were hired at Twitter and you

17  got your offer letter, you saw that Twitter had a

18  discretionary performance bonus plan, correct?

19      A.  Yes.

20      Q.  And it -- it said that you may be eligible

21  to earn a discretionary performance bonus in

22  accordance with the company's discretionary

23  performance bonus plan as it may exist and/or be

24  amended from time to time.

25          Do you see that?

46

1          A.   Yes.

2          Q.   And as your offer letter described, you

3     understood that Twitter had the discretion to decide

4     whether to amend or discontinue the plan from time

5     to time.

6               Isn't that true?

7          A.   No.

8          Q.   That's not true?

9          A.   Not the way you framed it, no.

10         Q.   Okay.  So if you look at the language, it

11    says that you are eligible to earn a bonus according

12    to the plan as it may exist and or be amended from

13    time to time.

14              Do you see that?

15         A.   Yes.

16         Q.   So you understood that the plan could be

17    amended from time to time?  Is that right?

18         A.   Based on this wording, yes.

19         Q.   And you understood it could cease to

20    exist, correct?

21         A.   That -- I'm sorry.  That it what?

22         Q.   Could cease to exist, correct?

23         A.   That it ceased to exist?

24         Q.   No.  My question is:  This language here

25    says that you could be eligible to earn a bonus in

47

1    accordance with the plan as it may exist.

2          Do you see that?

3      A.  Yes.

4      Q.  So you understood that the plan could, in

5    fact, cease to exist as well.

6          Isn't that true?

7      A.  Yes.

8      Q.  And you understood that the phrase

9    "discretionary" means noncompulsory, not required?

10     A.  No, I would not characterize it that way.

11     Q.  I'm just asking for you to tell me your

12   understanding of the word "discretion."

13         What does the word "discretion" mean?

14     A.  Context matters, so I would need to under-

15   -- if you could elaborate on the context that you

16   are asking me to opine on, then I would be able to

17   do that.

18     Q.  Okay.  Well, let's just ask in the

19   general, you know, dictionary definition sense of

20   the word.  Discretionary means something that is not

21   compulsory or required.

22         Isn't that true?

23     A.  Yes.

24     Q.  Okay.  And in connection with your offer

25   letter in reference to this performance bonus plan,

48

1      A.  Yes.

2           MR. MECKLEY:  We are going to mark another

3   exhibit to the deposition.  This will be Exhibit

4   Number 4.

5                (Whereupon, Exhibit 4 was marked for

6                identification.)

7           THE WITNESS:  Okay.  I have it.

8   BY MR. MECKLEY:

9      Q.  All right.  So Exhibit 4 is a three-page

10  document entitled 2022 Global Discretionary

11  Performance Bonus.

12          Do you see that?

13     A.  Yes.

14     Q.  And have you seen this document before?

15     A.  I have.

16     Q.  And what is it?

17     A.  This is the -- in this case, the specific

18  case, this is the plan document for the fiscal year

19  '22 discretionary performance bonus.

20     Q.  And have you ever heard this referred to

21  as the -- the PBP performance bonus plan?

22     A.  Yes.

23     Q.  Okay.  If during the deposition, you or I

24  refer to the PBP or the bonus plan, you understand

25  we are referring to this document?

50

1          A.   Yes.

2          Q.   Okay.

3               So did you draft any part of Exhibit 4?

4          A.   I participated in a red-line review of it,

5     yes.

6          Q.   When you say a "red-line review," can you

7     describe what you mean?

8          A.   Yes.

9          Q.   So --

10         A.   Are you wanting me to describe -- is

11    that -- are you wanting me to describe or are you

12    just asking:   Can I describe?

13         Q.   Fair point.   So now can you describe for

14    us what you mean?

15         A.   Yes.   So each year, this -- this document

16    would be updated, at a minimum, to reflect the new

17    plan year date.   And if the -- any of the changes to

18    the plan document -- the governance of it, those

19    would have been updated as well.   And red line, I'm

20    just simply referring to the document being opened

21    and tracked with changes.

22         Q.   And one of the things I'll flag here for

23    you, Mr. Schobinger, is during the deposition, I am

24    going to be asking you questions about

25    communications you may have had with people at

51

1          Q.   Is that accurate?

2          A.   Yes.

3          Q.   Was the performance bonus plan approved by

4     the Twitter compensation committee?

5          A.   Yes.

6          Q.   And when did that occur?

7          A.   Are you asking in the context of -- of the

8     fiscal '22 PBP?

9          Q.   Yes.

10         A.   My recollection is somewhere in the March

11    '22 time frame is likely when it would have been

12    fully approved.

13         Q.   And the -- the PBP was a form of incentive

14    compensation for Twitter employees.  Is that right?

15         A.   Yes.

16         Q.   Was it your understanding that any form of

17    incentive compensation for Twitter employees such as

18    the PBP had to be approved by the compensation

19    committee?

20         A.   Yes.

21         Q.   And who were the members of the

22    compensation committee in 2022?

23         A.   David Rosenblatt, Fayfay [phonetic], and I

24    forget the third one.

25         Q.   What was Fayfay's last name?

54

MARK SCHOBINGER

1          A.   I don't recall.

2          Q.   And did that membership change at any

3    point in 2022?

4          A.   I don't recall.

5          Q.   Who was on the compensation committee in

6    2023?

7          A.   There would not have been a compensation

8    committee in 2023.

9          Q.   And to your knowledge, why was that?

10         A.   I'm sorry.  I didn't hear the question.

11         Q.   I said:  To your knowledge, why was that?

12         A.   The company was acquired.

13         Q.   Exhibit 4, this document, was the PBP

14   document accessible to all Twitter employees?

15         A.   My recollection is yes.

16         Q.   How did employees have access to it?

17         A.   My recollection is it was put on a -- a

18   link on a Google -- a Google Drive, I believe, is

19   what I recollect.

20         Q.   Was there a link -- it was at

21   go/performancebonus?

22         A.   That sounds right, but I -- I don't --

23   that sounds right.

24         Q.   Were employees of Twitter expected to

25   review the PBP document?

1      A.  They were encouraged to review it.

2      Q.  And did Twitter track in any way whether

3   an employee had reviewed the PBP document?

4      A.  I don't know.

5      Q.  Did Twitter employees have to acknowledge

6   their agreement to the terms and conditions of the

7   PBP in any way?

8      A.  Not that I'm aware of.

9      Q.  Okay.  So if we could take a look at

10  the -- the documents, you'll see, on the first page

11  of the document, it says the plan year runs from

12  January 1 through December 31, 2022, unless

13  otherwise earlier changed, replaced, or terminated

14  by Twitter.

15          Do you see that?

16     A.  Yes.

17     Q.  And you would also see that the document

18  states that Twitter retains the full -- the full

19  discretion to interpret, amend, modify, terminate,

20  or revoke the plan and any individual PAF at its

21  sole discretion.

22          Do you see that?

23     A.  Is that further down?

24     Q.  It's the second paragraph from the bottom.

25     A.  Yes.

56

1          Q.   And you understood, based on the plan,

2     that Twitter had the right to terminate or revoke

3     the PBP at any time.   Isn't that true?

4          A.   Yes.

5          Q.   And can you take a look at the last

6     paragraph on the first page of the PBP?

7          A.   Okay.

8          Q.   Where it says:   Subject to applicable law,

9     eligible employees whose employment ends at any time

10    before the performance bonus payout date will not be

11    eligible for any performance bonus under the plan.

12          Do you see that?

13         A.   Yes.

14         Q.   So if an employee had their employment end

15    before the payout date, they wouldn't be eligible to

16    receive a bonus.

17          Is that correct?

18         A.   Correct.

19         Q.   And the bonus appointments were typically

20    made in March.   Is that correct?

21         A.   Yes.

22         Q.   Your bonus -- I think you got one for

23    2020, that was in -- paid in March.   Is that right?

24         A.   Yes.

25         Q.   And then you also got a bonus for 2021,

57

1    and that was paid in March as well, correct?

2         A.   Yes.

3         Q.   So if an employee, for example, had their

4    employment end in January, they would not be

5    eligible to receive a bonus, correct?

6         A.   Correct.

7         Q.   So through -- well, strike that.

8              Do you know whether a bonus was ever paid

9    in some month other than March?

10        A.   Clarifying question.  You're -- you

11   asked -- the questioning you are asking me are

12   within the context of solely the -- the bonus plan

13   and not any sort of other transaction.  Is that

14   accurate?

15        Q.   I'm asking whether you are aware of any

16   person receiving a performance bonus that was paid

17   in some month other than March?

18        A.   No, I'm not aware.

19        Q.   So continued employment through the

20   payment date was a condition of eligibility for the

21   bonus, is that right?

22        A.   So this is the nuance -- that's the

23   nuance.  You are asking me that in the context of

24   only the -- the -- the performance bonus plan,

25   correct?

58

1      Q.   Yes.

2      A.   Yes.

3      Q.   So if an employee quit or resigned they

4    were no longer eligible for a bonus, correct?

5      A.   Yes, that's correct.

6      Q.   And if an employee was fired, they were no

7    longer eligible for a bonus, correct?

8      A.   There's nuance with that, Mr. Mecky- --

9    Meckley.  I -- you know, and I -- there's nuance to

10   the way you are framing that question.

11     Q.   Okay.  Well, let's look back here at

12   the -- the document, Exhibit 4.

13          The last paragraph, it says:  "Subject to

14   applicable law, eligible employees whose employment

15   ends at any time."

16          Do you see that?

17     A.   Yes.

18     Q.   An employee's employment can end because

19   they are fired, right?

20     A.   Correct.  But there's different reasons

21   for being fired though.  So -- but that's what I

22   mean by it's nuanced.  I don't know if you are

23   asking me about a specific version of being fired or

24   just -- are you asking me in general, just within

25   the context of the bonus -- forget about any other

59

MARK SCHOBINGER

1          So if you are -- if you are agnostic of

2    those other reasons and you are just talking about

3    the performance bonus plan, then the answer to your

4    question is -- is yes.  You have to be employed on

5    the date that it was paid out to receive it.

6          Q.   Yep.  I'm not asking about any other forms

7    of compensation --

8          A.   Okay.

9          Q.   -- I'm just asking about performance

10   bonus.

11          Do you understand that?

12          A.   Yes.

13          Q.   In order to get any type of bonus payment

14   in connection with severance, an employee would have

15   to sign a general release of claim, wouldn't they?

16          A.   That is my understanding that that was one

17   of the conditions that had to be met to receive a

18   severance payment.

19          Q.   Right.  But to get a bonus payment, just a

20   bonus payment and you are still employed, you don't

21   need to sign a release of claims, correct?

22          A.   Correct.

23          Q.   And it's your understanding that if an

24   employee did not sign a release of claims, then the

25   employee would not be eligible to get any bonus in

61

1                    CERTIFICATE OF REPORTER

2

3        I, Siew Ung, a Certified Shorthand Reporter, do

4   hereby certify:

5        That prior to being examined, the witness in the

6   foregoing proceedings was by me duly sworn to testify to

7   the truth, the whole truth, and nothing but the truth;

8        That said proceedings were transcribed into

9   typewriting from the video recording under my direction

10  and supervision;

11       I further certify that I am neither counsel for,

12  nor related to, any party to said proceedings, nor in

13  any way interested in the outcome thereof.

14       In witness whereof, I have hereunto subscribed my

15  name.

16

17

18  7/26/2024

19

20

21

22

23  _____

    Siew Ung
24  CSR No. 13994, RPR, CSR

25

                              66

MARK SCHOBINGER

```
 1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2                  SAN FRANCISCO DIVISION
 3      MARK SCHOBINGER, on behalf   )
        of himself and all others    )
 4      similarly situated,          )
                                     )
 5             Plaintiff,            )
                                     ) Case No. 3:23-cv-03007-VC
 6      v.                           )
                                     )
 7      TWITTER, INC. And X CORP.,   )
                                     )
 8             Defendants.           )
 9
10
11            ORAL AND VIDEOTAPED DEPOSITION OF
12               MARK SCHOBINGER - VOLUME 2
13                 Friday, August 2, 2024
14
15
                  ORAL AND VIDEOTAPED DEPOSITION OF MARK
16      SCHOBINGER - VOLUME 2, produced as a witness at the
        instance of the Defendants, Twitter, Inc. and X Corp.,
17      and duly sworn, was taken in the above-styled and
        numbered cause on the 2nd of August, 2024, from
18      9:17 a.m. to 4:30 p.m., before Sharon Ross, Certified
        Shorthand Reporter in and for the State of Texas,
19      reported by computerized stenotype machine, at Quinn
        Emanuel Urquhart & Sullivan, LLP, 300 West 6th Street,
20      Suite 2010, Austin, Texas 78701, pursuant to the Federal
        Rules of Civil Procedure and/or any provisions stated on
21      the record or attached hereto.
22
23
        Reported by:
24      SHARON ROSS, Texas CSR #1961,
        Hawaii CSR #432, RMR, CRR, CRC
25      Realtime Systems Administrator
```

Page 67

```
1                       APPEARANCES                    08:29
2
     For Plaintiffs Mark Schobinger, on behalf of himself and
3    all others similarly situated:
4         Shannon Liss-Riordan
          LIGHTEN & LISS-RIORDAN
5         729 Boylston Street, Suite 2000
          Boston, Massachusetts  02116
6         617.994.5800
          Sliss@llrlaw.com
7
8    For Defendants Twitter, Inc. and X Corp.:
9         Eric Meckley
          MORGAN, LEWIS & BOCKIUS LLP
10        One Market, Spear Street Tower
          28th Floor
11        San Francisco, California  94105-1596
          415.442.1013
12        Eric.meckley@morganlewis.com
13             - and -
14        Julia Choe (via Zoom)
          Laurenne Babayan (via Zoom)
15        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          865 South Figueroa, 10th Floor
16        Los Angeles, California  90017
          213.443.3813
17        213.443.3347
          Juliachoe@quinnemanuel.com
18        Laurennebabayan@quinnemanuel.com
19             - and -
20        Jennifer J. Barrett (via Zoom)
          Bhargav Setlur (via Zoom)
21        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          51 Madison Avenue, 22nd Floor
22        New York, New York  10010
          212.849.7155
23        212.849.7391
          Jenniferbarrett@quinnemanuel.com
24        Bhargavsetlur@quinnemanuel.com
25
```

Page 68

```
 1                    APPEARANCES (Continued)
 2   For Defendant X Corp.:
 3         Adam Mehes
           X CORP.
 4         245 East 17th Street
           New York, New York  10003
 5         347.417.4940
           Amehes@x.com
 6
 7   Videographer:
 8         Peter Zierlein, Veritext Legal Solutions
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 69

```
1                        INDEX
2                                              PAGE
3    Appearances.................................  68
4    Exhibit Index...............................  70
5    MARK SCHOBINGER
          Examination By Mr. Meckley...............  75
6         Examination By Ms. Liss-Riordan.......... 291
7    Reporter's Certification..................... 294
8

                        EXHIBITS
9
     NO.      DESCRIPTION                       PAGE
10
     Exhibit 5...................................  76
11            Performance Bonus Plan from Birdhouse
12   Exhibit 6...................................  81
              Compensation @ Twitter, Total Granted
13            Compensation
              X-SCHOBINGER_000000051-52
14
     Exhibit 7................................... 105
15            Twitter Compensation Committee
              Consent
16            X-SCHOBINGER_000000067-69
17   Exhibit 8................................... 117
              8-19-22 Email from N. Segal to
18            Team@twitter.com and D. Brand and
              email string
19            X-SCHOBINGER_000000074-77
20   Exhibit 9................................... 124
              The New York Times, Twitter Tells
21            Employees They Might Get Only Half
              Their Annual Bonus
22
     Exhibit 10.................................. 126
23            12-3-22 Tweet by Y. Yue
              X-SCHOBINGER_000000090
24
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1                    EXHIBITS (Continued)
 2    NO.        DESCRIPTION                        PAGE
 3    Exhibit 11.................................... 129
                8-22-22 Direct Messages between
 4              M. Schobinger and E. LaPorte
                X-SCHOBINGER_000000079-80
 5
      Exhibit 12.................................... 131
 6              10-19-22 Direct Messages between
                M. Schobinger and C. McMillian
 7              X-SCHOBINGER_000000082
 8    Exhibit 13.................................... 136
                11-30-22 Direct Messages between
 9              K. Marcotte and M. Schobinger
                X-SCHOBINGER_000000083
10
      Exhibit 14.................................... 142
11              Meeting Invite for 1-5-23
                X-SCHOBINGER_000000152
12
      Exhibit 15.................................... 148
13              12-1-22 Email from M. Schobinger to
                B. Bjelde and others
14              X-SCHOBINGER_000000084-87
15    Exhibit 16.................................... 149
                1-6-23 Email from L. Chapman to
16              M. Schobinger and email string
                X-SCHOBINGER_000000101
17
      Exhibit 17.................................... 151
18              1-11-23 Email from L. Chapman to
                M. Schobinger and email string
19              X-SCHOBINGER_000000095-99
20    Exhibit 18.................................... 153
                1-19-23 Email from M. Schobinger to
21              L. Wegman and others
                X-SCHOBINGER_000000120
22
      Exhibit 19.................................... 157
23              1-11-23 Email from M. Schobinger to
                N. Koutoulas
24              X-SCHOBINGER_000000111-116
25
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1                    EXHIBITS (Continued)
 2    NO.       DESCRIPTION                          PAGE
 3    Exhibit 20.................................... 159
                1-13-23 Direct Messages between
 4              M. Schobinger and B. Applin
                X-SCHOBINGER_000000117
 5
      Exhibit 21.................................... 162
 6              1-12-23 Email from L. Chapman to
                M. Schobinger and others and email
 7              string
                X-SCHOBINGER_000000109-110
 8
      Exhibit 22.................................... 166
 9              2-23-23 Email from M. Schobinger to
                L. Chapman
10              X-SCHOBINGER_000000133
11    Exhibit 23.................................... 175
                Confidential Subject: FY22 PBP
12              Document
                X-SCHOBINGER_000000125-131
13
      Exhibit 24.................................... 180
14              2-16-23 Thread in team-leads-3432
15    Exhibit 25.................................... 184
                3-23-23 Direct Messages between
16              S. Conti and M. Schobinger
                X-SCHOBINGER_000000146-150
17
      Exhibit 26.................................... 219
18              Severance Matrix
                X_ARBS_000074908-74910
19
      Exhibit 27.................................... 243
20              6-3-22 Direct Messages between
                V. Yamamoto and M. Schobinger
21              X-SCHOBINGER_000000064-66
22    Exhibit 28.................................... 246
                10-4-22 Direct Messages between
23              L. Cummings and M. Schobinger
                X-SCHOBINGER_000000081
24
25

                                          Page 72
```

```
 1                    EXHIBITS (Continued)
 2    NO.        DESCRIPTION                        PAGE
 3
      Exhibit 29.................................. 248
 4             10-29-22 Thread in mpdm-plenke-
               lcummings-asardos-mschobinger-
 5             bamundsen-dperez-1
               X-SCHOBINGER_000000151
 6
      Exhibit 30.................................. 250
 7             5-13-22 Email from Internal
               Comms@twitter.com to team@twitter.com
 8             X_arbs_000071079-71087
 9    Exhibit 31.................................. 262
               3-3-23 Email from M. Schobinger to
10             M. Schobinger and email string
               X-SCHOBINGER_000000139-140
11
12              INDEX OF PREVIOUSLY MARKED EXHIBITS
      NO.                                          PAGE
13
      Exhibit 1................................... 261
14
      Exhibit 4...................................  80
15
16
17
18
19
20
21
22
23
24
25

                                          Page 73
```

| | PROCEEDINGS | 09:17 |
|---|---|---|
| 1 | | |

```
 1                    PROCEEDINGS                      09:17
 2              THE VIDEOGRAPHER:  Here begins Volume 2 in   09:17
 3   the deposition of Mark Schobinger in the matter of Mark  09:17
 4   Schobinger, et al. versus Twitter, Inc. and X Corp.,     09:17
 5   filed in the United States District Court, Northern      09:17
 6   District of California, San Francisco Division.  The     09:17
 7   case number is 3:23-cv-03007-VC.                         09:17
 8              We are located at 300 West 6th Street in      09:17
 9   Austin, Texas.  Today's date is August 2nd, 2024.  The   09:17
10   time is 9:17 a.m.                                        09:17
11              My name is Peter Zierlein here with our       09:17
12   court reporter, Sharon Ross; and we're here with         09:17
13   Veritext.                                                09:17
14              At this time will counsel please identify     09:17
15   themselves for the record, after which the court         09:17
16   reporter will swear in the witness?                      09:18
17              MR. MECKLEY:  Eric Meckley for defendant.     09:18
18              MR. MEHES:  Adam Mehes for X.                 09:18
19              MS. LISS-RIORDAN:  Shannon Liss-Riordan for   09:18
20   the plaintiff, Mark Schobinger.                          09:18
21              THE REPORTER:  Sir, could you --              09:18
22              MS. BARRETT:  Online you have Jennifer        09:18
23   Barrett for respondents.                                 09:18
24              MS. CHOE:  And Julia Choe also for            09:18
25   respondents.                                             09:18
```

Page 74

```
 1                    THE REPORTER:  Sir, could you raise your      09:18
 2    right hand, please?                                          09:18
 3                    (Witness sworn.)                             09:18
 4                         MARK SCHOBINGER,                        09:18
 5    having been first duly sworn, testified as follows:         09:18
 6                         EXAMINATION                            09:18
 7    BY MR. MECKLEY:                                              09:18
 8         Q.  All right.  Mr. Schobinger, this is the second     09:18
 9    day of your deposition.  I'm not going to give you all      09:18
10    the instructions that I gave you the first day.             09:18
11                    I'll just remind you that the testimony     09:18
12    you're giving today is under penalty of perjury which       09:18
13    means you have to tell the truth.                           09:18
14                    Do you understand that?                     09:18
15         A.  Yes.                                                09:18
16         Q.  Okay.  And, also, if at any point today you        09:18
17    have a question about any of my questions and need          09:18
18    clarification, please ask me.                               09:19
19         A.  Okay.                                               09:19
20         Q.  Will you do that?                                   09:19
21         A.  Yes.                                                09:19
22         Q.  Okay.  Great.  So at your first day of the         09:19
23    deposition, we did this thing where we marked exhibits      09:19
24    and looked at them.  We're going to start with that         09:19
25    again.                                                       09:19
```

Page 75

| | | |
|---|---|---|
| 1 | A.   Okay. | 09:19 |
| 2 | Q.   So this will be Exhibit 5. | 09:19 |
| 3 | (Schobinger Exhibit 5 marked.) | 09:19 |
| 4 | Q.   (BY MR. MECKLEY)  So this document is titled -- | 09:19 |
| 5 | very small at the top it says "Birdhouse" and then | 09:19 |
| 6 | "Performance Bonus Plan." | 09:19 |
| 7 | And let me know when you're ready to answer | 09:19 |
| 8 | questions. | 09:19 |
| 9 | A.   Okay.  I'm ready. | 09:19 |
| 10 | Q.   So do you recognize the text of this document, | 09:19 |
| 11 | Mr. Schobinger? | 09:20 |
| 12 | A.   Yes, it looks familiar. | 09:20 |
| 13 | Q.   And did you draft any portion of this? | 09:20 |
| 14 | A.   Yes, I would have participated in drafting it. | 09:20 |
| 15 | Q.   Okay.  And this document, which appears to be | 09:20 |
| 16 | on the Birdhouse, was that something that was published | 09:20 |
| 17 | to employees? | 09:20 |
| 18 | A.   Yes. | 09:20 |
| 19 | Q.   And was Birdhouse like an intranet site that | 09:20 |
| 20 | employees could go to to get information? | 09:20 |
| 21 | A.   That's correct. | 09:20 |
| 22 | Q.   Okay.  Do you know what portions of this that | 09:20 |
| 23 | you actually drafted? | 09:20 |
| 24 | A.   Let me -- let me read through it real quick. | 09:20 |
| 25 | Q.   Sure. | 09:20 |

Page 76

| | | |
|---|---|---|
| 1 | A.  My recollection, it would have been just | 09:20 |
| 2 | reviewing the metrics that were funding the plan, if | 09:21 |
| 3 | there were changes to that or any of the weightings, so | 09:21 |
| 4 | things of that nature. | 09:21 |
| 5 | Q.  Okay.  And I know we previously looked at the | 09:21 |
| 6 | actual PBP document itself, right? | 09:21 |
| 7 | A.  Yes. | 09:21 |
| 8 | Q.  Was the intent of, you know, something like | 09:21 |
| 9 | this published on Birdhouse to give employees just | 09:21 |
| 10 | another, you know, avenue to get information about their | 09:21 |
| 11 | performance bonus plan separate from the PBP document? | 09:22 |
| 12 | A.  Yes. | 09:22 |
| 13 | Q.  Okay.  And on the first page of this under | 09:22 |
| 14 | "Eligibility," the second point No. 2, it says, "Be | 09:22 |
| 15 | actively employed in good standing on the Performance | 09:22 |
| 16 | Bonus Payout Date." | 09:22 |
| 17 | Do you see that? | 09:22 |
| 18 | A.  I do. | 09:22 |
| 19 | Q.  And was that one of the conditions of | 09:22 |
| 20 | eligibility to get paid this bonus? | 09:22 |
| 21 | A.  Not necessarily. | 09:22 |
| 22 | Q.  Okay.  So did you, when you looked at this | 09:22 |
| 23 | document before and reviewed it, try to edit that point | 09:22 |
| 24 | to say that that wasn't necessarily an eligibility term? | 09:22 |
| 25 | A.  No. | 09:22 |

Page 77

```
 1        Q.   Okay.  So the document the employees got told      09:22

 2   them that they needed to be an employee in good standing    09:22

 3   to be eligible for a bonus, correct?                        09:22

 4        A.   This document, yes.                               09:22

 5        Q.   Okay.  Now, take a took at Page 2 and at the      09:22

 6   bottom; and I apologize that this is really small.  I       09:23

 7   tried to make it bigger, but I just couldn't.               09:23

 8             So under "PBP Payout," it says, "PBP payout       09:23

 9   happens in the Q1 of the following plan year."              09:23

10             Do you see that?                                  09:23

11        A.   I do.                                             09:23

12        Q.   And then below that it says, "If the              09:23

13   performance bonus plan is funded, bonus payments will be    09:23

14   made in the first quarter following the plan year."         09:23

15             Do you see that?                                  09:23

16        A.   I do.                                             09:23

17        Q.   So when the ref -- when it references "if the     09:23

18   bonus plan is funded," was that conditional in that the     09:23

19   bonus plan had to get funded before payouts would be        09:23

20   made?                                                       09:23

21        A.   I think that that would be a directional sort     09:23

22   of characterization of it.                                  09:23

23        Q.   And when you say a "directional                   09:23

24   characterization," what do you mean?                        09:23

25        A.   What I mean by that is there were two bonus       09:23
```

                                                        Page 78

```
 1   way that it's written.                                09:25

 2        Q.  But the employee general population bonus plan  09:25

 3   you referenced, it could not be funded at all; isn't   09:25

 4   that true?                                             09:25

 5        A.  No, that's not true.                          09:25

 6        Q.  Oh, okay.  Well, then let's take a look at     09:25

 7   Exhibit 4 which is something that we looked at         09:25

 8   previously in day -- I think Day One of your deposition.  09:25

 9             I'm not going to re-mark it since we         09:25

10   already marked it, but I'll give you a copy of it to   09:25

11   review.                                                09:25

12             So we previously looked at this.  This is    09:25

13   Exhibit 4.  If you could, take a look at Page 2.       09:25

14        A.  (Witness complies.)                           09:25

15        Q.  About midway -- well, the second heading from  09:25

16   the top, it says, "Funding of the Performance Bonus    09:26

17   Plan."  Do you see that?                               09:26

18        A.  I do.                                         09:26

19        Q.  All right.  And then there's one, two -- three  09:26

20   paragraphs under that.  There's a paragraph that starts  09:26

21   "If the Twitter group."  Do you see that?              09:26

22        A.  I do.                                         09:26

23        Q.  And in the last sentence of that paragraph, it  09:26

24   says, quote, "Notwithstanding the foregoing and subject  09:26

25   to applicable law, solely in the event of unforeseen and  09:26
```

Page 80

| | | |
|---|---|---|
| 1 | extraordinary circumstances, as determined by the | 09:26 |
| 2 | Compensation Committee, the Compensation Committee | 09:26 |
| 3 | reserves the right in its discretion to determine a | 09:26 |
| 4 | performance bonus pool amount based on an alternative | 09:26 |
| 5 | formula and/or elect not to fund any performance bonus | 09:26 |
| 6 | pool for the plan year." | 09:26 |
| 7 | Do you see that? | 09:26 |
| 8 | A.  I do. | 09:26 |
| 9 | Q.  So is it your understanding that the Comp | 09:26 |
| 10 | Committee referenced the right to elect not to fund any | 09:26 |
| 11 | performance bonus pool if it so determined, correct? | 09:26 |
| 12 | A.  That's how I would interpret that, yes. | 09:27 |
| 13 | Q.  Okay.  So the prior document we looked at where | 09:27 |
| 14 | it says "if the bonus pool was funded," it was | 09:27 |
| 15 | conditional on the Compensation Committee electing to | 09:27 |
| 16 | fund the bonus pool; isn't that true? | 09:27 |
| 17 | A.  Correct. | 09:27 |
| 18 | Q.  Let's take a look at this next document. | 09:27 |
| 19 | (Schobinger Exhibit 6 marked.) | 09:27 |
| 20 | THE REPORTER:  No. 6. | 09:27 |
| 21 | Q.  (BY MR. MECKLEY)  All right.  So Exhibit 6 is a | 09:27 |
| 22 | document entitled "Compensation @ Twitter, Total Granted | 09:27 |
| 23 | Compensation." | 09:27 |
| 24 | Do you recognize this document, | 09:28 |
| 25 | Mr. Schobinger? | 09:28 |

Page 81

| | | |
|---|---|---|
| 1 | Q.  And when you said "the two," two quarterly town | 09:41 |
| 2 | halls? | 09:41 |
| 3 | A.  Correct. | 09:41 |
| 4 | Q.  Okay.  Do you remember when those happened | 09:41 |
| 5 | roughly? | 09:41 |
| 6 | A.  I think the Q1 town hall happened roughly early | 09:41 |
| 7 | April, roughly.  The Q2 would have been July-August time | 09:41 |
| 8 | frame. | 09:41 |
| 9 | Q.  So the first one you said, early April, that | 09:41 |
| 10 | was prior to the merger agreement being signed; is that | 09:41 |
| 11 | right? | 09:42 |
| 12 | A.  Correct, I believe. | 09:42 |
| 13 | Q.  All right.  And then the Q2, you said occurred | 09:42 |
| 14 | in -- | 09:42 |
| 15 | A.  Roughly July and August time frame.  I don't | 09:42 |
| 16 | know the specific date. | 09:42 |
| 17 | Q.  Okay.  Were those called something?  Did they | 09:42 |
| 18 | have a title in Twitter, these town halls? | 09:42 |
| 19 | A.  They probably did.  I just -- I generically | 09:42 |
| 20 | refer to it as a town hall.  They probably had a formal | 09:42 |
| 21 | meeting title. | 09:42 |
| 22 | Q.  Does "all hands" sound familiar? | 09:42 |
| 23 | A.  It does sound familiar, yes. | 09:42 |
| 24 | Q.  Okay.  And focusing on the all-hands meetings | 09:42 |
| 25 | that occurred after the merger agreement was signed -- | 09:42 |

Page 90

| 1 | well, actually, I don't want to -- let's just say both | 09:42 |
| 2 | of the ones you remember, the Q1 and the Q2 all-hands. | 09:43 |
| 3 | Did you attend one or both of those? | 09:43 |
| 4 | A.  Both of them. | 09:43 |
| 5 | Q.  Okay.  And do you know how you attended? | 09:43 |
| 6 | A.  Virtually. | 09:43 |
| 7 | Q.  Virtually.  Okay.  Was that just a link or | 09:43 |
| 8 | something that you would click on and access? | 09:43 |
| 9 | A.  Yes.  There would be a meeting invite with a | 09:43 |
| 10 | link. | 09:43 |
| 11 | Q.  And was it video as well as audio? | 09:43 |
| 12 | A.  Yes. | 09:43 |
| 13 | Q.  Do you know if those were recorded? | 09:43 |
| 14 | A.  All of the all-hands meetings were recorded. | 09:43 |
| 15 | Q.  And do you know if attendance was optional? | 09:43 |
| 16 | A.  It was optional. | 09:43 |
| 17 | Q.  Okay.  So the -- and was it accessible to | 09:43 |
| 18 | employees, you know, throughout the world? | 09:43 |
| 19 | A.  Yes. | 09:43 |
| 20 | Q.  And none of those employees were required to | 09:44 |
| 21 | attend the town halls, correct? | 09:44 |
| 22 | A.  Correct. | 09:44 |
| 23 | Q.  And do you know who specifically attended? | 09:44 |
| 24 | A.  I would not know that. | 09:44 |
| 25 | Q.  And you personally didn't track attendance, | 09:44 |

Page 91

| 1 | correct? | 09:44 |
| 2 | A.  Correct. | 09:44 |
| 3 | Q.  And do you know one way or another whether | 09:44 |
| 4 | Twitter tracked attendance at the all-hands town hall | 09:44 |
| 5 | meetings? | 09:44 |
| 6 | A.  I don't know. | 09:44 |
| 7 | Q.  So, as you sit here today, you're not sure | 09:44 |
| 8 | which Twitter employees may have heard some, all, or | 09:44 |
| 9 | none of any of these quarterly town hall all-hands | 09:44 |
| 10 | meetings; is that true? | 09:44 |
| 11 | A.  Yes. | 09:44 |
| 12 | Q.  All right.  So let me -- oh, strike that. | 09:44 |
| 13 | Did you -- did you review or listen to any | 09:44 |
| 14 | of the videos that have been produced in your -- in this | 09:44 |
| 15 | case? | 09:45 |
| 16 | A.  At any time? | 09:45 |
| 17 | Q.  No.  I mean since they've been produced in this | 09:45 |
| 18 | case. | 09:45 |
| 19 | A.  No. | 09:45 |
| 20 | Q.  And after the town halls happened, before you | 09:45 |
| 21 | left the company, did you ever go back and like listen | 09:45 |
| 22 | or view any of the recorded town halls? | 09:45 |
| 23 | A.  No. | 09:45 |
| 24 | Q.  Did you ever make any notes of anything that | 09:45 |
| 25 | you were listening to in any of the town halls? | 09:45 |

Page 92

| | | |
|---|---|---|
| 1 | A.  No. | 09:45 |
| 2 | Q.  All right.  So, if you could, can you tell me, | 09:45 |
| 3 | in the first all-hands town hall from April, what | 09:45 |
| 4 | Mr. Segal said, if anything, about payment of bonuses? | 09:45 |
| 5 | A.  My recollection was he and Dalana just gave a | 09:45 |
| 6 | general update to employees that the bonus was trending | 09:46 |
| 7 | at 100 percent. | 09:46 |
| 8 | I don't think that they would have had | 09:46 |
| 9 | enough information -- too early in the fiscal year to do | 09:46 |
| 10 | anything different -- is my recollection. | 09:46 |
| 11 | Q.  Anything else you recall either Dalana or Ned | 09:46 |
| 12 | saying in that first all-hands about the bonus? | 09:46 |
| 13 | A.  Not that I recall. | 09:46 |
| 14 | Q.  And, now, in the second all-hands town hall | 09:46 |
| 15 | that you recall attending sometime in July-August, what | 09:46 |
| 16 | did Mr. Segal say, if anything, about a bonus? | 09:46 |
| 17 | A.  He did not give a -- like sort of the customary | 09:46 |
| 18 | update as to how the performance of the company was | 09:46 |
| 19 | trending. | 09:46 |
| 20 | And he cited -- I recollect he cited the | 09:46 |
| 21 | ongoing acquisition as the reason why but that he | 09:46 |
| 22 | would -- there would be a follow-up and they would share | 09:47 |
| 23 | additional information, which he did. | 09:47 |
| 24 | I don't recall the specific time frame.  It | 09:47 |
| 25 | was probably a few weeks after the all-hands meeting. | 09:47 |

Page 93

1     What was said about the bonus in the key talent meeting?     09:51

2          A.   A couple of things.  One was the -- for the     09:51

3     general population, that there was comfort in that the     09:51

4     plan had a floor, a minimum funding amount, and that     09:51

5     there were ongoing conversations with Elon's team to     09:51

6     potentially ask for additional relief where they could     09:51

7     increase that amount but that -- my recollection is --     09:51

8     well, I know that we were told "no" on that -- is what I     09:51

9     recollect.     09:52

10         Q.   Anything else you recall being said about     09:52

11    bonuses in these, you know, periodic key talent     09:52

12    meetings?     09:52

13         A.   No.     09:52

14         Q.   And you seem to recall something about people     09:52

15    being told or the key talent being told there were     09:52

16    ongoing conversations with Elon's team about increasing     09:52

17    the funding floor?     09:52

18         A.   There were a number of things that Parag had --     09:52

19    was seeking with Elon's team to retain the employee     09:52

20    population.     09:52

21              So bonus relief was one.  There were some     09:52

22    other things that I recall that were being sought but     09:52

23    they were told "no" on -- on all of them.     09:52

24         Q.   Was it your understanding that Parag was     09:52

25    seeking these things because they needed the buyer's     09:53

Page 96

| | | |
|---|---|---|
| 1 | consent to do certain actions regarding compensation? | 09:53 |
| 2 | A.  I believe that to be the reason why they | 09:53 |
| 3 | were -- why, you know, they were engaging with Elon's | 09:53 |
| 4 | team. | 09:53 |
| 5 | Q.  And one of those items they wanted was to | 09:53 |
| 6 | increase the funding floor, correct? | 09:53 |
| 7 | A.  That's my understanding. | 09:53 |
| 8 | Q.  And your understanding, also, was that that was | 09:53 |
| 9 | denied by the buyer? | 09:53 |
| 10 | A.  Yes. | 09:53 |
| 11 | Q.  What other items was Parag or the, you know, | 09:53 |
| 12 | Twitter exec team seeking from Elon's team regarding | 09:53 |
| 13 | comp? | 09:53 |
| 14 | A.  A retention program, a program -- sort of a | 09:53 |
| 15 | change-in-control program for top talent.  I think those | 09:54 |
| 16 | were the three things that I -- those are the three | 09:54 |
| 17 | things I remember.  There -- there could have been some | 09:54 |
| 18 | other things, but I don't recall what they were. | 09:54 |
| 19 | Q.  Okay.  And was the retention program for top | 09:54 |
| 20 | talent -- was that approved or denied by -- | 09:54 |
| 21 | A.  Denied. | 09:54 |
| 22 | Q.  -- the buyer? | 09:54 |
| 23 | A.  Denied. | 09:54 |
| 24 | Q.  And the change-of-control program for top | 09:54 |
| 25 | talent, was that approved or denied by the buyer? | 09:54 |

Page 97

| | | |
|---|---|---|
| 1 | question. | 09:56 |
| 2 | So did Mr. Segal or anyone at Twitter ever | 09:56 |
| 3 | tell employees that if they were terminated prior to the | 09:56 |
| 4 | normal bonus payout date, they would still get a | 09:56 |
| 5 | performance bonus? | 09:56 |
| 6 | A.  No, not that I recall. | 09:56 |
| 7 | Q.  Okay.  And did Mr. Segal or anyone from Twitter | 09:56 |
| 8 | ever tell an employee that if they were disciplined or | 09:56 |
| 9 | subject to written counseling prior to the normal bonus | 09:56 |
| 10 | payout date in March, they'd still get paid a bonus? | 09:56 |
| 11 | A.  Not that I recall. | 09:56 |
| 12 | Q.  Did Mr. Segal or anyone at Twitter ever tell | 09:56 |
| 13 | Twitter employees that they'd be paid a bonus even if | 09:56 |
| 14 | the PBP was terminated or revoked by Twitter? | 09:56 |
| 15 | A.  I -- I would say no.  I don't -- I don't think | 09:56 |
| 16 | I fully understand that -- that question the way that | 09:57 |
| 17 | you phrase it but it -- are you suggesting like -- maybe | 09:57 |
| 18 | if you could reask the question.  Let me.... | 09:57 |
| 19 | Q.  Sure.  I'm happy to. | 09:57 |
| 20 | Did Mr. Segal or anyone at Twitter ever | 09:57 |
| 21 | verbally tell employees that even if the PBP was | 09:57 |
| 22 | terminated or revoked, they would still get paid a | 09:57 |
| 23 | bonus? | 09:57 |
| 24 | A.  No, I don't recall. | 09:57 |
| 25 | Q.  Okay.  Did Mr. Segal or anyone at Twitter ever | 09:57 |

Page 99

| | | |
|---|---|---|
| 1 | verbally tell employees that they get paid a bonus even | 09:57 |
| 2 | if the PBP was not funded by Twitter? | 09:57 |
| 3 | A.  Not in the way that you just phrased it. | 09:57 |
| 4 | Q.  So let me try a different phrasing. | 09:57 |
| 5 | Did Mr. Siegel or anyone at Twitter say: | 09:57 |
| 6 | If the Comp Committee elects not to fund the PBP, you | 09:57 |
| 7 | would still get paid a bonus? | 09:58 |
| 8 | A.  I don't recall if he ever said such a thing. | 09:58 |
| 9 | Q.  Okay.  Did Mr. Segal or anyone else at Twitter | 09:58 |
| 10 | ever tell employees that they would get paid a bonus | 09:58 |
| 11 | separate and independent from any of the terms or | 09:58 |
| 12 | conditions of the PBP? | 09:58 |
| 13 | A.  No.  He -- in fact, it was -- that's exactly | 09:58 |
| 14 | the update that he was giving in the all-hands -- is | 09:58 |
| 15 | that employees actually would receive a bonus. | 09:58 |
| 16 | Q.  Under the terms of the -- | 09:58 |
| 17 | A.  Under the terms of the plan. | 09:58 |
| 18 | Q.  Okay. | 09:58 |
| 19 | A.  Correct. | 09:58 |
| 20 | Q.  And did Mr. Segal or anyone else at Twitter | 09:58 |
| 21 | tell employees that they'd get paid a bonus separate and | 09:58 |
| 22 | apart from the PBP? | 09:59 |
| 23 | A.  Not that I'm aware of. | 09:59 |
| 24 | Q.  You understood that the performance bonus had | 09:59 |
| 25 | two elements.  One was a company portion; the other was | 09:59 |

Page 100

| | | |
|---|---|---|
| 1 | plan document? | 10:02 |
| 2 | A.  Correct.  It's my recollection that he | 10:02 |
| 3 | communicated to employees that the bonus would fund at | 10:02 |
| 4 | 50 percent. | 10:02 |
| 5 | Q.  All right.  Did he reference at all the | 10:02 |
| 6 | discretionary language in the plan or not? | 10:02 |
| 7 | A.  Not that I recollect. | 10:02 |
| 8 | Q.  Okay.  And at that Q2 all-hands, your | 10:02 |
| 9 | recollection is he was referring to the plan funding at | 10:02 |
| 10 | 50 percent? | 10:03 |
| 11 | A.  Correct. | 10:03 |
| 12 | Q.  All right.  Did Mr. Segal or anyone else at | 10:03 |
| 13 | Twitter ever tell employees that the performance bonus | 10:03 |
| 14 | plan was being changed in any way? | 10:03 |
| 15 | A.  Not that I recollect. | 10:03 |
| 16 | Q.  Okay.  Did he ever tell employees that it was | 10:03 |
| 17 | being, you know, modified or amended in any way? | 10:03 |
| 18 | A.  Not that I recollect, no. | 10:03 |
| 19 | Q.  And it was your understanding that if there was | 10:03 |
| 20 | a change to the compensation policy, that had been on | 10:03 |
| 21 | the consent of the buyer, correct? | 10:03 |
| 22 | A.  That's what I understood to be accurate. | 10:03 |
| 23 | Q.  Were you aware of the buyer giving original, | 10:03 |
| 24 | you know, 1.0 management any leeway or concessions with | 10:03 |
| 25 | regard to the bonus? | 10:04 |

Page 103

| | | |
|---|---|---|
| 1 | A.  If the -- if the buyer gave any concessions? | 10:04 |
| 2 | Q.  Yeah. | 10:04 |
| 3 | A.  I -- I would not have been involved in the | 10:04 |
| 4 | discussion.  So I -- I have no recollection of that. | 10:04 |
| 5 | Q.  But you didn't hear about that happening? | 10:04 |
| 6 | A.  Correct. | 10:04 |
| 7 | Q.  Okay.  And were you aware of the Compensation | 10:04 |
| 8 | Committee, again, from April through end of October '22, | 10:04 |
| 9 | making any changes, modifications to the bonus plan? | 10:04 |
| 10 | A.  Not changes or modifications but affirming the | 10:04 |
| 11 | funding of the plan. | 10:04 |
| 12 | Q.  And what specifically are you referring to with | 10:04 |
| 13 | respect to that? | 10:04 |
| 14 | A.  My recollection is Sean Edgett, the general | 10:04 |
| 15 | counsel -- | 10:05 |
| 16 | Q.  Can I pause you for a second?  Is this a | 10:05 |
| 17 | communication that is broadly to a bunch of people or is | 10:05 |
| 18 | it -- because he's an attorney.  Is it more limited? | 10:05 |
| 19 | A.  Not -- it's not broadly.  It would have been to | 10:05 |
| 20 | the Comp Committee. | 10:05 |
| 21 | Q.  Was this at a meeting of the Compensation | 10:05 |
| 22 | Committee? | 10:05 |
| 23 | A.  It was done electronically. | 10:05 |
| 24 | Q.  Well, was it a virtual meeting? | 10:05 |
| 25 | A.  No.  It was a -- what I would call a unanimous | 10:05 |

Page 104

| | | |
|---|---|---|
| 1 | Q.   Was that your understanding that that was | 10:08 |
| 2 | accurate at that time? | 10:08 |
| 3 | A.   That's what -- yeah, I -- that's what I | 10:08 |
| 4 | understand to be accurate, yes. | 10:08 |
| 5 | Q.   Okay.  And you'll see it says, "absent any | 10:08 |
| 6 | adjustment, we would announce the accrual is now at the | 10:08 |
| 7 | floor." | 10:08 |
| 8 | Do you see that? | 10:08 |
| 9 | A.   I do. | 10:08 |
| 10 | Q.   I know you didn't write this, but what was your | 10:08 |
| 11 | understanding of the phrase "accrual is now at the | 10:08 |
| 12 | floor"? | 10:08 |
| 13 | A.   Well, I think that's -- it's a financial term. | 10:08 |
| 14 | So there's a couple ways that I would interpret that. | 10:09 |
| 15 | One is that finance is adjusting on the | 10:09 |
| 16 | books the amount of money for the general population -- | 10:09 |
| 17 | well, actually for both because they're referencing the | 10:09 |
| 18 | general population and staff. | 10:09 |
| 19 | So they're just updating the amount of | 10:09 |
| 20 | money that they're holding on the books for the bonuses. | 10:09 |
| 21 | And then the implication to this would have | 10:09 |
| 22 | then been the follow-on communication to employees | 10:09 |
| 23 | with -- consistent with what they would do every -- | 10:09 |
| 24 | every quarter at the all-hands meeting to give employees | 10:09 |
| 25 | an update on where the bonus plan is funding. | 10:09 |

Page 107

1               And when I say "bonus plan," they only ever    10:09

2  specifically talked about the general population plan at    10:09

3  those all-hands.  The staff meeting, they -- that wasn't    10:09

4  a topic of conversation in those broad -- broad    10:09

5  meetings.    10:09

6     Q.  Okay.  Are you a CPA?    10:09

7     A.  I am not.    10:10

8     Q.  Are you -- do you consider yourself an    10:10

9  accountant even if you're not a CPA?    10:10

10     A.  Well, I've worked in the compensation field for    10:10

11  15-plus years.  So I feel like I can sort of navigate    10:10

12  around and understand conceptually financial terms, yes.    10:10

13     Q.  Have you ever had a job or a title or position    10:10

14  that was accountant?    10:10

15     A.  No.    10:10

16     Q.  Okay.  So with respect to "accrual," I think    10:10

17  you said that's an accounting term; is that right?    10:10

18     A.  Well, I'm taking it to mean an accounting term.    10:10

19     Q.  Okay.  You're not sure with respect to this    10:10

20  document, I mean?    10:10

21     A.  Sean would have to answer what he meant by    10:10

22  that.    10:10

23     Q.  Okay.  Take a look at the second paragraph here    10:10

24  in Exhibit 7.    10:10

25            There's a description of the bonus payment    10:10

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

| | | |
|---|---|---|
| 1 | how I read it, that they're giving an alternative | 10:12 |
| 2 | perspective on how they would allocate the funded bonus | 10:12 |
| 3 | pool. | 10:12 |
| 4 | Q.  Okay.  Because the last part of that sentence | 10:12 |
| 5 | says, quote, "allowing differentiation, paying top | 10:12 |
| 6 | performers as much as a full bonus and others 50 percent | 10:12 |
| 7 | or less." | 10:12 |
| 8 | Do you see that? | 10:12 |
| 9 | A.  I do. | 10:12 |
| 10 | Q.  So it sounds like there's really two separate | 10:12 |
| 11 | components.  One is funding, and the other is allocation | 10:13 |
| 12 | of the bonus; is that right? | 10:13 |
| 13 | A.  Yes. | 10:13 |
| 14 | Q.  Was it your understanding that the pool could | 10:13 |
| 15 | be funded at the floor of 50 percent, but an individual | 10:13 |
| 16 | employee might not get paid 50 percent of their target | 10:13 |
| 17 | bonus based on the allocation? | 10:13 |
| 18 | A.  Yes. | 10:13 |
| 19 | Q.  Okay.  So the allocation is determined by the | 10:13 |
| 20 | manager's perspective on that individual employee's | 10:13 |
| 21 | performance; is that right? | 10:13 |
| 22 | A.  To some degree, yes.  And there is a -- there | 10:13 |
| 23 | is a mathematical answer to what you're really asking me | 10:13 |
| 24 | on the allocation side, if that's what you're trying to | 10:13 |
| 25 | get at. | 10:13 |

Page 110

1    Q.  I'm just trying to understand:  If the pool    10:13

2    gets funded at 50 percent, that doesn't automatically    10:13

3    mean that an individual employee is going to get 50    10:14

4    percent of their target because, based on performance,    10:14

5    they could get more, they could get less.  Is that    10:14

6    accurate?    10:14

7    A.  That's accurate.    10:14

8    Q.  Okay.  Now, you're referring to math.  What's    10:14

9    the math you're referring to in the allocation    10:14

10   component?    10:14

11   A.  Well, I'm not going to try to decipher what    10:14

12   Sean was suggesting here as an alternative but the --    10:14

13   the funding -- once you get past the funding, you move    10:14

14   into the allocation.    10:14

15          You had asked me previously what that was;    10:14

16   and I told you it was 50 percent company performance, 50    10:14

17   percent individual performance.    10:14

18          So each of those two things could go    10:14

19   from -- in theory, could go from zero to 200 percent.    10:14

20   So if you -- on the employee performance side,    10:14

21   theoretically if you zero that out because they were a    10:14

22   poor performer -- so that part's zero, and now you're    10:14

23   left with 50 percent on the company side.    10:15

24          That's not going to flex zero to 200    10:15

25   because you already -- we already have established the    10:15

Page 111

| | | |
|---|---|---|
| 1 | Mr. Segal spoke. | 10:43 |
| 2 | A.  (Witness nods head.) | 10:43 |
| 3 | Q.  Okay?  And I want to see if this is consistent | 10:43 |
| 4 | with your recollection, that he said to the group that, | 10:43 |
| 5 | you know, the company typically shares an update on the | 10:43 |
| 6 | bonus accrual every quarter and that they didn't share | 10:43 |
| 7 | that for this quarter because they don't have an update | 10:43 |
| 8 | right then because of the acquisition and issues around | 10:43 |
| 9 | that. | 10:43 |
| 10 | Is that consistent with what you recall? | 10:43 |
| 11 | A.  Yes. | 10:43 |
| 12 | Q.  And that he said, when we do have an update, we | 10:43 |
| 13 | will share it.  And then he recognized that that wasn't | 10:44 |
| 14 | necessarily satisfying for people.  Is that your | 10:44 |
| 15 | recollection? | 10:44 |
| 16 | A.  Yes. | 10:44 |
| 17 | Q.  Okay.  And then prior to that July meeting, | 10:44 |
| 18 | there wasn't anything that he said specifically about | 10:44 |
| 19 | bonuses, you know, after the merger had been signed.  Is | 10:44 |
| 20 | that true? | 10:44 |
| 21 | A.  Prior to July? | 10:44 |
| 22 | Q.  Yeah, between merger signing and this meeting | 10:44 |
| 23 | in July that we just talked about. | 10:44 |
| 24 | A.  No, not that I recall. | 10:44 |
| 25 | Q.  Okay.  You mentioned that there were periodic | 10:44 |

Page 115

| | | |
|---|---|---|
| 1 | meetings of sort of a smaller group of employees called | 10:44 |
| 2 | key talent.  Do you know whether those meetings were | 10:44 |
| 3 | recorded? | 10:44 |
| 4 | A.  I don't know if they were re -- were recorded | 10:44 |
| 5 | or not. | 10:45 |
| 6 | Q.  Okay.  And then after the July all-hands town | 10:45 |
| 7 | hall where Mr. Segal said he couldn't provide an update, | 10:45 |
| 8 | your recollection is the next time that there was any | 10:45 |
| 9 | type of update, it was via an email in the August time | 10:45 |
| 10 | frame; is that right? | 10:45 |
| 11 | A.  Yeah.  Well, there for sure was an email.  I | 10:45 |
| 12 | don't -- there could have been another town hall and I | 10:45 |
| 13 | don't -- I don't recall specifically but I -- the email, | 10:45 |
| 14 | I do. | 10:45 |
| 15 | Q.  Okay.  Do you know whether, separate from the | 10:45 |
| 16 | all employee town hall all-hands meetings, that there | 10:45 |
| 17 | were specific finance all-hands meetings? | 10:45 |
| 18 | A.  Each division or group would have all-hands | 10:46 |
| 19 | meetings.  So it would not surprise me if there was a | 10:46 |
| 20 | finance all-hands. | 10:46 |
| 21 | Q.  I see.  Were you part of the finance group for | 10:46 |
| 22 | these all-hands meetings? | 10:46 |
| 23 | A.  No, I was not. | 10:46 |
| 24 | Q.  Okay.  What was your group considered? | 10:46 |
| 25 | A.  HR or people team. | 10:46 |

Page 116

| | | |
|---|---|---|
| 1 | Q.  Or total rewards? | 10:46 |
| 2 | A.  Total -- yeah.  Well, total rewards as a part | 10:46 |
| 3 | of the HR organization. | 10:46 |
| 4 | Q.  Okay.  So you wouldn't attend -- to the extent | 10:46 |
| 5 | finance had all-hands, you didn't attend those? | 10:46 |
| 6 | A.  No. | 10:46 |
| 7 | Q.  Okay.  Let's have this marked next. | 10:46 |
| 8 | (Schobinger Exhibit 8 marked.) | 10:46 |
| 9 | THE REPORTER:  No. 8. | 10:46 |
| 10 | Q.  (BY MR. MECKLEY)  All right.  Exhibit 8 is a | 10:46 |
| 11 | series of emails.  The one most recent chronologically | 10:47 |
| 12 | is August 19, 2022, from Ned Segal to team@Twitter; and | 10:47 |
| 13 | then there's an attachment called "2022 PBP accrual: | 10:47 |
| 14 | Tweep FAQ, August 2022." | 10:47 |
| 15 | A.  Okay. | 10:47 |
| 16 | Q.  So have you seen this before? | 10:47 |
| 17 | A.  It looks familiar. | 10:47 |
| 18 | Q.  Okay.  And team@Twitter.com, you -- that would | 10:47 |
| 19 | have been something that you were included on as a | 10:47 |
| 20 | recipient; is that right? | 10:47 |
| 21 | A.  Yes. | 10:47 |
| 22 | Q.  All right.  Did you track whether any other | 10:47 |
| 23 | employees at team@Twitter.com read this email? | 10:47 |
| 24 | A.  No, not personally, no. | 10:48 |
| 25 | Q.  All right.  Do you know whether the company | 10:48 |

Page 117

| | | |
|---|---|---|
| 1 | tracked whether people had read this email? | 10:48 |
| 2 | A.  I wouldn't know. | 10:48 |
| 3 | Q.  All right.  So the first part of this says -- | 10:48 |
| 4 | Mr. Segal says, "Due to deal-related matters, we did not | 10:48 |
| 5 | yet have a complete answer in July around PBP accrual; | 10:48 |
| 6 | but we are now able to provide more clarity." | 10:48 |
| 7 | And then that sentence ends -- or excuse | 10:48 |
| 8 | me -- paragraph ends, quote, "Based on our Q2 | 10:48 |
| 9 | performance, the 2022 total bonus pool is now tracking | 10:48 |
| 10 | to 50 percent." | 10:48 |
| 11 | Do you see that? | 10:48 |
| 12 | A.  I do. | 10:48 |
| 13 | Q.  All right.  And that was just based on Q2 | 10:48 |
| 14 | performance, as he said, correct? | 10:48 |
| 15 | A.  As a point in time, yes. | 10:48 |
| 16 | Q.  When did Twitter's Q2 end? | 10:48 |
| 17 | A.  Well, if I recall correctly, Twitter's fiscal | 10:49 |
| 18 | year is a calendar year.  So Q2 would have been end of | 10:49 |
| 19 | June. | 10:49 |
| 20 | Q.  Okay.  So his statement doesn't reflect any | 10:49 |
| 21 | performance for Q3 or Q4, right? | 10:49 |
| 22 | A.  No. | 10:49 |
| 23 | Q.  And how he refers to it is the "bonus pool is | 10:49 |
| 24 | now tracking."  Will you agree that that's sort of a | 10:49 |
| 25 | statement as of that time, August 19, 2022? | 10:49 |

Page 118

1      A.  Correct.  And employees would have -- would      10:49

2  have interpreted that to mean that they would receive 50      10:49

3  percent of their target bonus.      10:49

4      Q.  Okay.  Well, I'm asking just whether you      10:49

5  understood that that was now tracking to mean now, as of      10:49

6  August 19, 2022.      10:49

7      A.  Yes.      10:50

8      Q.  Okay.  And then there were these FAQs attached.      10:50

9  Do you see that?      10:50

10      A.  I do.      10:50

11      Q.  Did you draft any portion of these FAQs?      10:50

12      A.  The sound -- if I can skim through it real      10:50

13  quick and see if I recognize....      10:50

14           I don't recall.      10:50

15      Q.  All right.  Did you -- separate from actually      10:50

16  writing any portion, did anyone ask you to provide input      10:50

17  as to these PBP accrual FAQs?      10:50

18      A.  Not that I recall.      10:51

19      Q.  All right.  First page of the FAQs, it says,      10:51

20  "Would the board and/or the buyer consider some relief      10:51

21  on or changes to the bonus plan given the extraordinary      10:51

22  circumstances we're facing?"      10:51

23           And it says, "That is something that the      10:51

24  board and the management team have looked at."      10:51

25           Is it your understanding that's true?      10:51

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

| | | |
|---|---|---|
| 1 | Q.  -- and 15? | 11:04 |
| 2 | A.  -- here's how I would answer your question:  I | 11:04 |
| 3 | don't know of a single employee who attended the | 11:04 |
| 4 | all-hands meetings in person or watched it remotely or | 11:04 |
| 5 | watched a recording of it -- I don't know of a single | 11:04 |
| 6 | employee who ever believed that they would not get a | 11:04 |
| 7 | bonus.  That's how I would answer your question. | 11:04 |
| 8 | Q.  But you haven't talked with a single employee | 11:04 |
| 9 | about that, correct? | 11:04 |
| 10 | A.  Correct. | 11:04 |
| 11 | MR. MECKLEY:  All right.  Let's have this | 11:04 |
| 12 | marked next. | 11:04 |
| 13 | (Schobinger Exhibit 11 marked.) | 11:04 |
| 14 | THE REPORTER:  No. 11. | 11:04 |
| 15 | Q.  (BY MR. MECKLEY)  All right.  Exhibit 11 is a | 11:04 |
| 16 | series of messages, appear to be between you and someone | 11:04 |
| 17 | named Eric LaPorte on August 22 of 2022. | 11:04 |
| 18 | A.  Okay. | 11:05 |
| 19 | Q.  All right.  So who's Eric LaPorte? | 11:05 |
| 20 | A.  I believe he was one of our recruiters. | 11:05 |
| 21 | Q.  And Exhibit 11 represents direct messages.  You | 11:05 |
| 22 | were writing to him, and he was writing back to you? | 11:05 |
| 23 | A.  Okay. | 11:05 |
| 24 | Q.  I'm asking:  Is that accurate? | 11:05 |
| 25 | A.  I -- I don't know where this came from but | 11:05 |

Page 129

| | | |
|---|---|---|
| 1 | of our bonus plan; but you would have to ask him that | 11:07 |
| 2 | question. | 11:07 |
| 3 | Q.  So, as you sit here today, you don't ever have | 11:07 |
| 4 | a recollection of ever telling Mr. LaPorte he's wrong in | 11:07 |
| 5 | his statement that the bonuses are never guaranteed? | 11:07 |
| 6 | A.  Not in this thread, no. | 11:07 |
| 7 | Q.  Or ever? | 11:07 |
| 8 | A.  No.  I wouldn't -- like, again, if you're | 11:07 |
| 9 | asking me if I've ever had a conversation with Eric | 11:07 |
| 10 | around the construct of our bonus plan, I'm pretty sure | 11:07 |
| 11 | I probably did. | 11:07 |
| 12 | Q.  Yeah.  I'm not asking if you had a conversation | 11:08 |
| 13 | about a construct.  I'm asking if you told him, at any | 11:08 |
| 14 | point after he told you "I know that our bonus is never | 11:08 |
| 15 | guaranteed," that he was incorrect and, in fact, the | 11:08 |
| 16 | bonus is guaranteed? | 11:08 |
| 17 | A.  Yeah, I can't -- I don't recollect. | 11:08 |
| 18 | Q.  All right.  Let's look at this next. | 11:08 |
| 19 | (Schobinger Exhibit 12 marked.) | 11:08 |
| 20 | THE REPORTER:  No. 12. | 11:08 |
| 21 | Q.  (BY MR. MECKLEY)  All right.  Exhibit 12 | 11:08 |
| 22 | appears to be a direct message chain between you and | 11:08 |
| 23 | Courtney McMillian on October 19, 2022. | 11:08 |
| 24 | A.  Okay. | 11:09 |
| 25 | Q.  And at this point Ms. McMillian was your direct | 11:09 |

Page 131

| | | |
|---|---|---|
| 1 | this is now October -- why are you saying it's in draft | 11:10 |
| 2 | in redline or are you referring to something else? | 11:10 |
| 3 | A.  I'm referring to this document. | 11:10 |
| 4 | Q.  Yeah.  That's the thing that was approved by | 11:10 |
| 5 | the Comp Committee back in March of 2022. | 11:10 |
| 6 | A.  No, this is not.  This is a -- this is just | 11:10 |
| 7 | sort of an internal document that describes the -- how | 11:10 |
| 8 | the plan works. | 11:10 |
| 9 | What the committee approved was the actual | 11:10 |
| 10 | funding metrics.  That's what they would have approved. | 11:10 |
| 11 | And this document is just taking those and | 11:10 |
| 12 | conveying some information to an employee.  So this | 11:10 |
| 13 | document, early in the year, was redlined to reflect | 11:10 |
| 14 | that; but somebody forgot to click "accept the changes." | 11:10 |
| 15 | So that's what I was simply calling out | 11:11 |
| 16 | when Courtney was asking -- when she sent this document | 11:11 |
| 17 | and asked:  Is this the current document? | 11:11 |
| 18 | Yes, that is the current document.  It's | 11:11 |
| 19 | just somebody forgot to click "accept changes." | 11:11 |
| 20 | Q.  All right.  So the document was approved by the | 11:11 |
| 21 | plan, the PBP, for 2022, which is Exhibit 4 -- approved | 11:11 |
| 22 | by the Comp Committee? | 11:11 |
| 23 | A.  Correct. | 11:11 |
| 24 | Q.  Okay.  So then the next message, you say here | 11:11 |
| 25 | on October 19 to Ms. McMillian, quote, "The PBP plan | 11:11 |

Page 133

| | | |
|---|---|---|
| 1 | does not specifically contemplate a change of control. | 11:11 |
| 2 | So it is really unclear to me if the bonus plan would | 11:11 |
| 3 | permit paying out." | 11:11 |
| 4 | Do you see that? | 11:11 |
| 5 | A.  I do. | 11:11 |
| 6 | Q.  Why was it unclear to you that the bonus plan | 11:11 |
| 7 | would permit paying out? | 11:11 |
| 8 | A.  Because it wasn't written specifically into | 11:11 |
| 9 | this -- into this Exhibit 4 document and there was some | 11:11 |
| 10 | conversations with corporate counsel to interpret that, | 11:11 |
| 11 | specifically Kevin Cope. | 11:12 |
| 12 | Q.  Well, I don't want you to talk about | 11:12 |
| 13 | communications with counsel. | 11:12 |
| 14 | A.  But you're -- you're asking me -- | 11:12 |
| 15 | Q.  No, I'm asking you not to say anything you | 11:12 |
| 16 | communicated -- | 11:12 |
| 17 | A.  I'm not asking -- | 11:12 |
| 18 | Q.  -- with counsel. | 11:12 |
| 19 | A.  Correct, and I'm not.  I'm just -- I'm | 11:12 |
| 20 | answering your question around if you're asking me why | 11:12 |
| 21 | would I make a comment about the plan not contemplating | 11:12 |
| 22 | it, it's because it wasn't specifically written into | 11:12 |
| 23 | this plan document. | 11:12 |
| 24 | Q.  Right.  So what you're referring to here is | 11:12 |
| 25 | because the PBP plan doesn't specifically reference a | 11:12 |

Page 134

| | | |
|---|---|---|
| 1 | change of control, you're unclear whether the bonus plan | 11:12 |
| 2 | would permit a payout of the bonus following a change of | 11:12 |
| 3 | control; is that correct? | 11:12 |
| 4 | A.  Correct. | 11:12 |
| 5 | Q.  All right.  And then you say a little bit after | 11:12 |
| 6 | that, "I think one could make an argument similar" | 11:12 |
| 7 | what -- "to what has been used in other matters ... | 11:12 |
| 8 | where the buyer would have to consent first." | 11:12 |
| 9 | Do you see that? | 11:13 |
| 10 | A.  No.  Let me -- oh, I do see that. | 11:13 |
| 11 | Q.  All right.  And when you're saying a similar | 11:13 |
| 12 | argument, you're referring to where you have to ask the | 11:13 |
| 13 | buyer for consent to make changes, correct? | 11:13 |
| 14 | A.  Yes, except it's redacted.  So I don't actually | 11:13 |
| 15 | know what the example that was -- has been redacted is | 11:13 |
| 16 | referring to. | 11:13 |
| 17 | Q.  But what you're referring to is situations | 11:13 |
| 18 | where the buyer has to consent to changes; is that | 11:13 |
| 19 | right? | 11:13 |
| 20 | A.  Correct.  What I'm referring to is we -- we | 11:13 |
| 21 | were -- we were told that if anything that we were doing | 11:14 |
| 22 | was new, that we would have to seek consent. | 11:14 |
| 23 | And so for the PBP, it was just simply -- | 11:14 |
| 24 | it was a question around because the -- does the plan | 11:14 |
| 25 | contemplate a CR -- a CIC event or is it implied?  We | 11:14 |

Page 135

| | | |
|---|---|---|
| 1 | had to get guidance as to how one might interpret that. | 11:14 |
| 2 | Q. Okay. All right. Let's look at the next. | 11:14 |
| 3 | (Schobinger Exhibit 13 marked.) | 11:14 |
| 4 | THE REPORTER: No. 13. | 11:14 |
| 5 | Q. (BY MR. MECKLEY) All right. Exhibit 13 is a | 11:14 |
| 6 | series of direct messages through Slack between you and | 11:14 |
| 7 | Katie Marcotte on November 30, 2022. | 11:14 |
| 8 | A. Okay. | 11:15 |
| 9 | Q. At that time who was Katie Marcotte? | 11:15 |
| 10 | A. She would have been the de facto leader of HR. | 11:15 |
| 11 | Q. And did you report to her? | 11:15 |
| 12 | A. No. Well, indirectly, yes. | 11:15 |
| 13 | Q. All right. And why do you say "indirectly"? | 11:15 |
| 14 | A. I think when Elon came in and a lot of the | 11:15 |
| 15 | staff was laid off, like if you went and you looked at | 11:15 |
| 16 | an org structure, I think, like, we were probably all | 11:15 |
| 17 | reporting in to Elon. | 11:15 |
| 18 | Q. All right. Okay. So if you could take a look | 11:15 |
| 19 | at your second message here to Ms. Marcotte on | 11:15 |
| 20 | November 30th, you wrote her, "The logical outcome | 11:16 |
| 21 | suggests we would not pay out FY 2022 bonuses due to the | 11:16 |
| 22 | current environment and the severe underperformance" of | 11:16 |
| 23 | the "plan." | 11:16 |
| 24 | Do you see that? | 11:16 |
| 25 | A. I do. | 11:16 |

Page 136

| | | |
|---|---|---|
| 1 | Q.  And when you wrote "FY22," you're referring to | 11:16 |
| 2 | the PBP bonuses under the plan; is that right? | 11:16 |
| 3 | A.  Correct. | 11:16 |
| 4 | Q.  Okay.  And then you write, "So you know, that | 11:16 |
| 5 | is what I recommended reflect (when we were still | 11:16 |
| 6 | public).  The plan permitted the cmte to exercise that | 11:16 |
| 7 | discretion." | 11:16 |
| 8 | Do you see that? | 11:16 |
| 9 | A.  I do. | 11:16 |
| 10 | Q.  And does "cmte" refer to the Compensation | 11:16 |
| 11 | Committee? | 11:16 |
| 12 | A.  It does. | 11:16 |
| 13 | Q.  And this indicates that you previously | 11:16 |
| 14 | recommended to the Compensation Committee that bonuses | 11:16 |
| 15 | not be paid to employees; is that correct? | 11:16 |
| 16 | A.  No. | 11:16 |
| 17 | Q.  All right.  So when you say "The logical | 11:16 |
| 18 | outcome suggests we would not pay out FY22 bonuses" and | 11:17 |
| 19 | then you say "that is what I recommended," what are you | 11:17 |
| 20 | referring to? | 11:17 |
| 21 | A.  I was asked for an opinion by Dalana Brand -- | 11:17 |
| 22 | just natural conversations when she would seek input | 11:17 |
| 23 | from her leadership team -- as to, you know, what do you | 11:17 |
| 24 | think? | 11:17 |
| 25 | So there's what I think; and there's the | 11:17 |

Page 137

| | | |
|---|---|---|
| 1 | reality, which I wasn't the decision-maker here. | 11:17 |
| 2 | Q. All right. | 11:17 |
| 3 | A. The decision-maker made the decision to fund it | 11:17 |
| 4 | at 50 percent. So my opinion is actually irrelevant. | 11:17 |
| 5 | Q. So when you say, "that is what I recommended | 11:17 |
| 6 | previously," you said you recommended that to Dalana | 11:17 |
| 7 | Brand. Is that the person to whom you recommended it? | 11:17 |
| 8 | A. Correct. | 11:17 |
| 9 | Q. In addition to Dalana Brand, did you recommend | 11:17 |
| 10 | to anyone else that the company not pay out fiscal year | 11:17 |
| 11 | '22 bonuses? | 11:17 |
| 12 | A. No, it just would have been with her and her | 11:17 |
| 13 | leadership team. | 11:18 |
| 14 | Q. So when you say "with her and her leadership | 11:18 |
| 15 | team," who else on her leadership team did you recommend | 11:18 |
| 16 | that the company not pay out -- | 11:18 |
| 17 | A. Well, Courtney -- | 11:18 |
| 18 | Q. -- 2022 bonuses? | 11:18 |
| 19 | A. Courtney McMillian would have been there. I | 11:18 |
| 20 | don't remember her -- all of her staff that was involved | 11:18 |
| 21 | but I -- what I recollect is she asked for an opinion, | 11:18 |
| 22 | and I gave an opinion. | 11:18 |
| 23 | Q. I'm just asking: In the context of when you | 11:18 |
| 24 | made your recommendation not to pay out 2022 bonuses, it | 11:18 |
| 25 | was to Ms. Brand, Ms. McMillian; and whom else was | 11:18 |

Page 138

| | | |
|---|---|---|
| 1 | present for that? | 11:18 |
| 2 | A.  I don't recall others. | 11:18 |
| 3 | Q.  But there were others.  You just don't remember | 11:18 |
| 4 | who? | 11:18 |
| 5 | A.  Correct. | 11:18 |
| 6 | Q.  Okay.  Your sentence here says, "The plan | 11:18 |
| 7 | permitted the" committee "to exercise that discretion." | 11:18 |
| 8 | And when you say "exercise that | 11:18 |
| 9 | discretion," are you referring to the discretion not to | 11:18 |
| 10 | pay bonuses? | 11:18 |
| 11 | A.  No.  I'm referring to the discretion that if | 11:18 |
| 12 | they wanted to change the funding of the plan; but, | 11:19 |
| 13 | again, they didn't.  In fact, they affirmed funding it | 11:19 |
| 14 | at 50 percent when Sean Edgett ask them to do that very | 11:19 |
| 15 | thing. | 11:19 |
| 16 | Q.  Right.  So I'm just asking about the | 11:19 |
| 17 | discretion.  Is the discretion that you're referring to | 11:19 |
| 18 | in a sense to decide not to fund the plan? | 11:19 |
| 19 | A.  Correct. | 11:19 |
| 20 | Q.  Okay.  You also wrote here to Ms. Marcotte, | 11:19 |
| 21 | quote, "Elon is the sole director at this point and it | 11:19 |
| 22 | really comes down to him and only him to make the final | 11:19 |
| 23 | decision." | 11:19 |
| 24 | Do you see that? | 11:19 |
| 25 | A.  I do. | 11:19 |

Page 139

1    was simply letting him know that we needed to get        11:26

2    disposition on the -- on the payout of the bonus, to     11:26

3    which he simply responded that he didn't -- he didn't    11:26

4    have an issue with paying a bonus if it was earned.      11:26

5        Q.  Okay.  And just so I'm sure, Mr. Schobinger --   11:26

6    because I don't want to get hung up on any words or      11:26

7    anything -- did you, during this January 5th meeting     11:26

8    with Mr. Musk, communicate in any way whatsoever your    11:26

9    belief that bonuses shouldn't be paid because of         11:27

10   whatever reason, including that the company had          11:27

11   underperformed?                                          11:27

12       A.  Not that I recall, no.                           11:27

13       Q.  Okay.  Do you know whether any other people who  11:27

14   attended that meeting have stated that as the            11:27

15   recommendation you made, that you should -- that bonuses 11:27

16   should not be paid?                                      11:27

17       A.  I -- I don't know.  I mean, it's -- it's         11:27

18   possible based on, you know, some of the previous        11:27

19   communications where when I was asked for an opinion     11:27

20   from Dalana Brand, I may have referenced that; but I     11:27

21   don't know.                                              11:27

22            You would have to -- you would have to ask      11:27

23   whoever else attended.                                   11:27

24       Q.  Uh-huh.  Did you take any notes during that      11:27

25   meeting --                                               11:27

                                            Page 144

| | | |
|---|---|---|
| 1 | Q.  And did you communicate with anyone on Elon's | 11:32 |
| 2 | leadership team regarding severance to employees? | 11:32 |
| 3 | A.  Yes. | 11:32 |
| 4 | Q.  And who was that? | 11:32 |
| 5 | A.  Lindsay Chapman. | 11:32 |
| 6 | Q.  Okay.  Anyone else? | 11:32 |
| 7 | A.  And it would have been, when she left, Walter | 11:32 |
| 8 | Yu -- Walter Gilbert. | 11:32 |
| 9 | Q.  Okay.  Anyone else? | 11:32 |
| 10 | A.  Not that I recall, no. | 11:32 |
| 11 | (Schobinger Exhibit 15 marked.) | 11:33 |
| 12 | THE REPORTER:  No. 15. | 11:33 |
| 13 | Q.  (BY MR. MECKLEY)  So Exhibit 15, | 11:33 |
| 14 | Mr. Schobinger, is a December 1st, 2022, email and | 11:33 |
| 15 | attachments entitled "FY22 PBP follow up," appears to be | 11:33 |
| 16 | from you to a variety of people. | 11:34 |
| 17 | Do you see that? | 11:34 |
| 18 | A.  I do. | 11:34 |
| 19 | Q.  And is this an email you sent to these people | 11:34 |
| 20 | here listed? | 11:34 |
| 21 | A.  It appears to be, yes. | 11:34 |
| 22 | Q.  And the attachment was your update regarding | 11:34 |
| 23 | various aspects of the PBP funding? | 11:34 |
| 24 | A.  Yes. | 11:34 |
| 25 | Q.  And if you could look at the first page of your | 11:34 |

Page 148

| | | |
|---|---|---|
| 1 | attachments, there's a series of bullet points there. | 11:34 |
| 2 | A.  (Witness complies.) | 11:34 |
| 3 | Q.  And the fourth bullet point from the top says, | 11:34 |
| 4 | quote, "Employee payout varies depending on individual | 11:34 |
| 5 | performance," period, close quote. | 11:34 |
| 6 | Do you see that? | 11:34 |
| 7 | A.  I do. | 11:34 |
| 8 | Q.  And was that true? | 11:34 |
| 9 | A.  Yes. | 11:34 |
| 10 | Q.  All right. | 11:34 |
| 11 | (Schobinger Exhibit 16 marked.) | 11:35 |
| 12 | THE REPORTER:  No. 16. | 11:35 |
| 13 | Q.  (BY MR. MECKLEY)  All right.  Exhibit 16 | 11:35 |
| 14 | appears to be an email from you to Lindsay Chapman dated | 11:35 |
| 15 | January 6th, 2023, entitled "more on the bonus | 11:35 |
| 16 | conversation for tonight." | 11:35 |
| 17 | A.  Okay. | 11:35 |
| 18 | Q.  And is this something that you sent to | 11:35 |
| 19 | Ms. Chapman? | 11:35 |
| 20 | A.  It appears to be, yes. | 11:35 |
| 21 | Q.  All right.  In the second sentence, it says, | 11:35 |
| 22 | "Assuming he agrees to fund the PBP pool." | 11:35 |
| 23 | Do you see that? | 11:35 |
| 24 | A.  I do. | 11:35 |
| 25 | Q.  And by "he," you're referring to Elon? | 11:35 |

Page 149

| | | |
|---|---|---|
| 1 | A.  Correct. | 11:35 |
| 2 | Q.  Right?  And one of the first decision points | 11:35 |
| 3 | was whether or not to fund the PBP pool, correct? | 11:36 |
| 4 | A.  Correct. | 11:36 |
| 5 | Q.  Okay.  And then, if that happened, you go on to | 11:36 |
| 6 | say, "the challenge we have is the ability to reasonably | 11:36 |
| 7 | gauge employee performance for the fiscal year because | 11:36 |
| 8 | of the massive changes to the workforce." | 11:36 |
| 9 | Do you see that? | 11:36 |
| 10 | A.  Yes. | 11:36 |
| 11 | Q.  And that was a true statement you were telling | 11:36 |
| 12 | Ms. Chapman, correct? | 11:36 |
| 13 | A.  Well, I think what I was telling Lindsay was a | 11:36 |
| 14 | few things. | 11:36 |
| 15 | One is there's the -- the funding of the | 11:36 |
| 16 | pool which from my perspective -- I mean, this is just | 11:36 |
| 17 | comprehensive and sort of going through the mechanics of | 11:36 |
| 18 | the plan. | 11:36 |
| 19 | So there's the funding element.  From my | 11:36 |
| 20 | perspective, that felt like that decision was already | 11:36 |
| 21 | made. | 11:36 |
| 22 | Then there's the allocation side of it, and | 11:36 |
| 23 | I was letting her know that that's likely going to be a | 11:36 |
| 24 | challenge because of the suspension of the performance | 11:36 |
| 25 | management process and the -- sort of the gutting of the | 11:36 |

Page 150

| | | |
|---|---|---|
| 1 | organization, that it would be difficult for leaders to | 11:37 |
| 2 | assess employees' performance. | 11:37 |
| 3 | So that was the update that I was giving | 11:37 |
| 4 | Lindsay. | 11:37 |
| 5 | (Schobinger Exhibit 17 marked.) | 11:37 |
| 6 | THE REPORTER:  No. 17. | 11:37 |
| 7 | Q.  (BY MR. MECKLEY)  All right.  Exhibit 17, | 11:37 |
| 8 | Mr. Schobinger, is a series of emails from a variety of | 11:37 |
| 9 | people but including yourself and Lindsay Chapman. | 11:37 |
| 10 | And there's one on the first page here | 11:37 |
| 11 | that's dated January 5th, 2023, from you to Lindsay. | 11:37 |
| 12 | My first question is:  Is this an email | 11:37 |
| 13 | that you sent to Ms. Chapman? | 11:38 |
| 14 | A.  It appears to be, yes. | 11:38 |
| 15 | Q.  The -- what looks to be the third paragraph | 11:38 |
| 16 | down, you write to her, "The second item concerns the FY | 11:38 |
| 17 | 2022 (calendar year 2022) bonus plan you may have heard | 11:38 |
| 18 | referred to as the PBP.  For context, the design of our | 11:38 |
| 19 | PBP plan includes a funding floor of 50 percent.  I had | 11:38 |
| 20 | shared with Nate previously that Elon as the sole | 11:38 |
| 21 | director is the only one who can approve to pay it out | 11:38 |
| 22 | or exercise discretion to not pay.  Katie had raised | 11:38 |
| 23 | this with Elon in mid-December, but he wanted to hold on | 11:38 |
| 24 | making any final decisions." | 11:38 |
| 25 | Do you see that? | 11:38 |

Page 151

| | | |
|---|---|---|
| 1 | A.  I do. | 11:38 |
| 2 | Q.  All right.  And you are saying here Elon was | 11:38 |
| 3 | the sole director, and that's director of the company? | 11:38 |
| 4 | A.  Well, he got rid of -- when he purchased the | 11:39 |
| 5 | company, he got rid of the board of directors.  So it | 11:39 |
| 6 | was our understanding he was the only, quote/unquote, | 11:39 |
| 7 | "officer" of the company. | 11:39 |
| 8 | Q.  Right.  And -- | 11:39 |
| 9 | A.  That's what this is referring to. | 11:39 |
| 10 | Q.  Okay.  And you're saying that Elon was the one | 11:39 |
| 11 | who -- the only one who could approve to pay out bonuses | 11:39 |
| 12 | or exercise discretion to not pay. | 11:39 |
| 13 | Do you see that? | 11:39 |
| 14 | A.  I do. | 11:39 |
| 15 | Q.  And that's discretion that he had the ability | 11:39 |
| 16 | to exercise, correct? | 11:39 |
| 17 | A.  Correct. | 11:39 |
| 18 | Q.  And it goes on.  The next sentence says, "I | 11:39 |
| 19 | think the first decision we need to land on is if we | 11:39 |
| 20 | intend to fund and pay it out." | 11:39 |
| 21 | Do you see that? | 11:39 |
| 22 | A.  Yes. | 11:39 |
| 23 | Q.  All right.  So as of this date, there was no | 11:39 |
| 24 | decision about funding, correct? | 11:40 |
| 25 | A.  Well, there was what we -- it's what every | 11:40 |

Page 152

1    employee was being told up to this point in time.    11:40

2    Whether that constitutes an official decision or not,    11:40

3    that's what they were being told; but for the purpose of    11:40

4    us executing, we actually need something in writing to    11:40

5    tell us go do it.    11:40

6        Q.  Well, you wrote, "the first decision we need to    11:40

7    land on is if we intend to fund."    11:40

8            So if you're telling Ms. Chapman that    11:40

9    that's a decision that needs to be made, wouldn't you    11:40

10   agree that the decision hasn't been made at that point?    11:40

11       A.  I don't -- no.  I think from my perspective,    11:40

12   you know, if you go back to the January 6th meeting with    11:40

13   Elon when he said if the bonus has been earned, then we    11:40

14   should pay it, to me, that sort of constitutes go forth.    11:40

15   He made the decision.    11:41

16           Whether he understood the mechanics of the    11:41

17   plan or not, I don't know.  You'd have to speak to him,    11:41

18   but it sort of feels like that decision was made.    11:41

19           I was just being comprehensive in the    11:41

20   thought process here behind here's the mechanics of what    11:41

21   we've got to sort of go through.    11:41

22       Q.  All right.  Well, let's take a look at    11:41

23   something else, then.    11:41

24           (Schobinger Exhibit 18 marked.)    11:41

25           THE REPORTER:  No. 18.    11:41

                                        Page 153

1    Q.   (BY MR. MECKLEY)   Okay.   So Exhibit 18 is a --   11:41
2    an email from you, Mr. Schobinger, to a variety of   11:41
3    people, including Lindsay Chapman and others, January 19   11:41
4    of 2023, "Subject:   FY22 PBP follow-up."   11:41
5            So, did you send this email to Lindsay   11:42
6    Chapman and these other folks?   11:42
7    A.   Yes.   11:42
8    Q.   All right.   And you'll say -- you say -- excuse   11:42
9    me -- "I updated the FY22 PBP recommendation to address   11:42
10   concerns raised when we met last week.   Essentially I   11:42
11   have restructured the approach to solve for two   11:42
12   decisions that are needed."   11:42
13           The first bullet point:   "Do we fund a   11:42
14   bonus pool?"   11:42
15           Second bullet point:   "And if we do fund,   11:42
16   how should we calculate?"   11:42
17           So this is January 19, Mr. Schobinger.   You   11:42
18   would agree at that point there was no decision yet as   11:42
19   to whether to fund a bonus pool, correct?   11:42
20   A.   No, I would not agree with that because, again,   11:42
21   back into early January, Elon had made his comment that   11:42
22   he was -- actually if I back further up, back in   11:42
23   August when the company was still public, the board --   11:42
24   specifically the Compensation Committee -- agreed to   11:43
25   fund at 50 percent.   All the employees were being told   11:43

Page 154

1    that.                                                    11:43

2              Fast-forward to early January.  Elon           11:43

3    himself said:  If the bonus was earned, then it should   11:43

4    be paid.                                                 11:43

5              This is simply -- we can't act on something     11:43

6    unless we get in writing from him saying go forth and do 11:43

7    it.  So we were still turning through that.  How do we   11:43

8    get him to answer that question?                         11:43

9        Q.  So your next sentence in Exhibit 18 says,        11:43

10   quote, "To be clear, Elon owns answering the first       11:43

11   question.  He can answer it in one of two ways:          11:43

12   Exercise discretion and not fund or allow the plan to    11:43

13   fund at 50 percent," period, close quote.                11:43

14             Do you see that?                                11:43

15       A.  I do.                                             11:43

16       Q.  All right.  So you wrote that to Lindsay          11:43

17   Chapman and all these other folks.                       11:43

18             Why didn't you tell them that the decision      11:43

19   had already been made and Elon was going to fund the     11:43

20   plan, if that was true?                                  11:43

21       A.  We did -- we did have that conversation.  So     11:43

22   everyone on this list was completely aware of that.      11:44

23             This is just being -- it's a                    11:44

24   comprehensive -- what we were asked to do was develop    11:44

25   the talk track for how are we going to execute on this?  11:44

                                              Page 155

1       So this is just a comprehensive document    11:44

2  that's sort of outlining the process that you go through    11:44

3  it.    11:44

4       What we needed from Elon was a simple email    11:44

5  saying:  I approve.  Pay this out.    11:44

6       But in the contrary, what he was doing was    11:44

7  saying, on the one hand, I don't have any issue with    11:44

8  paying it if it was earned but, on the other hand, the    11:44

9  direction:  Pause paying anything.    11:44

10       So that's the dilemma we were all in.    11:44

11    Q.  All right.  But you say "He can answer it in    11:44

12  one of two ways."    11:44

13       Why didn't you say that he has already    11:44

14  answered it?    11:44

15    A.  I was just being comprehensive.    11:44

16    Q.  So you believe it's comprehensive to say that    11:44

17  there's a decision that he can answer as opposed to    11:44

18  saying:  He already decided this.  It's going to be    11:45

19  funded?    11:45

20    A.  Again, I was just being comprehensive to this    11:45

21  group of people to help them understand the mechanics of    11:45

22  the bonus plan.    11:45

23    Q.  And in your earlier sentence, you say, "I have    11:45

24  restructured the approach for solve for two decisions    11:45

25  that are needed:  Do we fund a bonus pool?"    11:45

Page 156

| 1 | Why was there a decision needed around "Do | 11:45 |
| 2 | we fund a bonus pool" if, as you're saying, the decision | 11:45 |
| 3 | was already made -- | 11:45 |
| 4 | A.  Because this -- | 11:45 |
| 5 | Q.  -- let me finish -- the decision was already | 11:45 |
| 6 | made two weeks before? | 11:45 |
| 7 | A.  This group didn't understand the mechanics of | 11:45 |
| 8 | how the bonus plan funded and how it was allocated. | 11:45 |
| 9 | Q.  Did you ever put in writing to anyone that | 11:45 |
| 10 | there was already a decision by Mr. Musk to fund the | 11:45 |
| 11 | bonus pool for the 2022 fiscal year? | 11:45 |
| 12 | A.  No, that's not what my job was. | 11:46 |
| 13 | Q.  All right.  Let's take a short break. | 11:46 |
| 14 | THE VIDEOGRAPHER:  Going off the record. | 11:46 |
| 15 | The time is 11:46. | 11:46 |
| 16 | (Recess from 11:46 a.m. to 12:06 p.m.) | 12:06 |
| 17 | THE VIDEOGRAPHER:  Back on the record. | 12:06 |
| 18 | This marks the beginning of media unit No. 3.  The time | 12:06 |
| 19 | is 12:06. | 12:06 |
| 20 | Q.  (BY MR. MECKLEY)  All right.  Let's look at the | 12:06 |
| 21 | next exhibit, Mr. Schobinger. | 12:06 |
| 22 | (Schobinger Exhibit 19 marked.) | 12:06 |
| 23 | THE REPORTER:  No. 19. | 12:06 |
| 24 | Q.  (BY MR. MECKLEY)  Okay.  Exhibit 19 is -- | 12:06 |
| 25 | appears to be an invite that you sent to N. Koutoulas on | 12:06 |

Page 157

| | | |
|---|---|---|
| 1 | at any time? | 12:13 |
| 2 | A.  Not that I recall. | 12:13 |
| 3 | Q.  We had referenced the January 5th meeting with | 12:13 |
| 4 | Elon Musk and other people that you attended.  Remember | 12:13 |
| 5 | that? | 12:13 |
| 6 | A.  Yes. | 12:13 |
| 7 | Q.  And was Lindsay Chapman at that meeting as | 12:13 |
| 8 | well? | 12:13 |
| 9 | A.  I -- I think she was, but I can't be for | 12:14 |
| 10 | certain. | 12:14 |
| 11 | Q.  Okay. | 12:14 |
| 12 | (Schobinger Exhibit 21 marked.) | 12:14 |
| 13 | THE REPORTER:  No. 21. | 12:14 |
| 14 | Q.  (BY MR. MECKLEY)  Exhibit 21 is an email from | 12:14 |
| 15 | you to Lindsay Chapman and Yabre Kompaore, Nikki Sommer, | 12:14 |
| 16 | and Lauren Wegman, January 6th, 2023.  The subject is | 12:14 |
| 17 | "FY22 PBP." | 12:14 |
| 18 | A.  Okay. | 12:14 |
| 19 | Q.  Who was Nikki Sommer? | 12:14 |
| 20 | A.  She's another one of the HR business partners. | 12:14 |
| 21 | Q.  For what group? | 12:14 |
| 22 | A.  I don't recall. | 12:14 |
| 23 | Q.  And is this an email that you sent to these | 12:15 |
| 24 | folks on January 6th? | 12:15 |
| 25 | A.  It appears to be. | 12:15 |

Page 162

| | | |
|---|---|---|
| 1 | all-hands meetings that you attended in 2022, did you | 12:19 |
| 2 | ever take any notes of those meetings, what was being | 12:19 |
| 3 | said? | 12:19 |
| 4 | A.  No. | 12:19 |
| 5 | Q.  Did you ever, you know, hold up your phone and | 12:19 |
| 6 | do your own recording of what was said during those | 12:19 |
| 7 | meetings where you were videoing the video? | 12:19 |
| 8 | A.  No, because if I needed to go back and | 12:19 |
| 9 | reference something, I could go back and watch the | 12:19 |
| 10 | replays.  There was no reason for me to do that. | 12:19 |
| 11 | Q.  Okay.  Great. | 12:19 |
| 12 | (Schobinger Exhibit 22 marked.) | 12:19 |
| 13 | THE REPORTER:  22. | 12:19 |
| 14 | Q.  (BY MR. MECKLEY)  All right.  So Exhibit 22 is | 12:19 |
| 15 | a series of emails between you and Lindsay Chapman that | 12:19 |
| 16 | start on February 13, 2023, and kind of continue through | 12:20 |
| 17 | February 23, 2023.  Subject is "PBP." | 12:20 |
| 18 | A.  Okay. | 12:20 |
| 19 | Q.  So are these emails you and Lindsay sent back | 12:20 |
| 20 | and forth to one another? | 12:20 |
| 21 | A.  They appear to be, yes. | 12:20 |
| 22 | Q.  All right.  So in the first one chronologically | 12:20 |
| 23 | on February 13 at 8:20, you wrote to her and said that | 12:20 |
| 24 | you were thinking of the best way to provide her with a | 12:20 |
| 25 | summary of how the PBP plan works and ending -- and | 12:20 |

Page 166

| | | |
|---|---|---|
| 1 | ended up leveraging the white paper that you started on | 12:20 |
| 2 | the FY22 PBP topic. | 12:20 |
| 3 | Do you see that? | 12:20 |
| 4 | A.  I do. | 12:20 |
| 5 | Q.  So you created a white paper on the performance | 12:20 |
| 6 | bonus? | 12:20 |
| 7 | A.  The white paper was just -- they didn't -- | 12:20 |
| 8 | Lindsay didn't understand how the bonus plan worked. | 12:20 |
| 9 | So there was a simple document that was | 12:20 |
| 10 | created to -- to -- it was sort of a primer to walk her | 12:21 |
| 11 | through like how -- how the funding works, what the | 12:21 |
| 12 | metrics are, and what the allocation process looks like. | 12:21 |
| 13 | Q.  So you -- I'm just asking:  You used the phrase | 12:21 |
| 14 | "white paper."  What do you mean by that?  What's | 12:21 |
| 15 | your -- | 12:21 |
| 16 | A.  It's just a document.  It's a Google document. | 12:21 |
| 17 | Q.  Well, is a white paper like a memo? | 12:21 |
| 18 | A.  No, it's a Google document. | 12:21 |
| 19 | Q.  So you have no understanding of what the phrase | 12:21 |
| 20 | "white paper" means in the context of business or | 12:21 |
| 21 | anything like that? | 12:21 |
| 22 | A.  I don't think I understand your question. | 12:21 |
| 23 | Q.  Right.  Well, you used the phrase "white | 12:21 |
| 24 | paper"; and I'm asking:  What does that mean? | 12:21 |
| 25 | A.  Correct.  And in this case all it simply means | 12:21 |

Page 167

1        A.   He was the -- over FP&A.                    12:23

2        Q.   Did he have some job title that you were aware    12:23

3   of?                                                   12:23

4        A.   I -- I think it was F -- no, VP of FP&A, I   12:23

5   think.                                                12:23

6        Q.   Okay.   All right.   So then the next sentence   12:23

7   that you wrote to Ms. Chapman on February 13, you say,   12:23

8   quote, "This is why I believe exercising discretion and   12:23

9   not paying a bonus would be prudent despite the safe   12:23

10  harbor nature of the plan.   The optics of paying are not   12:23

11  good," close quote.                                   12:23

12            Do you see that?                            12:23

13       A.   I do.                                       12:23

14       Q.   All right.   Was that a true statement when you   12:23

15  wrote it?                                             12:23

16       A.   No, that was my opinion.   I was asked for an   12:23

17  opinion and I gave an opinion but the -- my opinion is   12:23

18  not the one that matters.  I'm not the decision-maker.   12:23

19  That decision to pay it was already made.             12:23

20       Q.   So you were telling Ms. Chapman, in February of   12:23

21  2023, that your opinion was that discretion should be   12:24

22  exercised to not pay a bonus; is that correct?        12:24

23       A.   No -- partially correct.  I told her -- when we   12:24

24  had conversations, verbal conversations, we talked about   12:24

25  the -- how the plan was designed and that it had that,   12:24

                                            Page 169

1    So you got to put it all in context and together and        12:25

2    just -- you know, so you picked one document.               12:25

3             What you didn't pick is all the other             12:25

4    documents where we did have those conversations.           12:25

5        Q.   So is it your understanding that you provided     12:25

6    some written communication to Ms. Chapman either in an     12:25

7    email or a message or some other way where you expressed   12:26

8    your opinion is to actually pay employees bonuses?  Is     12:26

9    that your testimony?                                       12:26

10       A.   We had those -- we had verbal conversations.      12:26

11       Q.   Okay.  That's not my question.                    12:26

12            My question is:  Did you ever communicate         12:26

13   to Ms. Chapman in a written form, whether it be email,     12:26

14   Slack message, direct message, et cetera, that you         12:26

15   recommended employees should be paid a bonus?              12:26

16       A.   Not that I recall in a written format.            12:26

17       Q.   Okay.  But in the only written formats that we    12:26

18   have, you communicated to her your opinion that            12:26

19   discretion should be exercised and a bonus not be paid,    12:26

20   correct?                                                   12:26

21       A.   If you want to -- if you're referring to          12:26

22   this -- did I say that?  Yes, I did.                       12:26

23       Q.   Okay.  Can you tell me why it would be that you   12:26

24   would communicate to her in writing a recommendation not   12:26

25   to pay the bonus and, yet, verbally you would tell her:    12:27

                                                    Page 171

| | | |
|---|---|---|
| 1 | the bonus plan. | 12:29 |
| 2 | Q.  And at this point when you were telling | 12:29 |
| 3 | Ms. Chapman you thought discretion should be exercised | 12:29 |
| 4 | to not pay a bonus, what was your position again? | 12:29 |
| 5 | A.  I led the compensation team. | 12:30 |
| 6 | Q.  Okay.  So you were the head of compensation at | 12:30 |
| 7 | that point? | 12:30 |
| 8 | A.  Yeah, de facto.  It's not something that I | 12:30 |
| 9 | asked for.  It's something that was the result of a -- | 12:30 |
| 10 | cutting all -- eliminating all the jobs. | 12:30 |
| 11 | Q.  Okay.  So Ms. Chapman was asking for your | 12:30 |
| 12 | opinion as the head of compensation as to what should be | 12:30 |
| 13 | done with the bonus; and this is the recommendation you | 12:30 |
| 14 | gave her in writing, correct? | 12:30 |
| 15 | A.  No, I can't -- I wouldn't characterize it if | 12:30 |
| 16 | she was asking me that question as -- as -- in my role | 12:30 |
| 17 | capacity or if she was just asking that in general.  You | 12:30 |
| 18 | would have to ask her that. | 12:30 |
| 19 | Q.  But you didn't write "in my personal opinion | 12:30 |
| 20 | this is why" in this email, did you? | 12:30 |
| 21 | A.  Well, I didn't use the -- if you're saying like | 12:30 |
| 22 | the -- did I use the adjective "personal" to describe | 12:30 |
| 23 | this is my personal view, no, but I did say this is -- I | 12:30 |
| 24 | think I'm pretty emphatic there that this is what I | 12:31 |
| 25 | believe if you're asking me for a contrarian opinion. | 12:31 |

Page 174

| | | |
|---|---|---|
| 1 | Q.  Uh-huh.  Is there anything in writing where -- | 12:31 |
| 2 | that you recall Ms. Chapman said:  Please give me a | 12:31 |
| 3 | contrarian opinion, using that phrase? | 12:31 |
| 4 | A.  No, this is just conversations that we had. | 12:31 |
| 5 | Q.  So your testimony is that Ms. Chapman in a | 12:31 |
| 6 | verbal conversation said:  I want you to give me a | 12:31 |
| 7 | contrarian opinion? | 12:31 |
| 8 | A.  I don't know if she used those specific words, | 12:31 |
| 9 | but we spoke about the pros and cons of doing it either | 12:31 |
| 10 | way. | 12:31 |
| 11 | Q.  And you'll see in Exhibit 22 there's that link | 12:31 |
| 12 | there.  Do you see that? | 12:31 |
| 13 | A.  I do. | 12:31 |
| 14 | Q.  And that was the link to your white paper, | 12:31 |
| 15 | correct? | 12:31 |
| 16 | A.  I assume that it is, yes. | 12:31 |
| 17 | (Schobinger Exhibit 23 marked.) | 12:32 |
| 18 | THE REPORTER:  No. 23. | 12:32 |
| 19 | Q.  (BY MR. MECKLEY)  All right.  Mr. Schobinger, | 12:32 |
| 20 | Exhibit 23 is a multipage document, "Subject:  FY22 | 12:32 |
| 21 | PBP"; and it says the driver of this is Mark Schobinger. | 12:32 |
| 22 | A.  Okay. | 12:32 |
| 23 | Q.  Is this the white paper that you created | 12:32 |
| 24 | regarding the bonus that -- | 12:32 |
| 25 | A.  It is. | 12:32 |

Page 175

1      Q.  -- you've been referring to?                    12:32

2      A.  Yes.                                             12:32

3      Q.  Okay.  And this is a document that you shared    12:32

4   with Ms. Chapman and Lauren Wegman and Yabre Kompaore   12:32

5   and other folks; is that right?                         12:32

6      A.  Yes.                                             12:32

7      Q.  All right.  And it's true you never sent this    12:32

8   document to Elon Musk, correct?                         12:32

9      A.  No, not that I recall.                           12:32

10      Q.  My statement is true that you never sent this   12:32

11   to Elon Musk; is that correct?                         12:32

12      A.  To the best of my recollection, that's correct. 12:32

13      Q.  Okay.  And in the second full paragraph of this 12:33

14   document that you were creating to, you know, be a      12:33

15   primer and a narrative regarding the bonus plan, you    12:33

16   mentioned to folks that "in the event of unforeseen and 12:33

17   extraordinary circumstances, discretion can be exercised 12:33

18   to determine a PBP pool amount based on an alternative  12:33

19   formula and/or elect not to fund any PBP pool for the   12:33

20   plan year," correct?                                    12:33

21      A.  Yes.                                             12:33

22      Q.  And you got that language from the actual PBP    12:33

23   document, correct?                                      12:33

24      A.  Correct.                                         12:33

25      Q.  Now, take a look at Page 2 of your white paper.  12:33

Page 176

| | | |
|---|---|---|
| 1 | A.   (Witness complies.) | 12:33 |
| 2 | Q.   At the top you say "Issue"; and then you say, | 12:33 |
| 3 | quote, "There are two decisions to make concerning the | 12:33 |
| 4 | FY22 PBP." | 12:34 |
| 5 | The first, "Should the plan be funded?" | 12:34 |
| 6 | "No. 2, If funded, how should the PBP be | 12:34 |
| 7 | allocated to employees?" | 12:34 |
| 8 | So you were telling folks that these were | 12:34 |
| 9 | the two decisions to make, correct? | 12:34 |
| 10 | A.   This was a comprehensive document that was put | 12:34 |
| 11 | together to describe the process to go through. | 12:34 |
| 12 | So although, yes, it's saying choices, the | 12:34 |
| 13 | choice to fund had actually already been made. | 12:34 |
| 14 | Q.   And, again, you're saying the choice to fund | 12:34 |
| 15 | was January 5th, that one statement by Elon that if | 12:34 |
| 16 | someone's earned a bonus, it's okay to pay it; is that | 12:34 |
| 17 | right? | 12:34 |
| 18 | A.   No.   What I'm saying is -- you got to put it | 12:34 |
| 19 | all together.   If you go back to the consent that the | 12:34 |
| 20 | board approved and the email that Sean Edgett sent -- | 12:34 |
| 21 | Q.   Uh-huh. | 12:34 |
| 22 | A.   -- and then in concert with that, Elon's, to | 12:34 |
| 23 | me, acknowledgment that it was earned -- | 12:35 |
| 24 | Q.   Uh-huh. | 12:35 |
| 25 | A.   -- that's how you get to that decision that it | 12:35 |

Page 177

| | | |
|---|---|---|
| 1 | was made. | 12:35 |
| 2 | Q.  Oh. | 12:35 |
| 3 | A.  The only thing that was lacking was having a | 12:35 |
| 4 | concrete email that said:  Yes, I approve.  Go allocate | 12:35 |
| 5 | out the -- whatever the -- I don't know what the numbers | 12:35 |
| 6 | were -- the several millions of dollars on the PBP. | 12:35 |
| 7 | And that's what we kept pressing for. | 12:35 |
| 8 | Q.  So take a look at Page 1 of Exhibit 23 where it | 12:35 |
| 9 | says -- and this is directly from the plan -- | 12:35 |
| 10 | "Notwithstanding the foregoing, solely in the event of | 12:35 |
| 11 | unforeseen and extraordinary circumstances, discretion | 12:35 |
| 12 | can be exercised to determine the PBP pool amount based | 12:35 |
| 13 | on alternative formula and/or elect not to fund any PBP | 12:35 |
| 14 | pool for the plan year." | 12:35 |
| 15 | You see that, correct? | 12:35 |
| 16 | A.  Yes. | 12:35 |
| 17 | Q.  Right.  And there's not a specific timeline on | 12:35 |
| 18 | which that decision must be made, correct?  It could be | 12:35 |
| 19 | made at any point? | 12:35 |
| 20 | A.  I suppose, yes. | 12:35 |
| 21 | Q.  And it could be made before the end of the | 12:36 |
| 22 | fiscal year, correct? | 12:36 |
| 23 | A.  Yes. | 12:36 |
| 24 | Q.  It could be made after the end of the fiscal | 12:36 |
| 25 | year as well, right? | 12:36 |

Page 178

```
 1        A.   I suppose.                                    12:36
 2        Q.   At any point before March of the following year  12:36
 3   when bonuses get paid, this decision could be made to   12:36
 4   elect not to fund the plan, correct?                    12:36
 5        A.   Yes.                                           12:36
 6        Q.   So after October 27, 2022, when Mr. Musk       12:36
 7   acquires the company, he could still make this decision  12:36
 8   to not fund the plan, correct?                           12:36
 9        A.   He could have but that's not what was being    12:36
10   messaged and that's certainly what -- not what finance   12:36
11   was doing when they continue to accrue the bonus.        12:36
12        Q.   Not -- that wasn't my question.                12:36
13             My question was:  After he acquired the        12:36
14   company, he had the discretion under the plan to elect   12:36
15   not to fund it; is that correct?                         12:36
16        A.   Yes.                                           12:36
17        Q.   All right.  And, then, so after he acquires the  12:36
18   company, the only communication you ever had with him    12:37
19   was on January 5th where he said:  If people have earned  12:37
20   a bonus, he was okay with paying it; is that right?      12:37
21        A.   With him, correct, yes.                        12:37
22        Q.   And you never had a communication from him     12:37
23   saying:  I have elected to fund the PBP plan for the     12:37
24   year, correct?                                           12:37
25        A.   No, that's what we were -- that's what we kept  12:37
```

Page 179

| | | |
|---|---|---|
| 1 | pressing to get the authorization to pay it. | 12:37 |
| 2 | Q.  All right. | 12:37 |
| 3 | (Schobinger Exhibit 24 marked.) | 12:37 |
| 4 | THE WITNESS:  You okay? | 12:37 |
| 5 | THE REPORTER:  Yes.  No. 24. | 12:38 |
| 6 | Q.  (BY MR. MECKLEY)  All right.  So Exhibit 24 is | 12:38 |
| 7 | a series of messages between you and Lauren Wegman in | 12:38 |
| 8 | January [sic] 16 of 2023 and also someone named Kerrin | 12:38 |
| 9 | Puente. | 12:38 |
| 10 | A.  Okay. | 12:38 |
| 11 | Q.  Who was Kerrin Puente? | 12:38 |
| 12 | A.  I don't recall. | 12:38 |
| 13 | Q.  Okay.  So these were messages you had sent back | 12:38 |
| 14 | and forth with Ms. Wegman and Ms. Puente; is that right? | 12:38 |
| 15 | A.  Yes. | 12:38 |
| 16 | Q.  All right.  So your message in the middle of | 12:38 |
| 17 | this page, it looks like 11:23 a.m. on the 16th of | 12:38 |
| 18 | February. | 12:38 |
| 19 | You say, quote, "Hi Lauren.  I'm attempting | 12:38 |
| 20 | to prepare for an unknown decision regarding the FY22 | 12:38 |
| 21 | PBP.  As I shared, there has been no decision either way | 12:38 |
| 22 | on the disposition.  I do have a concern on our ability | 12:39 |
| 23 | to execute if the decision is we will fund and pay it | 12:39 |
| 24 | out because it will be a 100 percent manual effort." | 12:39 |
| 25 | Do you see that? | 12:39 |

Page 180

1      A.   I do.                                              12:39

2      Q.   All right.   Why were you telling Ms. Wegman      12:39

3   that there had been no decision either way on the          12:39

4   disposition of the bonus?                                  12:39

5      A.   What I was actually referring to was getting       12:39

6   the -- the final email approving the final step on the     12:39

7   allocation process and this entire exchange is:   And      12:39

8   once we get that, how do we -- how are we going to do       12:39

9   that?                                                      12:39

10            Because we -- at that point we no longer        12:39

11   had a team.   Ordinarily we would have done this through   12:39

12   a tool, but we didn't have the resources anymore to run    12:39

13   the tool.                                                  12:39

14            So it was a conversation to sort of figure      12:39

15   out:   What is that going to look like?                    12:39

16      Q.   All right.   In the next sentence, you say, I     12:40

17   "have a concern on our ability to execute if the           12:40

18   decision is we will fund."                                 12:40

19            Do you see that?                                12:40

20      A.   I do.                                             12:40

21      Q.   Okay.   So you were telling Ms. Wegman that it    12:40

22   was conditional unknown whether or not you will fund;      12:40

23   isn't that true?                                           12:40

24      A.   No.   I -- I wouldn't get hung up on the          12:40

25   funding.   This is -- this -- again, it was -- I may have  12:40

Page 181

| | | |
|---|---|---|
| 1 | kept using the word "funding" but that -- again, I feel | 12:40 |
| 2 | like that that decision was already made.  This was more | 12:40 |
| 3 | about allocation. | 12:40 |
| 4 | Q.  Uh-huh.  Well, why didn't you write Ms. Wegman | 12:40 |
| 5 | and just tell her about how -- what we need to do to | 12:40 |
| 6 | determine allocation because the decision to fund has | 12:40 |
| 7 | already been made? | 12:40 |
| 8 | A.  Because I -- the -- we need a formal approval | 12:40 |
| 9 | to actually go spend the millions of dollars.  You can't | 12:40 |
| 10 | just -- I can't -- I didn't have that authority to do | 12:40 |
| 11 | that.  So that's why I didn't write it in that way. | 12:40 |
| 12 | Q.  Uh-huh.  And why didn't you tell her:  I just | 12:41 |
| 13 | need the formal approval in writing because we've | 12:41 |
| 14 | already decided to fund?  I just need that in writing? | 12:41 |
| 15 | A.  I don't know why I didn't say it in that way. | 12:41 |
| 16 | Q.  There never was any written approval to fund | 12:41 |
| 17 | the performance bonus plan, correct? | 12:41 |
| 18 | A.  I -- well, I would say that there was in that | 12:41 |
| 19 | July-August time frame when the committee approved | 12:41 |
| 20 | funding at 50 percent. | 12:41 |
| 21 | What -- what we did not have was a final | 12:41 |
| 22 | approval that said:  Yes, now it's okay to release those | 12:41 |
| 23 | funds. | 12:41 |
| 24 | Q.  Well, let's characterize -- you had said in | 12:41 |
| 25 | multiple of these communications that Elon Musk was the | 12:41 |

Page 182

| | | |
|---|---|---|
| 1 | sole director and he had the exclusive authority to | 12:41 |
| 2 | decide whether to fund or not, correct? | 12:41 |
| 3 | A.  Okay. | 12:41 |
| 4 | Q.  Isn't that true? | 12:41 |
| 5 | A.  Yes. | 12:42 |
| 6 | Q.  And you never received any written approval | 12:42 |
| 7 | from Elon Musk to fund the bonus plan for '22, correct? | 12:42 |
| 8 | A.  Correct. | 12:42 |
| 9 | Q.  All right.  And at some point you learned that | 12:42 |
| 10 | the bonus plan would not be funded, correct? | 12:42 |
| 11 | A.  Yes. | 12:42 |
| 12 | Q.  And how did you learn that? | 12:42 |
| 13 | A.  I don't recall specifically. | 12:42 |
| 14 | Q.  And from whom did you learn that the bonus plan | 12:42 |
| 15 | would not be funded? | 12:42 |
| 16 | A.  I don't recall specifically.  It may have been | 12:42 |
| 17 | Lindsay but I don't -- I don't recall. | 12:42 |
| 18 | Q.  Are you able to sort of rough time estimate, | 12:42 |
| 19 | you know, when you learned that? | 12:42 |
| 20 | A.  Late March maybe. | 12:42 |
| 21 | Q.  Okay.  And was that something you learned in an | 12:42 |
| 22 | email or a phone conversation? | 12:42 |
| 23 | A.  I don't recall. | 12:42 |
| 24 | Q.  All right.  And what were you told around the | 12:42 |
| 25 | fact that the bonus plan would not be funded? | 12:43 |

Page 183

1      A.   I think I recall just being told that Elon          12:43

2  decided not to pay bonuses.                                  12:43

3      Q.   But you don't recall who told you that?             12:43

4      A.   No.                                                 12:43

5      Q.   And do you recall any other context around that     12:43

6  message that he had decided not to fund the plan?            12:43

7      A.   Not that I recall, no.                              12:43

8      Q.   All right.                                          12:43

9           (Schobinger Exhibit 25 marked.)                     12:43

10          THE REPORTER:  No. 25.                               12:43

11     Q.   (BY MR. MECKLEY)  All right.  So Exhibit 25 is       12:43

12 a series of direct messages between you and Stacey Conti     12:43

13 on March 23, 2023.                                           12:43

14     A.   Okay.                                               12:44

15     Q.   And these are messages you sent back and forth      12:44

16 with Ms. Conti, correct?                                     12:44

17     A.   It appears to be, yes.                              12:44

18     Q.   And what was Stacy Conti's position at this         12:44

19 time with the company?                                       12:44

20     A.   I -- I don't recall specific -- I know what her     12:44

21 role was prior to this but I -- I don't know                 12:44

22 specifically like -- I couldn't characterize her role       12:44

23 specifically at this point in time.                          12:44

24     Q.   What was your understanding of her prior role?      12:44

25     A.   She worked in corporate development.                12:44

                                              Page 184

1    Q.   Okay.   And what was your understanding of what    12:44

2    her role in corporate development was?    12:44

3    A.   She worked on acquisitions, among other things.    12:44

4    Q.   Okay.   Do you know whether she worked on the    12:44

5    acquisition of Twitter by Elon Musk?    12:44

6    A.   Yes.    12:45

7    Q.   Did you ever talk with her about that?    12:45

8    A.   Yes.    12:45

9    Q.   And what did you talk with her about on that    12:45

10   subject?    12:45

11   A.   She asked for various documents and    12:45

12   explanations of how plans work, things of that nature.    12:45

13   Q.   Okay.   All right.   So on the first page of    12:45

14   Exhibit 25 -- let me make sure it's the first page.    12:45

15   Sorry.   Yeah, it is on the first page.    12:45

16          So it looks like Ms. Conti wrote to you and    12:45

17   says, "Do we know the details of the BOD approved PBP    12:45

18   targets this year?   Lindsay and Jared want to add more    12:45

19   to the PBP announcement such as," and then she gives a    12:45

20   description.    12:45

21          Do you see that?    12:45

22   A.   I do.    12:45

23   Q.   And do you know whether there was an    12:46

24   announcement regarding the performance bonus to -- made    12:46

25   to employees?    12:46

Page 185

1     A.   Yeah, I'm reading through to make sure I      12:46
2  understand the context.                               12:46
3     Q.   Sure.   Take your time.                        12:46
4     A.   Okay.   Yeah, I think she's -- I think I       12:46
5  understand where this starts off where she's asking   12:46
6  about the FY22 bonus plan.                             12:46
7          So -- I'm sorry -- could you repeat your       12:46
8  question?                                              12:46
9     Q.   Sure.   She wrote to you:   "Lindsay and Jared  12:46
10 want to add more to the PBP announcement such as"; and 12:46
11 then there's this quoted language which includes       12:46
12 "Unfortunately the company only generated $X and,      12:46
13 therefore, the FY22 PBP will not be funded."           12:46
14         Do you see that?                               12:47
15    A.   I do.                                           12:47
16    Q.   All right.   So was there, to your knowledge, a 12:47
17 communication made that the PBP would not be funded?   12:47
18    A.   I -- I don't recall specifically, but I assume 12:47
19 that there would have been.                            12:47
20    Q.   You don't know either way; is that fair?       12:47
21    A.   Correct.                                        12:47
22    Q.   All right.   So if you could take a look at the 12:47
23 next page of your messages with Ms. Conti, specifically 12:47
24 the message you sent her 3:45 a.m., the one that begins 12:47
25 "Okay."                                                 12:47

Page 186

| | | |
|---|---|---|
| 1 | Was the sentence you wrote to her accurate? | 12:50 |
| 2 | Could you answer that question? | 12:50 |
| 3 | A.  Which sentence? | 12:50 |
| 4 | Q.  The one I quoted last, which says, "What most | 12:50 |
| 5 | employees gloss over and don't read is that the plan is | 12:50 |
| 6 | discretionary, meaning it can also pay more or nothing | 12:50 |
| 7 | at all." | 12:50 |
| 8 | Was that accurate? | 12:50 |
| 9 | A.  Yeah, that's a gen -- I was making a | 12:50 |
| 10 | generalization.  So, yes, that would be somewhat | 12:50 |
| 11 | accurate. | 12:50 |
| 12 | Q.  Okay.  And then later on in that paragraph you | 12:50 |
| 13 | say "it," which I assume is profitability, "was so far | 12:50 |
| 14 | under expectations on the low end that discretion (which | 12:50 |
| 15 | is permitted under the plan) was applied and the plan | 12:50 |
| 16 | was not funded." | 12:50 |
| 17 | Do you see that? | 12:50 |
| 18 | A.  No.  Can you -- | 12:50 |
| 19 | Q.  It's the last sentence in that message to | 12:50 |
| 20 | Ms. Conti. | 12:50 |
| 21 | A.  Oh, okay.  I'm there. | 12:50 |
| 22 | Q.  Yeah.  So was that accurate what you wrote to | 12:51 |
| 23 | her, that discretion, which is permitted under the plan, | 12:51 |
| 24 | was applied and the plan was not funded? | 12:51 |
| 25 | A.  That would be accurate. | 12:51 |

Page 189

```
 1    responsibilities over to me.                         15:29

 2              And one of the things that we reviewed was  15:29

 3    the -- the severance calculation.  And so I reviewed it  15:29

 4    at their request; and then in one of those daily standup  15:30

 5    calls, they asked if I reviewed it.                  15:30

 6              And I -- I said:  Yes, I did.  And the --   15:30

 7    the severance calculations that appeared in that     15:30

 8    document did not match the severance matrix that -- that  15:30

 9    we knew about.                                        15:30

10              And I had asked the team:  What is the      15:30

11    reason for the difference in it?                      15:30

12              And the explanation I was given was because  15:30

13    that's what Elon wanted to pay.                       15:30

14         Q.  And who said that?                           15:30

15         A.  My recollection is Candace made that comment in  15:30

16    the meeting.  I don't remember Candace's last name.   15:30

17         Q.  Okay.  Okay.  Did anyone else say anything   15:30

18    about that topic in that meeting?                     15:30

19         A.  No, I think it was just like the -- everyone  15:30

20    wanted to move on.                                    15:30

21         Q.  So other than Candace making that statement,  15:30

22    you don't recall anything else that was said?        15:30

23         A.  No.                                          15:30

24         Q.  All right.  You resigned your employment with  15:30

25    Twitter; is that correct?                             15:31
```

Page 258

| | | |
|---|---|---|
| 1 | A.  I did. | 15:31 |
| 2 | Q.  It was a voluntary quit of your job? | 15:31 |
| 3 | A.  Yes. | 15:31 |
| 4 | Q.  And based on your understanding of the | 15:31 |
| 5 | severance matrix that you were familiar with, you didn't | 15:31 |
| 6 | expect to receive any severance? | 15:31 |
| 7 | A.  I did not. | 15:31 |
| 8 | Q.  Okay.  And you're not bringing any claim for | 15:31 |
| 9 | severance; is that correct? | 15:31 |
| 10 | A.  Correct. | 15:31 |
| 11 | Q.  And that's -- your understanding under the, you | 15:31 |
| 12 | know, severance matrix, as you understood it, employees | 15:31 |
| 13 | who resigned weren't eligible for severance? | 15:31 |
| 14 | A.  That's correct. | 15:31 |
| 15 | Q.  Okay.  Let's take a quick break.  I think we're | 15:31 |
| 16 | getting closer to the end. | 15:31 |
| 17 | THE VIDEOGRAPHER:  Going off the record. | 15:31 |
| 18 | The time is 3:31. | 15:31 |
| 19 | (Recess from 3:31 p.m. to 3:44 p.m.) | 15:44 |
| 20 | THE VIDEOGRAPHER:  Back on the record. | 15:44 |
| 21 | This marks the beginning of media unit No. 6.  The time | 15:44 |
| 22 | is 3:44. | 15:44 |
| 23 | Q.  (BY MR. MECKLEY)  All right.  Mr. Schobinger, | 15:44 |
| 24 | in order for an employee to receive severance under the | 15:44 |
| 25 | matrix you created, an employee would have to sign a | 15:44 |

Page 259

| | | |
|---|---|---|
| 1 | A.  Yes. | 16:12 |
| 2 | Q.  Okay.  All right.  So in your lawsuit in | 16:12 |
| 3 | Federal Court, do you understand whether that is on | 16:12 |
| 4 | behalf of yourself or other people? | 16:12 |
| 5 | A.  On mine or the one on Monday that -- | 16:12 |
| 6 | Q.  Yeah, I'm not asking about the one on Monday. | 16:12 |
| 7 | A.  Okay. | 16:12 |
| 8 | Q.  I'm asking about -- you under -- well, you | 16:12 |
| 9 | understand you have a lawsuit that's filed with you as | 16:12 |
| 10 | the plaintiff that's pending in Federal Court in San | 16:12 |
| 11 | Francisco? | 16:12 |
| 12 | A.  Yes. | 16:12 |
| 13 | Q.  Do you understand that? | 16:12 |
| 14 | A.  Yes, I do. | 16:12 |
| 15 | Q.  All right.  Do you understand that that | 16:12 |
| 16 | lawsuit -- is it on behalf of yourself or on behalf of | 16:12 |
| 17 | other people? | 16:12 |
| 18 | A.  Both. | 16:12 |
| 19 | Q.  Okay.  And who are the other people that you | 16:12 |
| 20 | understand your lawsuit is on behalf of? | 16:12 |
| 21 | A.  Any employee similar -- similarly situated to | 16:12 |
| 22 | myself that was employed when the bonus should have paid | 16:12 |
| 23 | but did not pay. | 16:12 |
| 24 | Q.  So let me write that down.  The date the bonus | 16:13 |
| 25 | should have been paid, in your opinion -- but not -- was | 16:13 |

Page 282

1    March of 2023?                                          16:13

2        A.  Would have been by the end of March at the     16:13

3    absolute latest, correct.                               16:13

4        Q.  Okay.  So the end of March.                     16:13

5            So the people that you understand that          16:13

6    you're seeking to represent are people who were employed 16:13

7    with Twitter at the end of March of 2023 and had not    16:13

8    been paid a bonus?                                      16:13

9        A.  Correct.                                        16:13

10       Q.  Okay.  So that wouldn't include people who were 16:13

11   terminated or laid off before that date, correct?       16:13

12       A.  Correct.                                        16:13

13       Q.  All right.  Let's see.  Are you unable to come  16:13

14   to San Francisco?                                       16:13

15       A.  For?                                            16:13

16       Q.  Anything.  I mean, I know you weren't able to   16:13

17   come for your deposition.  So --                        16:13

18       A.  Yeah.                                           16:13

19       Q.  You weren't able to come to San Francisco for   16:13

20   your deposition, correct?                               16:14

21       A.  Correct.                                        16:14

22       Q.  Are you able to come to San Francisco to appear 16:14

23   in court?                                               16:14

24       A.  Yes.                                            16:14

25       Q.  Okay.  And can you explain like the distinction 16:14

                                                    Page 283

```
 1                REPORTER'S CERTIFICATION
 2
 3        I, SHARON ROSS, Certified Shorthand Reporter, do
     hereby certify:
 4
          That on Friday, August 2, 2024, at 9:17 a.m.,
 5   appeared before me MARK SCHOBINGER, the witness whose
     deposition is contained herein; that prior to being
 6   examined was by me duly sworn;
 7        That the deposition was taken down by me in machine
     shorthand and was thereafter reduced to typewriting;
 8   that the foregoing represents, to the best of my
     ability, a true and correct transcript of the
 9   proceedings had in the foregoing matter.
10        That a request for an opportunity to review and
     make changes to this transcript:
11
              Was made by the deponent or a party (and/or
12            their attorney) prior to the completion of
              the deposition.
13      X     Was not made by the deponent or a party
              (and/or their attorney) prior to the
14            completion of the deposition.
              Was waived.
15
16        I further certify that I am not an attorney for any
     of the parties hereto, nor in any way concerned with the
17   cause.
18        Dated August 5, 2024.
19
20
21            _____
              SHARON ROSS, HI CSR NO. 432,
22            TX CSR NO. 1961, CRR, RMR, CRC
              Realtime Systems Administrator
23
24
25
```

Page 294